**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

VANESSA WILSON,

Plaintiff,

v.

CITY OF AURORA,

Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, Vanessa Wilson, by and through her counsel, Paula Greisen and Scott Medlock of GREISEN MEDLOCK, LLC, submits her Complaint and Jury Demand against Defendant City of Aurora, as follows:

**INTRODUCTION**

1. Vanessa Wilson was a dedicated and successful employee of the City of Aurora for over twenty-five years, ultimately serving as the Chief of Police for the Aurora Police Department. On April 6, 2022, the City of Aurora, acting through the City Manager Jim Twombly ("CM Twombly"), terminated Chief Wilson's employment "without cause" because of her association with and advocacy on behalf of individuals of color, and in retaliation for, and in anticipation of, Chief Wilson engaging in protected activities.

2. Vanessa Wilson became interim Chief of Police in January 2020 after working at the Aurora Police Department (APD) for more than 20 years and appointed permanent Chief in August 2020. She was the first woman to lead the department as its Chief of Police.

3. Chief Wilson was appointed to the top leadership role of the APD at a time when the department was careening through a series of high-profile controversies under the former administration, many race-related, including the tragic murder of Elijah McClain at the hands of the Aurora police and fire departments. Chief Wilson, tasked with restoring community trust, began the process of reforming the department, including developing and implementing robust anti-bias policies and practices. She publicly committed to equitable policing, and held officers accountable when they violated the law, firing or demoting over two dozen "bad apple" police officers during her tenure.

4. Days after Chief Wilson's appointment, in August 2020, Colorado Attorney General Phil Weiser disclosed that his office had opened a civil rights "pattern and practices" investigation into the Department, with a particular focus on the Department's mistreatment of people of color. A little over a year later, in September 2021, after an extensive probe into the department's practices going back over five years, Attorney General Weiser issued a damning report, finding that APD officers had a long-standing pattern and practice of violating state and federal law through racially biased policing and the use of excessive force which disproportionately injured people of color. The City of Aurora subsequently entered into a five-year Consent Decree with the Office of the Attorney General which obligated the City to finally implement necessary reforms, many of which Chief Wilson had already begun.

5. However, on November 2, 2021, the composition of Aurora City Counsel changed and certain newly elected conservative Councilmembers, particularly Councilpersons Danielle Jurinsky, Steve Sundberg, and Dustin Zvonek, publicly and privately sought to halt or even reverse Chief Wilson's race reform efforts. Angered by her advocacy on behalf of people of color and commitment to eradicate racism in the police department, Jurinsky repeatedly publicly called Chief Wilson "trash" and falsely accused her reforms of making the City, its businesses, and its residents "unsafe." Repeatedly, Jurinsky, Sundberg, and Zvonek publicly demanded that CM Twombly fire Wilson.

6. On April 6, 2021, CM Twombly fired Chief Wilson, falsely claiming that a change in leadership was necessary to "provide the level of public safety that our community deserves." Twombly explicitly stated he was firing Chief Wilson "without cause," and that she was being terminated for "prioritize[ing] community involvement."

7. Upon information and belief, the above-named city councilpersons and police officers forced CM Twombly to fire Chief Wilson because of her association with and advocacy for people of color, her efforts to eradicate racism in the APD, and in retaliation for, and in anticipation of, Chief Wilson engaging in additional protected activities as she continued to implement the consent decree.

8. Accordingly, Respondent City of Aurora violated Chief Wilson's civil rights.

## PARTIES

9. Chief Wilson is a natural person, who has resided in Colorado at all relevant times.

10. Aurora is the third largest city in Colorado.

11. The City of Aurora is a home rule city and operates under a council/city manager form of government. The Aurora City Council is composed of a mayor and 10 council members, all of whom are elected. During the relevant time period, Aurora's Mayor was Mike Coffman, who was first elected in 2019.

12. Aurora's City Council appoints the City Manager. The City manager is the final policymaker over employment decisions, including the decision to fire the Chief of Police, in Aurora. The City Manager can be replaced at any time by a majority vote of City Council. During the relevant time period, Aurora's City Manager was Jim Twombly, who was hired in 2018.

13. Under the Aurora City Charter, the City Manager appoints the Chief of Police with the approval of a majority of the City Council. The Charter provides that only the City Manager can fire the police chief.

14. In conducting business and making decisions for the City, Aurora City Council must comply with Colorado's open meetings law, the Colorado Sunshine Act of 1972, C.R.S. § 24-6-101 *et seq*. The Colorado Sunshine Act requires any state or local governmental body to discuss public business or to take formal action in meetings that are open to the public. A meeting refers to any kind of gathering, convened to discuss public business, whether in person, by telephone, electronically, or by other means of communication. Thus, two or more members of the City Council cannot discuss public business outside of a formal council meeting.

15. As an employer, the City is bound by state and federal Equal Opportunity laws, including Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq*.).

## JURISDICTION AND VENUE

16. This action arises under the Constitution and laws of the United States.

17. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII"), and 42 U.S.C. § 1981.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because the violations alleged herein were committed within the jurisdictional boundaries of the United States District Court for the District of Colorado.

19. All conditions precedent to a private enforcement action under Title VII have been satisfied. Chief Wilson timely filed Charges of Discrimination alleging discrimination in violation of Title VII with the Equal Employment Opportunity Commission ("EEOC"). More than 180 days have elapsed since Chief Wilson's Charges of Discrimination were filed and she has requested a Right To Sue.

20. Likewise, Chief Wilson timely filed the required notice pursuant to the Colorado Governmental Immunity Act with the City of Aurora. *See* C.R.S. § 24-10-109.

## FACTUAL ALLEGATIONS

21. Chief Wilson was a highly regarded member of the APD for over 25 years.

22. She was initially hired by the Department as a patrol officer in 1996, and worked her way up from the lowest rung of the Department to "top cop."

23. Chief Wilson steadily rose through APD's ranks, receiving accolades and promotions at every position she held. She was promoted to sergeant in 2006 and to lieutenant in 2009. In 2012, she was appointed Executive Officer of the Major Investigations Bureau. She was

promoted to Captain in 2014 and started developing the Aurora Community Outreach Team. She was also instrumental in creating APD's Crisis Response Team (which addressed subjects in mental health crises) and worked on developing the department's first Domestic Violence Unit.

24. In late 2018, the APD became embroiled in several high-profile scandals, many race-related, resulting in sweeping public protests against the Department's police brutality and loud demands from the community for needed change.

25. In December 2018, Aurora police killed David Baker, a Black man, by restraining him face-down and sitting on him. Baker's family reported to the police that he was a Navy veteran suffering from PTSD and other mental health problems. When APD officers were called to Mr. Baker's apartment on a domestic violence call, three officers punched, wrestled and bit Mr. Baker, shocked him with TASERs over a dozen times, used dangerous chokeholds, then restrained him in a hobble position face-down and sat on him. The Arapahoe County Coroner determined Mr. Baker died of "restraint asphyxia," and ruled his death a homicide. None of the officers involved attempted to de-escalate the situation, and none were disciplined for their actions which caused Mr. Baker's death.

26. On August 24, 2019, three Aurora Police officers stopped, without legal justification, Elijah McClain – an unarmed, 23-year-old Black man – as he was walking home from a convenience store. The officers – all white men – wrestled the slim young man to the ground, placed him in a chokehold, kept him pinned down as he vomited, and then permitted two paramedics to inject him with the powerful sedative ketamine. The officers and firefighters' actions caused Elijah's death. The department staged a brief internal investigation that cleared the

officers, which Adams County District Attorney Dave Young then used to decline to file any charges. The officers and EMTs were not disciplined in any way.

27. Just three days later, on August 27, 2019, a white male Aurora Police Officer hobbled Shataeah Kelly, a Black woman, in his squad car with her hands and ankles behind her back (just as the white officers did to Mr. Baker, causing his death, a few months before). Ms. Kelly slipped off the seat into an inverted position and cried out for help as she too struggled to breathe. The officer admitted he heard her beg for help and scream in pain. The officer, however, ignored Ms. Kelly's cries of "I can't breathe" and "my neck is breaking," refusing to help her up for twenty minutes. Fortunately, Ms. Kelly survived (unlike Mr. Baker).

28. One month later, on September 27, 2019, Aurora Police Chief Nick Metz announced he would retire at the end of the year.

29. Prior to her formal appointment to interim Chief, Wilson publicly advocated for reform as an APD Division Chief, and publicly identified necessary reforms to eradicate the racism and culture of using excessive force infesting the Department. At a November 3, 2019 town hall about public safety, then-Division Chief Wilson acknowledged that, although Chief Metz had put into place several initiatives that increased transparency in the wake of officer-involved shootings and deaths, particularly of people of color, "we haven't done everything that we can do."

**Wilson Was Appointed Interim Chief to Reform the APD and Restore the Public's Trust.**

30. On January 1, 2020, Wilson took over as the interim Chief of Police. She was appointed by CM Twombly to help reform the APD and restore the public's trust in the department.

31. In a news release announcing Wilson's appointment, CM Twombly stated, "Chief Wilson is a dedicated and proven leader in the Aurora Police Department who excels at building

consensus and developing strong ties to the community." He further expressed, "We are confident that she is the right person to guide our team as interim chief and be a steady and respected figure both with our officers and our residents." Wilson, in turn, acknowledged community anger over the death of Elijah McClain and stated that she planned to implement a new body camera mounting system that will keep cameras from dislodging, and institute a review board examination of the officers involved.

32. Upon her selection as the new Chief, Wilson signed an employment contract with the City.

33. The Aurora City Council, as then constituted, applauded Wilson's appointment. At the press conference announcing the appointment, Councilwoman Alison Coombs stated: "I know that … [Chief] Wilson is well respected by community members and community leaders — particularly folks that have been involved in pursuing justice in the Elijah McClain case and broadly, for the police." Councilwoman Coombs continued, "So I think she's a very good pick, because the community knows that they can trust her."

**As Interim Chief, Wilson Advocates for Police Reform and Begins to Make Necessary Changes.**

34. As interim Chief, Wilson immediately began to investigate and discipline officers who broke the law, including by harassing, assaulting, and otherwise discriminating against people of color.

35. For example, on February 24, 2020, Chief Wilson fired the white officer who had used excessive force against Shataeah Kelly, overriding an advisory panel's recommendation that he only be suspended.[1]

36. In March 2020, a white APD officer pulled his gun on an Indian-American physician after the doctor honked his horn at the officer's police cruiser which was blocking the doctor's entrance to the parking lot of the refugee center the doctor owned and operated. The doctor told the media he believes he would have been treated even more harshly if he was Black. Chief Wilson suspended the officer for 40 hours without pay and required him to attend de-escalation training.

37. On May 25, 2020**,** George Floyd was murdered by police officers in Minneapolis. In the following days, as video of Floyd's murder went viral, and then protests in Minneapolis were crushed by brutal police force, more protests against excessive police force against the black and brown communities began to spring up across the country, including in Aurora.

38. Chief Wilson, to show her support for members of the minority communities, participated in "Black Lives Matter" protests in Aurora, marching arm in arm and kneeling in silence with protesters. Images of her were widely published in the local news.

[1] Later, in an October 6, 2021 hearing on the officer's appeal of his termination before the Civil Service Commission (which has final say over the hiring and firing of officers), Wilson again excoriated the officer's abuse: "We are not to treat people inhumanely like they don't matter. And he is lucky she [Shataeah Kelly] did not die in the backseat of that car. Because he would be – in my opinion – in an orange jumpsuit right now."




*Chief Wilson kneels with community members protesting racist police brutality.*

39. At an Aurora town hall meeting on June 23, 2020, where the four finalists for the permanent position of Chief of Police were taking questions from the community, Wilson publicly criticized racism within the APD and emphasized the need for implicit bias training.

40. On June 24, 2020, the State of Colorado opened an investigation into Elijah McClain's death.

41. Five days later, on June 29, 2020, photos taken in October 2019 were uncovered that showed three white APD officers smiling and mocking Elijah McClain's death, and gleefully "re-enacting" the carotid control hold used during the altercation that resulted in his death, taken

at the site he was detained. The officers then sent the photo to one of the officers who helped kill Elijah McClain. That officer responded "ha ha" after receiving the photo.

42. On July 3, 2020, Wilson fired two of the officers in the photo, and the officer who responded, "ha ha." The third officer in the photo resigned during the investigation. At a news conference, Chief Wilson accurately described the officers' conduct as "a crime against humanity and decency … beyond comprehension, and it is reprehensible."



*Aurora Police Officers "re-enacting" McClain's Death*

43. Meanwhile, protests about the death of Elijah McClain, calls for racial justice and in support of the Black Lives Matters movement continued across the country and in Aurora.

44. As protests continued, on July 3, 2020, protesters staged a sit-in at the Aurora police station, demanding that the Department fire the officers who killed Elijah McClain. Chief Wilson ordered officers not to disperse the crowd – but allow them their right to protest. Later, Councilperson Jurinsky would ludicrously claim that the officers inside the station were "kidnapped" by the protestors.

45. On August 2, 2020, five white Aurora police officers forced a Black woman, her daughter, younger sister and nieces, ages six to seventeen, to lay face down on a parking lot while

officers pointed guns at them and accused them of driving a stolen car. Though the stopped car had the same license plate number as a stolen vehicle, the stolen vehicle's license plate was from a different state and the stolen vehicle was actually a motorcycle, not a SUV akin to the vehicle driven by the family at issue. Chief Wilson immediately held a press conference and apologized to the family. She publicly excoriated the officers, saying "I am sick to my core that these children were traumatized the way they were." Chief Wilson then changed the policy that gave officers discretion in using this type of traffic stop. Chief Wilson also demoted the lead officer at the scene – who had shockingly been a "training" officer instructing the others that this was actually proper police procedure – and suspended him from duty for two weeks and removed his training duties. The City would later pay $1,900,000 to settle claims brought by the family.

46. On August 3, 2020, after serving as interim Chief for seven months, Wilson was appointed by CM Twombly and approved by the then-City Council to be the city's next Police Chief.

47. While announcing his decision to recommend Chief Wilson to the Council, CM Twombly said Chief Wilson had taken charge of the department by making "difficult personnel decisions" and had made changes to the department necessary to start rebuilding the public's trust. "I believe that she is the right choice to lead the Aurora Police Department."

48. While accepting her position, Chief Wilson made clear her intent to continue to advocate for the protection of people of color, police reform, and for diversity on the force:

> I am committed to leading the Aurora Police Department to be an active and engaged part of this community in building a collaborative and constructive path forward. We will be a transparent partner dedicated to making Aurora a safer city for all,

> with respect for our diversity, and embrace of unity, and continual conversation about how we can do better.

49. During an August 4, 2020, interview with talk radio KUNC, Chief Wilson was asked about the ongoing Black Lives Matter protests and marches commemorating the anniversary of Elijah McClain's murder. Stating that the relationship between the police department and the communities it serves was "broken," she reiterated the need for change at the APD and her goal to increase diversity at the APD and to implement implicit bias training.

50. On August 11, 2020, Chief Wilson and CM Twombly announced the hiring of 21CP Solutions, a group of experts focusing on the areas of civil rights and public safety,[2] to review the APD's policies, procedures, and operations. 21CP Solutions presented its report and recommendations to City Council on August 16, 2021.

51. 21CP Solutions concluded that officers used force disproportionately against Black men – though 29% of the people who officers used force on were Black men, only 9% of the City's population are Black men. Likewise, 21CP Solutions found that white men were subjected to force considerably *less* often than their share of the population.

52. In particular, among numerous other suggestions, 21CP Solutions made the following recommendations to the Department:

> a. Revise the written use of force policies to clarify that force should only be used "when necessary, proportional and objectively reasonable, to the nature of a subject's threat, and after de-escalation tactics and strategies have been attempted and failed, or are not feasible under the given circumstances";

---

[2] 21CP has been widely recognized for its expertise in policing. Federal judges have relied on 21CP to help monitor the implementation of federal consent decrees against multiple police departments, including in Baltimore and Cleveland.

b. Include a comprehensive statement and purpose expressly affirming the sanctity of human life in the use of force policy;

c. Refine and expand its treatment of de-escalation as an affirmative duty;

d. Authorize force only when it proportional to the nature of the threat;

e. Prohibit circumstances when force should be used (like against those engaging in First Amendment speech) and prohibiting specific techniques like chokeholds, use of force against people in handcuffs, and hobbling or hog-tying suspects;

f. Require a "duty to intervene" when officers see other officers violating the APD policy;

g. Revise policies and training related to "bias free policing"; and,

h. Improve community relationships and make efforts to diversify the police department and leadership.

53. Even before 21CP Solutions prepared its final report, Chief Wilson had already adopted many of its primary recommendations, in addition to other reforms she identified to prevent racist police brutality. To specifically address problems that contributed to the officers killing Elijah McClain, Chief Wilson implemented an "officer relief" policy that required officers to "tap out" when additional officers arrived on scene in order to deescalate conflicts, and a "suspicious person" directive to prevent officers from engaging with people who are not actively doing anything wrong (like Elijah McClain).

54. In April 2021, Chief Wilson required all APD officers to attend a training about the history of policing, led by Dr. Dwinita Mosby Tyler, of Denver's The Equity Project. The Equity Project provides diversity, equity, and inclusion training to a wide variety of organizations, and helps companies, municipalities, and businesses to be more inclusive. The Equity Project's other clients include (among many others) the Denver Zoo, the Denver Museum of Contemporary Art,

and the City of Breckenridge, Colorado. Dr. Mosby Tyler is the former Senior Vice President and Chief Inclusion Officer for the Children's Hospital of Colorado and was the former Executive Director for the Office of Human Resources for the City and County of Denver.

55. The Equity Project training focused on the history of policing, and problems police have historically had in the Black community, including touching on police forces' history as slave patrols in the South. A small number of officers were offended by the training, including the Aurora Police Association's president, Doug Wilkinson. Wilkinson provided the press with anonymous "survey" results he created, calling Dr. Mosby Tyler a "myopic bigot" "present[ing] training … in the guise of diversity and equity," and calling for Chief Wilson to be "removed from her position." The president of the APD's official bargaining unit, the Fraternal Order of Police, however, told the press he believed the training overall "had merit" and that most officers "have an open mind" and are "willing to accept training."

56. Likewise, Chief Wilson required officers applying for a promotion to read Dr. Brenda Allen's book *Difference Matters: Communicating Social Identity*, and take a test on its contents. Chief Wilson required potential supervisors to read the book in order to ensure supervisors understood how racism could infect organizations, and to protect both officers of color in the Department and the public.

57. In May 2021, Chief Wilson also informed CM Twombly that there was a substantial backlog in processing police reports that had existed before she became Chief. Although CM Twombly expressed his appreciation that she had informed him of the problem, the City refused her request for additional revenue and the necessary employees to cure the backlog.

58. In June 2021, a white male Aurora police sergeant screamed profanity at a terrified Black teenager accused of speeding, telling her: "You think I'm out here playing fucking games?" "You're out of your fucking mind!" "You better keep your fucking mouth shut!" and "I'll make your life a living fucking hell from this day forward … I don't give a shit how old you are. Let that sink in!" After an investigation, Chief Wilson demoted the sergeant after learning that he had similarly berated other Black residents with profanity on three other occasions.

59. In late July 2021, two white officers violently arrested and beat Kyle Vinson, an unarmed Black man. Mr. Vinson was resting on a lawn with two other men when the first officer approached and attempted to arrest him on an outstanding warrant. This officer then pistol-whipped Vinson then forced Mr. Vinson to lie on his stomach as the officer continued to beat Mr. Vinson's head with his pistol. The officer then held his gun at Mr. Vinson's head and strangled him for 39 seconds. The officer's partner watched and did nothing to stop the assault. At one point, Mr. Vinson cried out, "You're killing me."

60. In contrast to APD's previous practice of responding to abuse accusations with denials and delays, Chief Wilson quickly released the video clips of the officer assaulting Mr. Vinson. Chief Wilson apologized to the community, expressing her anger and disgust at the officers' conduct at a news conference on July 27, 2021. She said, "this is not police work…this is not the Aurora Police Department. This was criminal." Wilson began a criminal investigation into both officers and issued arrest warrants for both. The first officer resigned on July 29, 2021, and Chief Wilson fired his partner on August 12, 2021.

61. Throughout her tenure as Chief, Chief Wilson regularly met with groups representing people of color in Aurora, such as the local NAACP chapter. Chief Wilson

encouraged people of color to apply to serve on police oversight commissions, to ensure that minority communities were represented in these bodies and had input into police discipline matters.

62. Chief Wilson regularly appeared on local podcasts produced by members of the Black community, such as "Know Justice, Know Peace." As a token of their appreciation, and to help her learn more about their community, the podcast presented Chief Wilson with a copy of the book Black History 365.



*Chief Wilson accepts a Black history textbook from local community members*

63. Likewise, Chief Wilson required classes of new Department recruits to meet with members of Aurora's Black community, to hear about the community's experiences with the Department. The purpose of these meetings were to educate new officers about the racism the community felt from the Department and contribute to reforming the Department's racist practices.

**The Colorado Attorney General's Investigation finds Systemic Racism in the Aurora Police Department**

64. On September 15, 2021, the State of Colorado issued a report finding that the APD had consistently violated state and federal law through racially biased policing and excessive force. In its report entitled, "Investigation of the Aurora Police Department and Aurora Fire Rescue," the Colorado Office of the Attorney General chronicled an exhaustive investigation of over a million records over a five-year period, concluding that the APD had a pattern and practice of racially biased policing, using excessive force, and failing to record legally required information when interacting with the community.

65. Among other disturbing findings, the investigators found APD officers disproportionately interacted with and arrested minority community members. For instance, Aurora Police arrested people of color 1.3 times more than whites based on population percentage alone, and Black community members were arrested over 2 times more than white members. APD officers used force against people of color almost 2.5 times more than whites based on their relative percentage of the population.

66. The Office of the Attorney General found:

a. "Aurora Police's culture leads to frequent use of force, often in excess of what the law permits."

b. The APD had not meaningfully reviewed officer use of force incidents and instead had relied on practices that cleared officers of wrongdoing.

c. The City's Civil Service Commission "overturns discipline in high-profile cases in a way that undermines the Chief of Police's authority,

such that as a result, Aurora Police officers who violate law or policy often remain on the force."[3]

d. "Aurora Police officers do not reflect the diversity of the city."

67. The investigation Report recognized Chief Wilson's ongoing attempts to reform the APD. Specifically, the investigation commended Chief Wilson's efforts to improve diversity in the police force and training on diversity initiatives, as well adding diverse community members to the disciplinary review committee and changes to the use of force policy.

**Chief Wilson's Discipline of Bad Apple Officers Angers Certain Police Officers and City Council Candidates**

68. On September 24, 2021, Chief Wilson announced an internal affairs investigation into the use of force a white APD officer used on Preston Nunn, III, a Black man, during a traffic stop on May 15, 2021. The officer quickly escalated the encounter, drawing his gun on Mr. Nunn, while screaming contradictory instructions. When Mr. Nunn exited the car, officers quickly tackled him, and shocked him with their TASERs twice, after he was already down on the ground, and while two other officers restrained Mr. Nunn. Another officer is heard telling Mr. Nunn, "You about got shot." The department's Force Review Board examined the incident in June 2021 and recommended only additional training for the officer. When Chief Wilson reviewed the incident, she suspended the officer pending a full and proper investigation.

69. In response to Chief Wilson's investigation of this officer's conduct, on September 27, 2021, the Aurora Police Association – led by its president, Doug Wilkinson - launched a "no-

[3] Among many notable cases, in 2018 the CSC overturned former Chief Metz's decision to terminate a police lieutenant who called a group of Black residents "Alabama porch monkeys."

confidence" poll against Wilson. Wilkinson specifically stated the vote was initiated because Wilson had "restarted" the investigation of the officer who brutalized Mr. Nunn.

70. Immediately following the no-confidence vote, speaking for the City, Deputy City Manager Jason Batchelor stated the City supported Chief Wilson, stating "[Chief Wilson] accepted and embraced her role knowing significant challenges were ahead. She is responsible for making difficult and, at times, unpopular decisions to meet the needs of both employees and the community."

71. Around this same time, the police unions and certain officers including Wilkinson's Aurora Police Association) endorsed the conservative candidates in upcoming City Council elections, including Danielle Jurinsky, Steve Sundberg, and Dustin Zvonek, who were vocal opponents of reforming the APD.

72. Indeed, prior to his election, Sundberg, a white man, had filmed himself imitating Mexicans, Arab Muslims, South Asians, and members of other ethnic groups as online advertisements for a bar he owned. The videos showed Sundberg dressed in stereotypical garb, speaking in exaggerated and offensive accents and broken English, mocking Arab dietary practices, and making racist jokes about anatomical stereotypes regarding Black men. When local media belatedly reported on the videos, Aurora residents described Sundberg's videos as "disrespectful," "insulting," "horrible," and "racist."




*Councilperson Sundberg imitating a South Asian man.*

73. Likewise, during the campaign, Jurinsky regularly tweeted statements like "#AllLivesMatter," a slogan commonly associated with opposition to the Black Lives Matter movement, and a rejection of the idea that police must be reformed to protect Black lives.

74. In the November 2, 2021 election for Aurora City Council, Jurinsky, Sundberg, and Zvonek were elected. Almost immediately, Jurinsky started openly criticizing Chief Wilson.

**The City of Aurora Enters into A Consent Decree with the Colorado Attorney General in late 2021**.

75. On November 16, 2021, the City of Aurora agreed to enter into a court-monitored Consent Decree with the State of Colorado. The court order required the APD to correct policies and training to eradicate racism and reduce racial disparities in the use of force. It also required the APD to make changes to its recruitment, hiring, and disciplinary policies to hold officers accountable and increase diversity in the Department's ranks. The monitoring would last at least five years to ensure compliance.

76. Chief Wilson embraced the Consent Decree, pledging to make the required reforms and work to eradicate racism in the APD.

77. On November 16, 2021, the President of the Aurora Police Association, Doug Wilkinson, sent an email to 270 Aurora Police Association members mocking the Consent Decree and Chief Wilson's new diversity policies:

> The decree indicates that they want to replace as many of the department's white males as possible with as many women and minorities ... To match the 'diversity' of 'the community,' we could make sure to hire 10 percent illegal aliens, 50 percent weed smokers, 10 percent crackheads, and a few child molesters and murderers to round it out. You know, so we can make the department to look like the 'community.'

78. Wilkinson further called the consent decree "sexist and racist," because it "discriminated" against white men and stated that the APD would have to lower its hiring standards to promote women and people of color.

79. One day after Wilkinson sent the email, several Aurora officers complained to the City's human resources division about the racist and misogynist email, leading Chief Wilson to open an investigation and put Wilkinson on leave.

80. Jurinsky, on the other hand, quickly defended Wilkinson's email by saying it was sent from a private email account to members, not an official account, and should not be held against him.

81. In December 2021, Jurinsky warned Chief Wilson not to fire Wilkinson because of the email. Chief Wilson explained that the investigation was being conducted by the HR department, that several officers voiced objection to Wilkinson's statements, and that she was personally appalled by the racism displayed by the email. Chief Wilson told Jurinsky that she

would not back down from her efforts to eradicate racism in the police department and enforce the consent decree.

82. Jurinsky countered that she and the other new council members "did not believe" in the consent decree, did not believe that there was racism in the APD, and that she and the new council members would seek to reverse the decree.

83. Shortly thereafter, Councilperson Sundberg echoed the comments by Jurinsky in a meeting with Chief Wilson. He also made veiled references to Chief Wilson's membership in the LGBTQ+ community and told her he didn't want Aurora "turning into San Francisco." Chief Wilson again conveyed that she would not stop her efforts to enforce the consent decree and to eradicate racism in the APD.

84. During a January 27, 2022 interview on a conservative talk radio show, Jurinsky demanded that Chief Wilson and Deputy Chief Parker be fired.[4] She went on to falsely claim that Chief Wilson's policies were making Aurora unsafe. When she was asked how to make the

---

[4] Jurinsky's statements violated Section 3-10 of Article III of the city's charter that prohibits council members from meddling in the appointment of employees who fall under the authority of the city manager. "Neither the council nor any of its committees or members shall direct or request the appointment of any person to, or his removal from, employment by the city manager…neither the council nor any member thereof shall give orders to any employee of the city either publicly or privately." Councilmember Juan Marcano initiated official censure procedures regarding the charter violation. However, a majority of Aurora's City Council agreed in private in a closed session at the beginning of a March 14, 2021 meeting to dismiss the censure process pending against Jurinsky, in violation of the Colorado Sunshine Act.

situation better, Jurinsky stated "We remove the chief immediately, and with her take out the trash of the deputy chief of police, Darin Parker."[5]

85. Jurinsky went on to accuse Chief Wilson of mistreating officers and said, "She's trash. … If you want to quote something, 'Chief Vanessa Wilson is trash.'" Jurinsky further stated, "this is my hometown we're talking about. And those who threaten to do harm to Aurora, just know that I'm here." She repeated that "change is coming" and suggested firing Chief Wilson "is in the works."

86. That same day, on January 27, 2022, Jurinsky wrote in a tweet "#FireTheChief."

87. The next day, January 28, 2022, Jurinsky posted on Facebook a hashtag "fire the chief," while posting a tirade about Chief Wilson: "The Police Chief needs to leave Aurora immediately! I will be doing weekly interviews on multiple shows until the Chief is gone and our department is liberated. … 'You are not safe' and I will only get louder. #FireTheChief."

88. Likewise, Jurinsky began attending police briefings and making negative comments about Chief Wilson to officers, promising to remove her from office.

89. On February 3, 2022, Chief Wilson fired Wilkinson for the racist statements in his email to officers.

90. Upon information and belief, at that time Jurinsky, Sundberg, and Zvonek were having private discussions about strategies for getting rid of Chief Wilson and began pressuring CM Twombly to fire Chief Wilson – or else they would ensure that he was fired.

[5] Deputy Chief Parker was appointed by Chief Wilson to assist her in disciplining "bad apple" officers, and to implement her reforms and the Consent Decree. As such, Deputy Chief Parker was closely identified with Chief Wilson's reform efforts and drew the ire of certain police officers.

91. In late March 2022 and early April 2022, CM Twombly began to privately encourage Chief Wilson to resign. When she asked why she should leave, CM Twombly wouldn't give a direct answer, but just said words to the effect that he was "talking to people." When she refused, there were well-publicized efforts to get Chief Wilson to step down, such as falsely leaking to the media that her resignation was imminent.

92. On April 5, 2022, the City publicized an inflammatory report suggesting it had just "identified" a problem with backlogged police reports that was causing serious delays in violent crime investigations. The report opined that these problems could result in mass murders and school shootings, clearly implying that Chief Wilson was responsible for this backlog. In reality, Chief Wilson and others had brought this problem to CM Twombly's attention years prior – requesting that the City hire the staff needed to process these reports, which were largely not related to serious crime investigations.

93. The group that authored the report was run by an anti-police-reform, anti-Black Lives Matter activist who had publicly called advocates of police reform "morons" and "haters." This activist also accused universities of inciting "race and gender wars under the guise of diversity and inclusion," calling legislation requiring officers to activate body-worn cameras "total lunacy," and describing the 1619 Project[6] as "political indoctrination" and "nonsense."

---

[6] The 1619 Project is a Pulitzer-prize winning journalism initiative by the NEW YORK TIMES to commemorate the 400th anniversary of the arrival of slave ships in the American colonies. The Project "aims to reframe the country's history by placing the consequences of slavery and the contributions of Black Americans at the very center of our national narrative." It has become a frequent target of right-wing politicians and commentators who are opposed to an accurate accounting of American history.

94. The next day, CM Twombly fired Chief Wilson. In a press conference announcing her forced termination, CM Twombly stated that she was being terminated "without cause," making statements that there was poor officer morale at the APD and Chief Wilson was unable to lead the department. CM Twombly specifically stated that the inflammatory report was in no way related to her termination.

95. Twombly announced that Division Chief Chris Juul, a white male, would temporarily oversee operations at APD.

96. According to an April 7, 2022 news article by Police1 (an online destination for law enforcement agencies and police departments worldwide), the day after Chief Wilson's termination, Zvonek stated, "The city manager has been contemplating Wilson's future for several months."

97. Upon her termination, the City refused to allow Chief Wilson to keep her badges despite the APD routinely allowing officers to do so upon their departure. The City also refused to issue Chief Wilson a Law Enforcement Officer Safety Act card, which would have allowed her to carry a concealed weapon. Deputy City Manager Jason Batchelor told Chief Wilson that he had approved releasing the badges and LEOSA card, but he was overruled by "the powers that be."

98. On April 20, 2022, the City named Daniel Oates as the Department's acting chief while the City searched for a replacement. Oates had previously served as the Department's chief from 2005 to 2014.

99. On September 21, 2022, the City named two white men as finalists to permanently replace Chief Wilson. Both finalists later withdrew before accepting the position. Though one third

of the applicants for the chief position were women or people of color, only two candidates selected for semi-finalist interviews were from diverse backgrounds.

100. On December 5, 2022, the City hired former Miami, Florida police chief Art Acevedo, as interim Chief while the search for a permanent chief continued. Notably, Acevedo resigned this position after just thirteen months on the job.

101. Shortly after Chief Wilson's termination, many of her reforms to end racism in the Department were quickly undone, including many of the DEI trainings.

102. On information and belief, Chief Wilson was forced out of her employment because she did what the Consent Decree and the law required her to do – eradicate racism from the APD and implement and enforce the terms of the Consent Decree. The above-named City council persons and police officers made it their mission to force the termination of Chief Wilson because of her support of and implementation of the Consent Decree and her support of and efforts to eradicate racism from the APD. Accordingly, the City of Aurora violated Chief Wilson's civil rights and terminated her in violation of the public policy of the State of Colorado.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1981 ASSOCIATION DISCRIMINATION

103. Plaintiff incorporates by reference all allegations in every preceding and subsequent paragraph as if fully set forth herein.

104. At all relevant times, Chief Wilson was qualified for her position as Chief of Police of Aurora.

105. Section 1981 protects employees' rights to form contracts from discrimination when the employee acts to protect another person's contract-related right.

106. As Chief of Police, Chief Wilson was closely associated with people of color through her public support of the Consent Decree, taking steps to eradicate racism from the police department (including to promote diversity in the ranks), terminating officers when they engaged in racist behavior (both against fellow Department employees and the community), and advocating for the equal treatment of black and brown people in the City of Aurora.

107. CM Twombly, acting as the final policymaker for the City in employment matters, took adverse action against Chief Wilson by terminating her from being the Chief of Police because of her association with and advocacy for people of color in the City of Aurora, her association with employee of color through her work to improve diversity among the APD ranks, her firing of certain police officers that she believed in good-faith had displayed racist beliefs and behaviors, and her open support and enforcement of the Consent Decree which sought to eradicate racist policing.

108. As the final policy maker on all matters related to employment with the City, CM Twombly rubber-stamped, adopted, and ratified the discriminatory animus of the above-named city councilpersons and police officers in discriminating against Chief Wilson by terminating her employment contract in violation of the law. In so doing, CM Twombly engaged in conduct that amounted to the official policy of the City of Aurora.

109. The City's termination of Chief Wilson was caused by CM Twombly acting on the discriminatory animus of these city councilpersons and the police officers who opposed the consent decree, opposed Chief Wilson's support and enforcement of the consent Decree, and her

efforts to eradicate racism in the police department (both to protect the citizenry and employees of color in the Department).

110. The violation of Chief Wilson's right to make contracts under Section 1981 was caused by this discriminatory policy.

111. The reasons proffered for the termination of Chief Wilson were pretexts for discrimination and retaliation for Chief Wilson's exercise of her duty and the law, including her right to make and perform her employment contract.

112. The harm suffered by Chief Wilson as a result of her association with and advocacy for individuals of color and commitment to eradicating racism in the APD were directly caused by this discriminatory, retaliatory policy.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1981 – RETALIATION**

113. Plaintiff incorporates by reference all allegations in every preceding and subsequent paragraph as if fully set forth herein.

114. At all relevant times, Chief Wilson was qualified for her position as Chief of Police of Aurora.

115. Section 1981 protects employees' rights to form contracts from retaliation when the employee acts to protect another person's contract-related right.

116. Chief Wilson engaged in good-faith protected conduct when she acted to protect people of color who were employed by the Department by terminating officers who engaged in discrimination or who she believed created a hostile work environment for minority Department

employees, when she acted to diversify the Department's officer corps, and through her efforts to prevent officers from discriminating against people of color living in Aurora.

117. The City, acting through CM Twombly as the final policymaker for employment matters, took adverse action against Chief Wilson by terminating her employment contract. CM Twombly acted as the rubber stamp for the councilpersons and police officers who desired to retaliate against Chief Wilson for her protected conduct.

118. The City's termination of Chief Wilson was caused by CM Twombly acting as the rubber stamp of these city councilpersons and the police officers who desired to retaliate against Chief Wilson due to her good-faith efforts to eradicate racism in the police department (both to protect the citizenry and employees of color in the Department).

119. Any other reasons cited by the City for terminating Chief Wilson's employment were pretexts for this retaliation.

120. Chief Wilson engaged in all her protected activity in a good faith attempt to end the racism in the Department, and to repair the Department's broken relationship with communities of color in Aurora.

121. Chief Wilson suffered significant harms, including economic and emotional distress, in addition to other compensatory damages, as a direct result of the retaliation against her in violation of Section 1981.

**THIRD CLAIM FOR RELIEF**
**TITLE VII – ASSOCIATION DISCRIMINATION**

122. Plaintiff incorporates by reference all allegations in every preceding and subsequent paragraph as if fully set forth herein.

123. At all relevant times, Defendant was an "employer" within the meaning of Title VII and Chief Wilson was an "employee" within the meaning of the statute.

124. At all relevant times, Chief Wilson was qualified for her position as Chief of Police.

125. The City of Aurora, through CM Twombly, terminated Chief Wilson's as a result of the pressure exerted by the above-named city councilpersons and police officers who opposed her association with the Black Lives Matter movement and opposed her support and actions to eradicate racism from the APD (including her efforts to diversify the Department, and to eliminate racist officers from the ranks). Chief Wilson became associated with people of color specifically through her opposition to unlawful employment practices, such as Wilkinson's racist email, and the racist behavior displayed by other APD officers. These actions of Chief Wilson, among others, were protected activity under Title VII.

126. CM Twombly acted as a rubber stamp for the council and certain police officers, and adopted and ratified their discriminatory animus to terminate Chief Wilson. CM Twombly relied on the biased councilmembers' and certain police officers' reports and recommendations in deciding to terminate Chief Wilson.

127. Chief Wilson was terminated in violation of Title VII for her association with and advocacy on behalf of people of color in Aurora, and support and enforcement of the Consent Decree. The reasons provided by Defendant for her termination were a pretext for this discrimination. A reasonable employee would find termination to be a materially adverse consequence of Chief Wilson's protected activity.

128. Chief Wilson suffered significant harms, including economic and emotional distress, in addition to other compensatory damages, as a direct result of the illegal discrimination against her in violation of Title VII.

**FOURTH CLAIM FOR RELIEF**
**TITLE VII – RETALIATION**

129. Plaintiff incorporates by reference all allegations in every preceding and subsequent paragraph as if fully set forth herein.

130. Title VII prohibits employers from retaliating against employees who oppose discriminatory employment practices.

131. At all relevant times, Defendant was an "employer" within the meaning of Title VII and Chief Wilson was an "employee" within the meaning of the statute.

132. At all relevant times, Chief Wilson was qualified for her position as Chief of Police.

133. Chief Wilson, acting in good faith, engaged in protected opposition to discrimination outside of her ordinary job responsibilities by disciplining officers who engaged in discriminatory actions and employment practices (including by overruling recommendations of no discipline), opposing the continued employment of employees who engaged in racist practices on behalf of employees subjected to the discrimination, formulating new training and job requirements for supervisors to prevent discrimination inside the Department, and repeated efforts to appropriately address discrimination in the police department. Chief Wilson regularly conveyed to the City her concerns that the Department's officers were engaging in unlawful practices prohibited by discrimination law.

134. The City, acting through its final policymaker in employment matters, CM Twombly, took action against Chief Wilson that a reasonable employee would find to be materially adverse by terminating her employment.

135. In violation of Title VII, Chief Wilson was terminated in retaliation for her good-faith advocacy on behalf of employees of color in the APD and people of color in Aurora, and for her support and enforcement of the Consent Decree (including her actions to terminate racist police officers). The reasons provided by Defendant for her termination were a pretext for this discrimination. A reasonable employee would find termination to be a materially adverse consequence of Chief Wilson's protected activity.

136. CM Twombly acted as a rubber stamp for the biased councilpersons and certain police officers' desires to retaliate against her when he terminated Chief Wilson.

137. Any other reasons cited by the City for terminating Chief Wilson's employment were pretexts for this retaliation.

138. The termination of Chief Wilson caused her harm and damages, including economic and compensatory damages.

**FIFTH CLAIM FOR RELIEF**
**WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**

139. Plaintiff incorporates by reference all allegations in every preceding and subsequent paragraph as if fully set forth herein.

140. Chief Wilson was discharged because she engaged in conduct that is protected and encouraged as a matter of public policy. Specifically, Chief Wilson engaged in protected conduct

by supporting and enforcing the Consent Decree entered by the State of Colorado against the City of Aurora, and because of her support and efforts to eradicate racism in the APD.

141. As a result of her conduct, she was terminated from her employment by the City of Aurora that expressly adopted and ratified the conduct of the councilpersons and police officers who opposed Chief Wilson's reform efforts.

142. The City of Aurora terminated Chief Wilson in retaliation for exercising her job-related right to enforce the consent decree and eradicate racism in the APD and performing her duties as required by law. The termination of Chief Wilson undermines a clearly expressed and important public policy as expressed in the Consent Decree and the anti-discrimination laws of our State.

143. The termination of Chief Wilson caused her harm and damages, including economic and compensatory damages.

## PRAYER FOR RELIEF

144. Wherefore, Chief Wilson requests that the Court enter judgment in her favor and against Defendant, in amounts to be proven at trial, including but not limited to:

a. Economic losses, including but not limited to back pay, in amounts to be determined at trial;

b. Equitable relief, including but not limited to front pay (in lieu of reinstatement), in amounts to be determined at trial;

c. Compensatory damages (including but not limited to travel and moving expenses and other consequential damages) in amounts to be determined at trial;

d. Non-economic losses, including but not limited to emotional distress, pain and suffering, humiliation, inconvenience, and loss of enjoyment of life, and/or impairment of the quality of life in amounts to be determined at trial;

e. Gross-up for taxation as a result of the relief granted;

f. Attorneys' fees and costs on all claims allowed by law;

g. Pre- and post-judgment interest at the highest lawful rates; and

h. Such further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE.**

DATED this 15th day of March 2024.

Respectfully submitted,

GREISEN MEDLOCK, LLC

*s/ Paula Greisen*
Paula Greisen
Scott Medlock
6110 E. Colfax Avenue, Suite 4-216
Denver, CO 80220
(303) 876-7663
pg@greisenmedlock.com
sm@greisenmedlock.com

*Attorneys for Plaintiff*

Address of Plaintiff:

Vanessa Wilson
118 S. Logan Street
Denver, CO 80209