**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 24-cv-00731-SKC-TPO**

VANESSA WILSON,

Plaintiff,

v.

CITY OF AURORA,

Defendant.

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff, by and through her undersigned counsel, hereby submits her Response in Opposition to Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, as follows:

**<u>LIST OF EXHIBITS</u>**

A complete list of exhibits referenced within this response is attached as *Exhibit 39 Response to MSJ Exhibits.*

**<u>STATEMENT OF UNDISPUTED FACTS AND SUPPORTING EVIDENCE</u>**

| Moving Party's Undisputed Material Facts and Supporting Evidence (Defendants Undisputed Material | Opposing Party's Response/Additional Facts and Supporting Evidence (Plaintiff | Moving Party's Reply and Supporting Evidence |
|---|---|---|

| **Facts hereafter "DUMF")** | **Additional Facts hereafter "PAF")** | |
|---|---|---|
| 1. Aurora is a home rule city and operates pursuant to its Charter. Ex. E, Batchelor Depo., p. 106:8-10. | Undisputed. | |
| 2. The Aurora City Council (the "Council") is composed of 10 elected members and the elected Mayor. Ex. B, Charter, Art. 3-1. | Undisputed. | |
| 3. Pursuant to the Charter, the Council has sole authority to appoint or terminate a City Manager. *Id*. at Art. 7-1. | Undisputed. | |
| 4. Jim Twombly was the Council-appointed City Manager from 2018 until his retirement in April 2023. Ex. C, Twombly Depo., p. 20:2-4. | Undisputed. | |
| 5. The Aurora Police Department (the "APD") is run by a Police Chief and employs approximately 700 sworn officers. Ex. D, Wilson Depo., p. 113:4-6. | Undisputed. | |
| 6. Pursuant to the Charter, the City Manager appoints the Police Chief with approval by the City Council and has sole authority to terminate the Police Chief. Ex. B, Art. 3-10 and 3-14(1); Ex. D, p. 129:1-7. | Undisputed. | |
| 7. On August 24, 2019, Elijah McClain, a young Black man, died in | Undisputed that Elijah McClain, a 23-year-old young man, was walking | |

| | | |
|---|---|---|
| custody following his arrest by three APD officers. Ex. E, p. 14:13-15. | home when he was forcibly and illegally detained by white APD officers because he allegedly looked "sketchy," injected with a high dose of ketamine by white Aurora paramedics, and died six days later.<br><br>*Ex. 2 Deposition of Jason Batchelor 14:9-16:12*; *Ex. 3 Photograph of Elijah McClain* | |
| 8. A few days later, an APD officer arrested and inappropriately secured a Black woman, Shataeah Kelly, who fell off the seat of the patrol car and repeatedly asked for help from the officer driving the car; the officer did not help her. Ex. E, pp. 33:15-25, 34: 1-25, 35:1-7. | Disputed that the restraint used on Ms. Kelly was merely "inappropriate." Undisputed that Ms. Kelly was arrested by a white APD officer, hog tied with her hands and feet behind her back and then tied together, lying face down in the patrol car, crying that she couldn't breathe, and refused any assistance even saying to the white officer "Master, I'll be good " while begging for help. *Ex. 4 Video of Shataeah Kelly arrest by Officer Levi Huffine on August 27, 2019; Ex. 2, p. 33:18-35:4* | |
| 9. In December 2019, then-APD Chief of Police Nick Metz retired. Ex. D, p. 38:7-14. | Undisputed. | |
| 10. Twombly began the process for selecting an Interim Police Chief in December 2019; four | Undisputed. | |

| | | |
|---|---|---|
| internal candidates applied for the position: Vanessa Wilson, Ernie Ortiz, Harry Goodman and Terry Brown. *Id.* at p. 62:5-8. | | |
| 11. Twombly and then-Deputy City Manager Batchelor interviewed each of the candidates. *Id.* at p. 62:11-13. | Undisputed. | |
| 12. Twombly selected Wilson, who had worked in the APD in various capacities as a sworn officer since 1996, to serve as Interim Chief. *Id.* at p. 63:23-25, 64:1-2; Ex. C, p. 35:9-11. | Undisputed. | |
| 13. In late December 2019, Wilson spoke at a Town Hall meeting, where she was very vocal about her belief that the APD need to address racial bias in police practices. Ex. A, Batchelor Decl., p. 2, ¶10; Ex. A-1, Denver 7 News Article. | Undisputed. | |
| 14. When Twombly talked to Wilson about her selection as Interim Chief, Wilson specifically told him that she was not going to be a "lame duck interim" and that she was going to make reforms. Ex. D, p. 99:20-23. | Undisputed. | |
| 15. Twombly was very supportive of Wilson, agreeing with her 100 percent on the subject. *Id.* | Undisputed.<br><br>PAF 1: Aurora City management understood that implementing the | |

| | | |
|---|---|---|
| | reforms mandated by the consent decree would not be a popularity contest and that some officers were going to get upset by the changes. *Ex 2, p. 143:1-11. Ex. 5, Expert Report of Michael S. Harrison, p. 20.* (It would violate generally acceptable standards of care and criminal office management to allow the Chief of Police position to be determined by a popularity contest among officers or political winds seeking to curry the favor of those officers.) | |
| 16. After her appointment as Interim Chief, Council Members Alison Coombs and Juan Marcano met with Wilson to discuss concerns they had regarding the tactics the APD used when it assisted Denver Police with protests over the death of George Floyd. Ex. D, pp. 67:3-25, 68:1-6. | Undisputed. | |
| 17. Coombs believed that people had the right to protest and did not like the optics of Aurora's militaristic response or the use of the "BEAR," Aurora's ballistic vehicle to quell unlawful protests. *Id*. at p. 69:14-19. | Undisputed. | |
| 18. In February 2020, Wilson overruled a recommendation from the Chief's Review Board | Undisputed. (In reference to DUMF 8) | |

| | | |
|---|---|---|
| recommending that the officer involved in the arrest of S. Kelly, a Black woman, be suspended; she recommended that he be terminated instead. Ex. A, p. 2, ¶¶12-14. | | |
| 19. Pursuant to the Charter, Wilson could not unilaterally terminate APD officers as a disciplinary measure; any disciplinary action that that impacted an officer's pay by more than one third of his/her monthly salary had to be submitted to the City Manager or Deputy City Manager for approval or denial. Ex. D, pp. 20:20-25, 21:1. | Undisputed. | |
| 20. Bachelor, with support of Twombly, approved every single termination recommendation that Wilson made during her tenure as Interim Chief and Chief. *Id.* at p. 21:1-5. | Undisputed. | |
| 21. In March 2020, Wilson recommended that another officer be terminated for inappropriately handling a conflict with an Indian citizen, P.J. Parmar. Ex. A, p. 2, ¶16 | Disputed to the extent that the incident involved an officer's merely "inappropriately" conduct. The Indian-born citizen involved, Dr. P.J. Parmar, was in his car pulling into the refugee center he operated when he honked at a patrol car and in response, the white APD officer got out of his car and pointed a gun at Dr. Parmar and | |

| | | |
|---|---|---|
| | said "let me see your fucking hands." *Ex. 6, Photograph of Dr. PJ Parmer; Ex. 2, p. 36:16-37:12.* | |
| 22. In May 2020, Wilson participated in a community protest regarding the death of George Floyd, a Black man who was killed by a police officer in Minneapolis. Ex. D, p. 88:7-25. | Undisputed. | |
| 23. The protest was well-publicized and numerous pictures of Wilson in her APD uniform marching and kneeling with the protesters were publicly circulated. *Id.* | Undisputed. *Ex. 7 Photograph of Chief Vanessa Wilson kneeling with protestors.* | |
| 24. Other uniformed officers were pictured participating in the protests with Wilson, Chris Amsler and Matt Longshore, both of whom still work for the APD. *Id.* at pp. 89:1-11; 90:2-10. | Disputed only to the extent that there were also about 40 other APD police officers at the George Floyd protest who chose not to kneel and stood away from Chief Wilson when she took a knee with the protestors. *Ex. 8, Deposition of Vanessa Wilson 90:13-17* | |
| 25. Neither Wilson nor any other officer was disciplined for participating in the protests. *Id.* at pp. 90:18-25, 91:1. | Undisputed. | |
| 26. Wilson participated in other public protests during her time as Interim Chief. *Id.* at pp. 91:19-25, 92:10-22. | Undisputed that Chief Wilson participated in other "public protests" concerning the death of Elijah McClain. At one | |

| | | |
|---|---|---|
| | such protest, Elijah McClain's mother hugged Chief Wilson and said she knew that Chief Wilson was trying to do the right thing. *Ex. 8, p.* 91:19-92:1, 93:5-17 | |
| 27. Wilson was never directed by any City Council member, Twombly or Bachelor to cease participating in any protests. *Id.* at pp. 93:22-25, 94:1-5. | Undisputed. | |
| 28. In the spring of 2020, the City conducted a national search for a permanent Police Chief; Wilson was one of several applicants for the position. Ex. D, pp. 95:23-25, 96:7-16. | Undisputed. | |
| 29. Wilson was named as one of four finalists for the position. *Id.* | Undisputed. | |
| 30. On June 23, 2020, the City held a Town Hall meeting where the community could ask the four finalists, including Wilson, questions. *Id.* at p. 97:21-25. | Undisputed. | |
| 31. Throughout the application and interview process, Wilson was very vocal about her intentions to reform the APD. *Id.* at p. 98:14-23. | Undisputed. | |
| 32. In June 2020, the Attorney General's office commenced an investigation into the APD and the Aurora Fire Department related to the | Disputed. The referenced investigation was into the pattern and practice of racially biased policing at APD, not the McClain death, and that the | |

| | | |
|---|---|---|
| death of Elijah McClain. Ex. A, p. 3,¶18; Ex. A-2, Investigation Report | Investigation Report found that APD had engaged in a pattern and practice of racially biased policing, that APD disproportionality used excessive force against the Black community, and listed immediate steps that need to be taken to remedy the racially biased policing practices. *Ex. 9, Investigation of the Aurora Police Department and Aurora Fire Rescue dated September 15, 2021 (CO AG's Office)* at pp. 1, 57-66 at ¶7.6, 85 at ¶8.4.5 and 87-88 at ¶ 8.5. | |
| 33. On June 29, 2020, APD discovered photographs of three APD officers mocking the death of Elijah McClain and a message from a fourth officer who commented "haha" on the photographs. Ex. A, p. 3, ¶19. | Undisputed. *Ex. 10, Photograph of three officer's "reenacting" McClain chokehold.* | |
| 34. On July 3, 2020, after one of the officers resigned, Wilson recommended that the other three officers be terminated. *Id*. at p. 3, ¶20. | Undisputed. | |
| 35. Twombly and Bachelor approved the termination recommendations. Ex. D, p. 21:1-5. | Undisputed. | |
| 36. In June 2020, community members held | Undisputed. | |

| | | |
|---|---|---|
| a violin vigil outside of APD Headquarters to honor Elijah McClain. Ex. D, p. 13:8-10 and 22-24. | | |
| 37. When a few of the attendees knocked down a fence, officers in full riot gear moved to disperse the crowd, using pepper spray on the crowd. *Id.* at pp. 13:16-25, 14:1-12; 16:3-9. | Undisputed. | |
| 38. Several City Council members, who attended the vigil with the community members, were upset by APD's response. *Id.* at p. 16:13-25. | Undisputed. | |
| 39. At no point during Wilson's time as Interim Chief did any City Council member, Twombly or Bachelor direct Wilson not to participate in any protest; to the contrary, they made it clear that they did not want her to take action to prevent any protests. *Id.* at pp. 71:11-16, 72:1-15. | Undisputed. | |
| 40. In early August 2020, Twombly informed Wilson that he had selected her for the Police Chief position; the City Council approved Twombly's selection. Ex. D, p. 99:1-5, 100:9-20. | Undisputed with the clarification that it was the *pre-December* 2022 City Council members who approved Chief Wilson's hiring.<br><br>PAF 2: In August 2020, white APD officers stopped a vehicle on suspicion of being stolen and forced, at gunpoint, a | |

| | | |
|---|---|---|
| | black family, the Gilliam family including four children, to lie face down on a hot asphalt parking lot, with the children crying and screaming out "no" and "mommy" as their mother was taken away in handcuffs; the car was not the stolen vehicle in question. *Ex.11, Video of traffic stop of Gillam family by Officer Darian Dasko on August 2, 2020; Ex. 2, p. 38:13-44:25.*<br><br>PAF 3: Chief Wilson held a meeting with the Black Ministerial Alliance and agreed that police officers would not have treated the family in this manner if the family had been white instead of African-American, and this sentiment angered the union leadership. *Ex. 8, p. 73:7-24.* | |
| 41. Wilson negotiated a contract (the "Contract") for the Police Chief position. *Id.* at p. 70:9-14. | Undisputed.<br><br>PAF 4: During her time at the APD, Chief Wilson was aware of other incidents of racism by APD officers, including an officer mocking a black suspect by making monkey noises and then later said to a black man "listen boy, you are not even good enough to shine my boots" and another officer said | |

| | | |
|---|---|---|
| | publicly that he hoped a building burned down with all the black people, using the "N" word in reference to the black community members. *Ex 8, 120:4-122:5.*<br><br>PAF 5: During her tenure, Chief Wilson was known by City Management to have established relationships with and be a vocal supporter of the minority community, including relationships with the NAACP and the Interfaith Alliance. *Ex. 2, p. 94:7-25. S*he promised the black community that she would provide more transparency about officer conduct, *Ex. 2, p. 264:23-265:10*, but the police union was sending the message that Chief Wilson didn't "have their backs" and did not like the fact that she took a knee with protestors regarding the murder of George Floyd. *Ex. 7, Photograph of Chief Vanessa Wilson kneeling with protestors*; *Ex. 2, p.* 96:3-24, 269:5-9. | |
| 42. In August 2020, 21CP Solutions, a global firm of national experts in the areas of civil rights and public safety that Twombly hired to review APD policies, issued a | Disputed only to the extent that the report, issued in August 2021, merely recommended "several changes" when it resulted in a 160-page report that recommended | |

| | | |
|---|---|---|
| report suggesting several changes. Ex. G, Amsler Depo., p. 39:2-8; Ex. A, p. 3, ¶21; A-3, 21CP Report. | that APD implement policies and practices to reduce racially biased policing and provide racial diversity training. *Ex. 12, 21CP Solutions Report at 59-62.* | |
| 43. In the spring of 2021, Wilson required all APD officers to attend training conducted by a group called the Equity Project; some officers were offended by the training. Ex. D, p. 109:1-14. | Undisputed with the clarification that this was the racial "implicit bias" training Chief Wilson implemented that was criticized by officers in a publicized survey as "wokeness," "liberal propaganda," and "soft peddling of critical race theory." *Ex.13, Deposition of James Amsler 43:13-46:3* | |
| 44. There were two police unions that represented officers in the APD: the Aurora Police Association (the "APA") and the Fraternal Order of Police (the "FOP"). Ex. D, p. 74:1-8 | Undisputed. | |
| 45. In May 2021, a year and a half after Wilson took command of the APD, an APD officer was accused of using excessive force against a Black man named Preston Nunn. *Id.* at p. 116:4-20. | Undisputed that the Nunn matter involved excessive force by white police officers who ordered Mr. Nunn, an unarmed black man, to get out of his car, then tackled him, pulled guns on him and tased him twice without provocation. *Ex. 14, Video of arrest of Preston Nunn by Officer Gabriel Nestor on May 15, 2021*; *Ex. 2, p. 48:11-49:13.* | |

| | | |
|---|---|---|
| 46. The conduct of the officer involved in the Nunn arrest was investigated, and the officer was ordered to attend additional training. *Id.* | Disputed. The matter was not "investigated" but rather was initially reviewed by the APD "Use of Force Board" and when Chief Wilson saw the video showing that the white officer had used excessive force against Nunn, she asked that the matter be investigated. *Ex. 14, Video of arrest of Preston Nunn by Officer Gabriel Nestor on May 15, 2021*; *Ex. 8, p. 116:4-117:18.* | |
| 47. Additional incidents involving inappropriate police interactions with Black community members occurred in June and July 2021, while Wilson was Chief. Ex. A, p. 3, ¶24. | Undisputed with the clarification that there were additional *excessive force incidents involving white APD officers* against Black community members.<br><br>PAF 6: These incidents included Chief Wilson disciplining a white officer who yelled profanity and used excessive force against a 17-year-old, handcuffed black girl for speeding, ("the Davis incident"), *Ex. 15, Findings, Conclusions and Order re Acuti, p. 1, 3-4*; and Chief Wilson terminating a white officer who participated in stopping an unarmed black cyclist who was sitting in the shade next | |

| | | |
|---|---|---|
| | to his bike when the white officers escalated the situation, repeatedly pistol-whipped him, held a gun to his head and threatened to shoot him. *Ex. 16, Video of John Haubert pistol whipping Kyle Vinson on July 23, 2021*; *Ex. 2, p. 51:11-20, 52:12-54:18*; *Ex 9, Investigation of the Aurora Police Department and Aurora Fire Rescue dated September 15, 2021 (CO AG's Office) at 8 ¶ 4, 9 ¶ 1, and FNs 24, 25*; *Ex. 17 Photograph of John Haubert, former APD Officer.* | |
| 48. In September 2021, the Attorney General's office completed its investigation and issued a 118-page report (the "AG Report") detailing concerns it had with the APD. Ex. A, p.4, ¶26; Ex. A-6, AG Report. | Disputed to the extent that the report merely detailed "concerns" but rather determined that there was a pattern and practice of racially bias policing at the APD. *Ex. 9, at p.1, ¶ 1.* | |
| 49. As a result of the AG Report, the City entered into a Consent Decree in order to continue to focus on improving APD operations. Ex. F, Consent Decree. | Undisputed with the clarification that the Consent Decree mandated that the APD reduce "racial disparities in how Aurora Police engages, arrests, and uses force against people of color in the community." *Ex. F, p. 7.*<br><br>PAF 7: During her tenure, Chief Wilson's | |

| | | |
|---|---|---|
| | disciplinary decisions "were required in order to achieve the consent decree mandate to transform the APD's culture into a culture of accountability." *Ex. 5, p. 12.* | |
| 50. Shortly after the AG Report was issued, bodycam footage of the Nunn arrest was released to the public. Ex. D, p. 116:4-20. | Undisputed. | |
| 51. Although the matter had been investigated, Wilson put the officer involved in the incident on leave and commenced a new investigation. *Id.* | Disputed. See Response to Def. UMF #46.<br><br>PAF 8: Chief Wilson's decision to open this investigation was mandated by the reforms outlined in the investigation and comported with generally accepted standards of police practices. *Ex.5, p. 9.* | |
| 52. APA and FOP union representatives were angry that Wilson reopened a closed investigation of an APD officer. *Id.* at 115:3-32. | Undisputed with the above clarification. | |
| 53. In September 2021, the unions conducted a poll regarding Wilson's ability to lead the APD. *Id.*; Ex. A, pp. 3-4, ¶25; Ex. A-4, Poll Email. | Undisputed to the extent that the then-President of the APA, Doug Wilkinson, a very vocal critic of the Consent Decree, initiated a so-called "no confidence" poll against Chief Wilson after she started an investigation into the Nunn incident, in an | |

| | | |
|---|---|---|
| | attempt by Wilkinson to undermine her authority. *Ex. 13, p. 73:6-74:22, 78:2-9; Ex. 2, p. 124:17-125:5; 135:9-136:15, 137:2-15; Ex. 19 Wilkinson email to Mayor Coffman media re no confidence poll.* | |
| 54. The poll reflected that 458 of the approximately 700 police officers employed at the APD at that time participated in the poll. Ex. A, ¶24; Ex. A-4. | Disputed. Wilkinson released "snippets" of what he said were the results of the poll, including criticism that Chief Wilson "should have fought" the consent decree, but there were no controls on how many times a person could vote in the poll so City management did not have any confidence in the veracity of the poll. *Id.*; *Ex. 13, p. 74:2-22, 78:6-9.* | |
| 55. 442 of the responses to the poll indicated that they had no confidence in Wilson's leadership; 16 supported her. *Id.* | Disputed. *See* response above. | |
| 56. Concerns were raised that the poll, which was publicized by the unions, was inaccurate and unreliable. Ex. C, p. 56:11-16; Ex. E, p. 135:19-25 | Disputed that the "union" publicized the poll. The APA then-President Wilkinson sent the poll to the media.<br><br>Undisputed that the Aurora city management did not believe that the poll was accurate or reliable. *Ex. 13. p.74:2-22; Ex. 2, p. 135:9-136:15.* | |

| | | |
|---|---|---|
| 57. Twombly stood by Wilson at that point because he did not know how reliable the poll was. Ex. C, pp. 56:11-16, 57:19-22, 58:1-4. | Disputed as misleading. At that time, city management stated that it did not believe the poll was reliable and issued a statement that Chief Wilson had the City's full confidence. *Ex. 18 Deposition of James M. Twombly, p. 57:19-58:7; Ex. 2, p. 140:24-142:25.*<br><br>PAF 9: "A police union's vote of no confidence is common against chiefs when they make agency decisions that include community partnership, enhance accountability, create fairness and equity in the selection, hiring, and promotional process, and disrupt the status quo." *Ex. 5, p. 19.* | |
| 58. After the results of the poll were released, Twombly began speaking with police officers to see if the poll had any validity. *Id.* at p. 58:8-24 | Disputed that CM Twombly "began" speaking to officers after the release of the poll. CM Twombly did not talk to any officers until about 3-4 months after the poll results were announced and only *after* Jurinsky was elected and started the campaign to get him to fire Chief Wilson. *Ex.18, p. 60:2-11.* | |
| 59. City Council elections took place in November 2021. Ex. D, p. 104:10-11. | Undisputed.<br><br>PAF 10: With the election, the conservatives became the majority on city council, including Danielle | |

| | | |
|---|---|---|
| | Jurinsky, Steven Sundberg, and Dustin Zvonek, who had the endorsement of the police unions, were outspoken critics of the Consent Decree, and Jurinsky was very hostile to anything representing DEI principles. *Ex. 20, Jurinsky and Zvonek FaceBook photo candidate photo with APD;* *Ex. 21, Jurinsky FaceBook post with endorsements of APA and FOP;* *Ex. 2, 172:21-173:174:18; 175:9-176:4, 195:4-196:17;* *Ex. 13, 85:20-86:14.* | |
| 60. There were three City Council seats up for election, which were filled by Danielle Jurinsky, Steve Sundberg and Dustin Zvonek. Ex. D, pp. 125:24-25, 126:1-6. | Undisputed.<br><br>PAF 11: Jurinsky called Chief Wilson a "woke" police chief," and testified that Democrat, including Governor Polis and Attorney General Weiser, are part of a demonic cult and that Democrats in Colorado have legalized rape. *Ex. 22, Deposition of Danielle Jurinsky, p. 213:6-19 and 214:23-25;* *Ex. 18, p. 75:21-25;* | |
| 61. In late November 2021, APA President Doug Wilkinson sent out an email criticizing the AG Report; the email contained racist and/or sexist comments. Ex. A, p. | Disputed. The Wilkinson email referenced the Consent Decree, not the AG report. *Ex. 23, Wilkinson Email re Consent Decree, dated 11/17/2021 at p. 1, ¶ 1.* | |

| | | |
|---|---|---|
| 4, ¶26; Ex. A-5, Wilkinson Email. | Undisputed that Wilkinson sent the referenced email to the APA which contained racists and misogynist language, including that the "diversity "in the Aurora community" was represented by illegal aliens, weed smokers, crackheads, child molesters and murderers, that the consent decree was "leftist identity politics," was an attempt to replace white males officers with unqualified women and minorities, and that the consent decree mandated changes to stop racist policing practices was "literally systematically sexist and racist" against white males. *Ex. 24, Findings, Conclusions and Order re Doug Wilkinson firing at p. 3.* | |
| | PAF 12: Chief Wilson was publicly critical of Wilkinson's comments and encouraged minority members of the APD who were offended to file formal complaints about the racist and sexist language, and three minority APD officers filed EEO discrimination claims based on the email. *Ex. 24; Ex. 25 Email from Jason Batchelor to James* | |

| | | |
|---|---|---|
| | *Twombly, dated November 17, 2021, re Doug Wilkerson EEO complaint at p. 4-5; Ex. 2, 152:7- 153:23; Ex. 13, 80:14-83:2.* | |
| 62. After receiving complaints about Wilkinson's email, Wilson recommended that Wilkinson be terminated; Twombly and Batchelor agreed with the termination recommendation. Ex. G, p. 81:14-25; Ex. C, p. 62:12-21. | Undisputed that Chief Wilson recommended that Wilkinson be terminated on February 23, 2022. *Ex. 24.*<br><br>PAF 13: At the Civil Service Commission, Wilkinson claimed that he had a First Amendment right to make the offensive statements and that other officers who had engaged in racist conduct had not been terminated, including an officer that referred to the black community as "Alabama porch monkeys, another officer had used the "N" word, and another officer made racially derogatory statements to a black suspect, but the Commission upheld the termination because of Wilkinson's "lack of remorse, and an inability to understand and acknowledge the negative effects of his statements." *Ex. 24, p. 1, 3-4, 7, 11-12.*<br><br>PAF 14: Chief Wilson's decision to take swift and decisive disciplinary | |

| | | |
|---|---|---|
| | action and terminate Wilkinson was mandated not only by the consent decree, but also by acceptable standards of police practices. *Ex. 5 at p. 10.*<br><br>PAF 15: At the end of November 2021, the City of Aurora announced the settlement of the lawsuit with the family of Elijah McClain for $15 million and Chief Wilson participated in the mediation because Elijah McClain's mother trusted Chief Wilson and requested her presence. *Ex. 2, 148:4-25.* | |
| 63. Jurinsky met with Wilson in December 2021 and told Wilson, among other things, that she was upset that a white officer who admitted to driving drunk had not been terminated; that she believed it was important to speak up for APD officers who had been portrayed very negatively by press reports of the Consent Decree (which Wilson agreed with and described as "infuriating"); that she wanted to help Wilson rebuild her relationship with APD officers in light of the no-confidence poll; and that she believed that Wilson should terminate | Undisputed that Jurinsky met with Chief Wilson and they both expressed their belief that an officer who had been found drunk on the job should have been fired.<br><br>Disputed that Jurinsky stated that she wanted to help Chief Wilson "rebuild her relationship" but rather told Chief Wilson that firing Deputy Chief Darin Parker, who was helping Chief Wilson implement the reforms, would help Chief Wilson to "rebuild" her relationship. *Ex. 8, 130:12-131:5.* | |

| | | |
|---|---|---|
| then-Deputy Chief Darin Parker, who Jurinsky said was not liked. Ex. H, Jurinky Depo., pp. 26: 8-25, 27:1-25, 95:25, 96:1-25, 97:4-9; Ex. I, Recording of December Meeting, 14min.18 sec. to 16 min. 06 secs., 18min. 27 sec. to 20 min. 15 sec, 20 min. 42 sec. to 21 min. 10 sec., 22 min. 15 sec. to 24 min. 04 sec., 31 min. 10 sec. to 40 min., 47 min. to 48 min. 20 sec., 49 min. to 50 min. 40 sec., 52 min. 36 sec. to 52 min. 49 sec. | PAF 16: Wilson did not trust Jurinsky because by the time of the December meeting, Jurinsky had already made it clear that she wanted Chief Wilson to be fired, that Jurinsky was mad about the enforcement of the Consent Decree, did not believe there was racism in the APD, that she did not want Wilson to fire Wilkinson for his email, that Chief Wilson was just "bowing down to the attorney general or the liberal woke city council members" and that Jurinsky said that the new City Council members were "fired up and ready to fight back" with the AG about the Consent Decree.<br><br>*Ex. 8, 127:1-5, 128:1-9; Ex. 22, 123:20-23.* | |
| 64. They were also concerned about the extremely high number of officers who had left the Department since Wilson took charge, with approximately 150 officers leaving the APD in 2021 alone. Ex. E, p. 235:8-25, 236:1-15. | Disputed to the extent it suggests City Management blamed Chief Wilson for the attrition of police officers. City Management knew that there were high attrition rates in law enforcement nationwide caused by a variety of factors, including the George Floyd protests, the pandemic, the new Colorado laws that took away officer immunity | |

| | | |
|---|---|---|
| | and public sentiment against law enforcement. *Ex. 18, 42:19-43:25; Ex. 13, 93:5-23; Ex. 5 at p. 17.* | |
| 65. Jurinsky publicly criticized Wilson on the Steffan Tubbs Show and in various social media platforms, complaining about Wilson's leadership, calling her "trash" and indicating that she should be fired. Ex. J, Tubbs Transcript, pp. 6:3-8, 10:25, 11:1-6, 12:1-8, 16:20-22, 17:1-16, 19:3-13, 23:10-20; Ex. H, pp. 26:8-25, 27:1-25, 28:1-7, 124:9-25, 125:1-4. | Undisputed.<br><br>PAF 17: At the beginning of 2022, Jurinsky began making public demands that Chief Wilson be fired, vowing that "change was coming to the APD, that change would start with the removal of Wilson as Chief and that she was not going to stop demanding that Chief Wilson be fired, including on the Tubbs show on January 27, 2022 stating that "it's a new day in Aurora. There's a new council. And I'm here, you know. And not just myself, you know, Steve Sundberg, Dustin Zvonek, I think hands down are the most vocal. And that's very known. But – but change is coming, " "there is a new council," "change is coming" … "things are in the works" . . . "For now, change is coming" to the APD, repeatedly calling the Chief "trash," that she is "not backing down on the changes that need to happen with the police department on my outspoken support, my | |

| | | |
|---|---|---|
| | very, very loud support for the men and women of the Aurora Police Department. That's going to be known;" she said she wears "thin blue lives shirts," that "I'm doing everything I can to let the department know, and these officers know, it is a different day. And you will see a different council," that "we need to remove the Chief immediately," "and along with it, their antics of destroying police officers' lives, of ruining the department's reputation, throwing police officers under the bus publicly," berating that Wilkinson "sent out an email to membership, to his private membership (referring to the police union) and [Wilson] has him wrapped up in an internal affairs investigation," "It's frivolous, its's frivolous" that she was never going to "be silenced unless—unless some, you know, leftist mob carries me away," that she will be "doing weekly interviews on multiple shows until the Chief is gone and our department is liberated" and sent out social media posts saying #FiretheChief. | |

| | | |
|---|---|---|
| | *Ex. 18, 73:6-74:9, 74:15-20, and 143:5-144:5;*<br>*Ex. 2, 200:25-203:23; Ex. 26, Jurinsky FaceBook post, "doing interviews until chief is gone" dated January 28, 2022;*<br>*Ex. 27, Jurinsky FaceBook post, #FireTheChief;*<br>*Ex. 28, Transcript of Tubbs Radio Show January 27, 2022, 7:13-22, 9:14-23;16:20-17:3, 18:22-19:2, 29:11-13.*<br><br>PAF 18: Aurora's media department kept CM Twombly informed about the statements made by Jurinsky about Chief Wilson; CM Twombly understood that the conservative city council members and police union wanted Chief Wilson fired and that if he did not fire her, they would make sure he was fired, but the City Manager and the Deputy City Manager did not have the power to stop Jurinsky.<br>*Ex. 18, 73:6-74:20; 82:14-83:4, 134:14-18; 84:1-11; 140:8-11; 134:1-18 ; 141:6-9; 143:5-144:5; Ex. 2, p. 206:6-14;*<br>*Ex. 29, Emails between Marsha Berzins and Jim Twombly re comments regarding the no confidence survey of Chief* | |

| | | |
|---|---|---|
| | *Wilson, dated October 29, 2021.* | |
| | PAF 19: Soon after Jurinsky was elected, Officer Jad Lanigan, one of the officers aligned with Jurinsky, started letting her into police briefings where she criticized Chief Wilson in an effort to undermine Chief Wilson's authority. *Ex. 2, p. 179:8-180:22 Ex. 18, p. 76:5-77:6.* | |
| 66. Twombly was aware that Jurinsky, Zvonek and Sundburg wanted Wilson to be fired; he also spoke to several other Council members who were supportive of Wilson. Ex. K, Recording of March 9 Meeting at 19 min. 40 sec. to 19 min. 58 sec. | Undisputed.<br><br>PAF 20: On January 28, 2022, City Council member Marcano filed charges against Jurinsky stating that her public statements were a "direction to terminate Chief Wilson and Deputy Chief Darin Parker in direct violation of the City Charter" which forbids city council members from interfering in terminating city employees, and the then Deputy City manager agreed that Jurinsky's actions violated the City Charter. *Ex. 30, Marcano Letter to Jurinsky re censure; Ex. 18, 145:23-146:2; Ex. 2, 216:13-19.*<br><br>PAF 21: Jurinsky claimed that she had a First Amendment right to demand that Chief Wilson be fired. | |

| | | |
|---|---|---|
| | *Ex. 31, February 23, 2022 Letter to Aurora City Council.* | |
| 67. In February 2022, various City personnel, including personnel from the Communications Department and Wilson, developed and introduced a five-point plan designed to explain changes the APD was enacting in response to community concerns. Ex. E, p. 242:10-25, 243:1-15. | Disputed. The "New Way Forward Plan" (cited in Defendant's Exhibit E) was created by Chief Wilson *to help improve officer moral and communications,* was approved by Deputy City Manager Batchelor, and presented by Chief Wilson to City Counsel in February 2022 with CM Twombly. *Ex. 32, "A New Way Forward" Presentation;*<br>*Ex. 2, 242:5-245:10, 264:3-19;*<br>*Ex. 8, 159:11-160:4.* | |
| 68. In the Spring of 2022, the City hired Police Records Management ("PRI"), a company specializing in auditing police records, to review APD's police backlogged police files. Ex. D, p. 162:1-22: Ex. A, p. 4,¶28; Ex. A-6, PRI Report. | Undisputed.<br><br>PAF 22: The records backlog existed long before Chief Wilson was appointed and Chief Wilson had requested additional funds to resolve the problem but her requests were denied. *Ex. 33, Email from John Schneebeck to Vanessa Wilson re Records Staffing Tracking Review, dated April 1, 2022;*<br>*Ex. 34, Email from John Schneebeck to Jason Batchelor re Yesterday's Internal Audit Reports, dated March 11, 2022;*<br>*Ex. 35, Deposition of John Schneebeck, p. 13:14-20, 16:5-19, 20:3-22, 24:12-* | |

| | | |
|---|---|---|
| | *20, 24:25-25:5, 33:24-34:24.* | |
| 69. PRI found that there were 2,512 cases, 1,054 of which were from 2021, that had not yet been investigated and that the backlog was attributable to "a lack of leadership and accountability." Ex. D, pp. 163:19-25, 164:9-18, 166:21-25, 167:8-14; Ex. A-6 p. 3. | Undisputed that the report made this statement. | |
| | PAF 23: Twombly did not terminate Chief Wilson because of the records backlog. *Ex. 18, p. 94:6-10.* | |
| | PAF 24: On March 14, 2022, the City Council voted to drop the charges against Jurinsky for her demands that Chief Wilson be fired and, at that point, CM Twombly understood that any guardrails around Jurinsky's behavior were off.<br>*Ex. 36, Stipulation to Resolve Charges Brought Against Council Member Jurinsky dated March 17, 2022 (unsigned);*<br>*Ex. 18, 148:13-24, 154:8-20.* | |
| 70. Twombly's interviews of officers revealed that officers had concerns with Wilson's leadership. Ex. C, pp. 59:3-24, 103:24-25, 104:1-17, 116:2-8 and 20-22, | Undisputed to the extent that *after* Jurinsky started to pressure Twombly to fire Chief Wilson, Twombly talked to the officers identified to him by Jurinsky (Jad | |

| | | |
|---|---|---|
| 117:4-25, 118:1-25, 119:1-2. | Lanigan, Tim Glenn and Doug Pearson) who were critical of Chief Wilson, but CM Twombly never asked Chief Wilson for names of people she wanted him to talk to, *Ex. 18, p. 115:24-118:2, 120:13-20, 133:7-9;* *Ex. 37 Email from Lanigan to Twombly,* and Twombly only started talking to officers "because of what the union and conservative city council people were saying" about Chief Wilson. *Ex. 18, 131: 24 - 132:3.* | |
| 71. Twombly met with Wilson on March 9, 2022 to discuss the concerns he had regarding her ability to rebuild her relationships with officers and to lead the APD; he told her he wanted her to think about it and meet with him again. Ex. K, March 9, 2022 Recording at 17min. 30 sec. to 18 min. 5 sec., 32 min. 28 sec. to 33 min. | Disputed in part. Twombly and Wilson met at the request of Wilson on March 9, 2022 to discuss the campaign against her being waged by the police union and the conservative City Council members and CM Twombly voiced his concern that if they continued to voice these complaints "loud enough and long enough" that people would start to believe them, and that CM Twombly and Chief Wilson would "talk again" about these issues. *Defendant Ex. K at minutes 17:18-19:30 and 32:25-35:26;* *Ex. 18, 97:24-100:8; 99:44-100:8* | |

| | | |
|---|---|---|
| | *Ex. 8, 171:6-24.*<br><br>PAF 25: The Aurora City Attorney Pete Schulte told Chief Wilson that the three conservative city council members were pressuring CM Twombly to fire her and that she should get an attorney because she was getting "fucked." *Ex. 8, 174:18-175:12.*<br><br>PAF 26: On March 11, 20222, CM Twombly asked Jad Laningan, the officer aligned with Jurinsky, who he should talk to about Chief Wilson and Lanigan gave him the names of Tim Glenn and Doug Pearson. *Ex. 37; Ex. 18, 115:22-117:23, 120:13-20.* | |
| 72. Twombly attempted to meet with Wilson, but she was unavailable. Ex. C, p. 108:11-14. | Disputed. Twombly did not make any attempts to meet with Chief Wilson, did not go to her office or call her and doesn't remember if he ordered her to meet with him but admits that Chief Wilson had never refused an order from him. *Ex. 18, 115:1-4, 151:10-152:1.*<br><br>PAF 27: On March 14, 2022, City Council voted to withdraw the charges against Jurinsky and Twombly understood that this meant there would | |

| | | |
|---|---|---|
| | no longer be any "guardrails" on Jurinsky. *Ex. 18, 148:13-19, 154:17-20.* | |
| 73. After Wilson failed to set up a second meeting with him to talk about how they could improve her relationship with officer and "come up with some kind of plan of action to where [they] could hopefully turn things around" as he had discussing in the March 9, 2021 meeting, Twombly learned she had retained an attorney, who had gone to the media about the possibility of Wilson being terminated, which led him to believe that Wilson no longer wanted to work with him to try to turn things around. Ex. C, p. 122:3-9, 123:1-17. | Disputed. After the Mar. 9th meeting, Twombly was told that Chief Wilson had retained an attorney, and he understood she had gotten an attorney because she was concerned about her job due to what the city council members and the police union were saying about her, *Ex. 18, 113:6-21, 113:25-114:5, 104:18-20, and 105:17-19*, and Twombly claimed he decided to terminate her when he learned she got an attorney. *Ex. 18, 105:17-106 :1, 113:2-114 :5, and 122:3-9.*<br><br>Also disputed that Chief Wilson "failed" to set up a meeting, that her counsel had "gone to the media" and that Chief Wilson did not want to work with city manager Twombly. See *Ex. 8, 108:3-14; 122:19-21.*<br>Twombly did not remember if she refused to meet with him, he did not make any efforts to meet with Chief Wilson, doesn't recall ordering her to meet with him, *Ex. 18, 98:24-:14*, but remembers that she was | |

| | | |
|---|---|---|
| | out of the country and never indicated to Twombly that she didn't want to work with him. *Ex. 18, 108:24-109:2, 122:19-21.* | |
| 74. At that point, based on his interviews with current and former police officers, the no-confidence vote, the high number of APD officers leaving the City and his belief that Wilson no longer wanted to work to repair the situation, Twombly determined that he no longer had confidence that she could lead the APD and decided to terminate her employment. *Id.* | Disputed. Twombly did not make the decision to terminate Wilson until after city council had voted on March 14th to dismiss the censure against Jurinsky, thereby taking off any guardrails on her. *Ex. 18, 97:7-16, 103:16-19.* | |
| 75. Twombly terminated Wilson's employment in April 2022. Ex. D, pp. 181:19-25, 182:1-4 ; Ex. A, p. 4,¶29; A-7, Termination Letter. | Disputed. Twombly testified he made the decision to terminate Chief Wilson between March 9th and March 21st. *Ex. 18, p. 97:7-16, 103:16-19.*<br><br>Undisputed that Twombly announced his decision to terminate Chief Wilson *without cause* at the beginning of April 2022.<br><br>PAF 28: Defendant stated that the reason Chief Wilson was fired was 1) because of the union poll, 2) complaints from police officers, 3) the attrition rate of police | |

| | | |
|---|---|---|
| | officers, 4), Chief Wilson did not provide a plan to rebuild her relationship with her officers, and 5) the backlog problem. *Ex. 38 Defendant's Response to Interrogatory #5.*<br><br>PAF 29: The then-deputy City manager testified that Chief Wilson was terminated because of officer morale, attrition in the APD, the increase in crime rate in 2021, and attrition in the APD, *Ex. 2, p. 264:4-12*, but he was unable to quantify any increase in crime that was attributable to Chief Wilson and also testified that he knew that implementing the reforms in the consent decree would upset some officers. *Ex. 2, 143:1-11, 262:21-262:10.* | |
| 76. After Wilson was terminated, she asked to be permitted to keep her badge and to be issued a Law Enforcement Officer Safety Act ("LEOSA") card. Ex. C, pp. 157:18-25; 158:4-25. | Undisputed. | |
| 77. Twombly denied her request because officers who were terminated, including all of the officers that Wilson | Undisputed that when Batchelor became the City Manager, he issued Chief Wilson her LEOSA card. | |

| | | |
|---|---|---|
| recommended for termination, were not allowed to keep their badges, nor were they issued LEOSA cards; however, the City ultimately provided her with both her Badge and LEOSA card. *Id.*; Ex. E, p. 285:7-10. | Disputed that "all the officers who were terminated" were not allowed to keep their badges. The officers who were terminated "for cause" like APA President Doug Wilkinson, were not allowed to keep their badges and Twombly denied Chief Wilson her badge because Jurinsky said it would not be fair that Chief Wilson got her card when Doug Wilkinson was denied that privilege. *Ex. 18, 170:24-173:10; Ex. 8, 237:1-21.*<br><br>PAF 30: After he fired Chief Wilson, Twombly sent Jurinsky a copy of Wilson's personnel file record confirming that Chief Wilson had been fired. *Ex. 18, 170:4-172:17.*<br><br>PAF 31: Jurinsky sent Twombly a text telling him that she had just had her deposition taken in this case but Twombly refused to reveal the content of that text because it was "private." *Ex. 18, 86:3-10, 90:6-15.* | |
| 78. Pursuant to the terms of her Contract, Wilson received one year's regular pay after her | Undisputed. | |

| | | |
|---|---|---|
| termination. Ex. D, p. 183:5-10. | | |
| | PAF 32: During her tenure, Chief Wilson's actions were in accordance with the mandates of the Consent Decree. *Ex. 2, 128:16-19.* | |
| | PAF 33: It would violate generally acceptable standards of care and criminal office management to allow the Chief of Police position to be determined by a popularity contest among officers or political winds seeking to curry the favor of those officers. *Ex. 5, p. 20.* | |

## <u>INTRODUCTION</u>

Vanessa Wilson was a 23-year veteran with the Aurora Police Department (APD) when she was appointed Chief of Police in 2020. From the beginning, Chief Wilson was very vocal in her commitment to reforming the APD to eliminate racially biased policing. With the support of the Aurora City Management and the then-City Council, Chief Wilson began disciplining and terminating officers that engaged in racist behavior, she marched with George Floyd protestors and aligned herself with and advocated for the minority community. She implemented DEI and "implicit bias" training at the APD to benefit the minority community and minority officers. In 2021, a Consent Decree was entered against APD as a result of its history of White officers using excessive force against members of the Black and

Brown community. Chief Wilson publicly supported the Consent Decree and announced her dedication to the mandated reforms. The police union criticized Chief Wilson and her DEI efforts as "liberal propaganda" and "soft peddling of critical race theory." Despite this criticism, City Management stood firm in its support of Chief Wilson's efforts to implement the Consent Decree. At the beginning of 2022, a new conservative "MAGA" City Council majority was elected with the support of the police unions. These council members did not believe there was systemic racism in the APD, did not agree with the implementation of DEI policies or the Consent Decree mandates, and demanded that Chief Wilson be fired. One of these members, council person Jurinsky, repeatedly threatened the City Manager that if he did not fire the "woke" Chief Wilson, city council would fire him. City council member Marcano brought charges against Jurinsky for violating the city charter by directing the City Manager to fire the Chief. Ultimately, on March 14, 2022, the conservative city council blocked these charges and the "guardrails" came off Jurinsky. Within one week, CM Twombly made the decision to fire Chief Wilson, allegedly for her lack of "leadership."

Chief Wilson has brought four claims for relief: a claim under §1981 for association and advocacy discrimination, a claim under §1981 for retaliation against her for her protected activity in an effort to implementing reforms to benefit the minority community, a claim under Title VII for discriminating against her for her association and advocacy for minorities, and a claim under Title VII for retaliation against her for her protected activity and work as an advocate for minorities.

## STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Whether there is a genuine dispute of a material fact depends on whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-249 (1986). In evaluating a motion for summary judgment, the court views "the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor." *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

## LEGAL ARGUMENT

### A. Plaintiff's Claims for Associational Discrimination and Retaliation Are Not Duplicative

Defendant fails to understand the conceptual difference between an associational/advocacy claim and a claim for retaliation based on protected activity.

Title VII and §1981 claims of discrimination are distinct legal theories of liability from their related retaliation claims. Claims of associational discrimination are premised on the concept that an adverse action is taken against a Plaintiff merely

because of her association with and advocacy for a minority group. *See Parr v. Woodmen of World Life Ins. Co.*, 791 F.2d 888 10th Cir. 1986)(Plaintiff may allege association race discrimination under 1981 and Title VII because of biracial marriage.) A plaintiff need not engage in any particular type of protected activity, rather it is the Plaintiff's mere association with the minority that is the basis for the associational discrimination claim.

On the other hand, retaliation claims under §1981 and Title VII arise because a Plaintiff has engaged in some protected activity on behalf of the minority person or group. *See Bekkem v. Wilki*e, 915 F.3d 1258, 1267 (10th Cir. 2019) and *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997-998 (10th Cir. 2011). "[T]he showing required to establish retaliation is identical under §1981 and Title VII [of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17]. *Id*. at 998 (citations omitted). Although claims of discrimination and retaliation under both §1981 and Title VII are distinct legal theories with different remedial purposes, the same substantive standards apply to both Title VII and §1981 claims. *See e.g. Barrett v. Whirlpool Corp.*, 556 F.3d 502, 520 (6th Cir. 2009)(difference between associational claims and retaliation claim is that associational discrimination is based on the perceived connections between the plaintiff and the minority community whereas retaliation claims involve "opposition to unlawful conduct.")

Separate claims based on separate theories of liability do not make the claims duplicative, even if the facts supporting those claims overlap. *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, (10th Cir. 2004); *Roberts v. Roadway Express*, 149

F.3d 1098, 1110, 1998 (10th Cir. 1998)(Although §1981 and Title VII retaliation claims may be based on precisely the same facts and both statutes require proof of the same elements to recover, it is not assumed that a verdict rests on only one theory of liability.)

Moreover, the federal rules of civil procedure expressly allow a plaintiff to plead alternative theories. *See Bragg v. Office of the DA*, 704 F. Supp. 2d 1032, 1063 (D. Colo. 2009)(Claims under alternative theories of liability are not duplicative" even when they involve the same set of facts because plaintiff may present alternate theories of liability under Fed.R.Civ. P. 8(a)(3).) *C.f. Kincaid v. Unified Sch. Dist. No. 500*, 572 F. Supp. 3d 1081, 1094-1095 (D. Kan. 2021)(Although the claim of retaliation has overlapping evidence with a claim of retaliatory harassment, the claims are not duplicative since the relevant statutes have different remedial purposes.)

Defendant's reliance on *Brown v. City of Tulsa* is misplaced. In that case, the plaintiff brought a 42 USC §1983 against the Chief of Police in his official capacity claim and as well as a Monell claim against the City of Tulsa. Since an official capacity suit must be treated as a suit against the entity, the Court correctly dismissed the claim brought against the Chief in his official Capacity. That has no relevance to the claims in this case.

While it is correct that much of the evidence in this case supports both theories of discrimination and retaliation, that does not require Plaintiff to elect between legal theories and Defendant cites no authority that demands such election.

**B. <u>Plaintiffs §1981 Claims are Properly Asserted</u>**

Defendant next argues that Plaintiff's §1981 claims should be dismissed because she did not specifically state in her Complaint that these claims are being "brought under 42 U.S.C. §1983." This argument is frivolous.

In her First Amended Complaint, Plaintiff specifically states that she brings her §1981 claims "pursuant to 42 U.S.C. §1983." First Amended Complaint, ¶¶ 113 and 123. It is also clear from the allegations in her complaint that Chief Wilson is alleging that her §1981 claims are premised on the actions of the city manager in his capacity as "the final decision-maker on behalf of the City." First Amended Complaint, ¶¶s 107, 108, 118, 119. Thus, Plaintiff is not relying on respondeat superior liability and the claims are sufficiently pled. *See Melton v. City of Okla. City*, 879 F.2d 706, 725 (10th Cir. 1989)(Liability under §1983 attaches when City Manager, as final decision-maker under the City Charter, made decision to terminate Plaintiff in violation of her First Amendment rights and liberty interest without due process.)

**C. <u>Plaintiff has Stated Valid Claims Under Title VII and §1981.</u>**

The showing required to establish claims under §1981 and Title VII and the principles underlying these statutes are the same. *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (internal quotation marks omitted). When circumstantial evidence is involved, the *McDonnell Douglas* burden shifting analysis is used.

1. Associational/Advocacy Discrimination Claims

Defendant argues that Plaintiff's associational claims fail as a matter of law because 1) she did not have a "relative or close associate in the protected class," 2) there is no evidence that creates an inference that her advocacy for minorities caused her termination or 3) that the reason for her termination were pretextual. These arguments fail.

Contrary to Defendant's assertion, the Tenth Circuit has specifically recognized an associational race claim under §1981. In *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989), the Tenth Circuit held that a plaintiff could bring a §1981 claim alleging discrimination because of his association with a racial minority community. In that case, the defendant was a newspaper which published negative articles about the plaintiff, a White man, because he was advocating for the rights of the Black community. The district court dismissed the plaintiff's claim stating that a "§1981 claim must allege discrimination against the plaintiff on the basis of *his* race." *Id.* at 1266- 67 (emphasis added). The Tenth Circuit disagreed, finding that a White person could bring a claim under §1981 because of his association with the Black community. *Id.* In making this finding, the Court cited *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1446-1447 (10th Cir. 1988) *superseded by statute on other grounds* (White employee had standing to bring association retaliation under §1981 for assisting Black employee with EEOC claim because the premise of association claim was a "racial situation.") and *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 312 (2d Cir.)(suit allowed under §1981 where

White employee claimed his company forced him to retire because he sold his house to a Black employee), *modified on other grounds*, 520 F.2d 409 (2d Cir. 1975).

Although there is not yet any opinion in the Tenth Circuit on whether a discrimination association/advocacy claim can be brought *under Title VII*, other courts have recognized the viability of such claims regardless of the race of the Plaintiff. In *Johnson v. University of Cincinnati*, 215 F.3d 561, 574-575 (6th Cir. 2000) the Plaintiff was responsible for implementing the university's affirmative action program. When he was terminated, he brought suit under §1981 and Title VII claiming he had been discriminated against for advocating on behalf of women and minorities. The district court dismissed the Plaintiff's claims finding that he had "postured his protected status, not as a member of a racial minority, but rather as a person who advocates on behalf of women and minorities." According to the district court, a Title VII claim required the plaintiff to show that the discrimination was "because of" his own race. *Id*. at 573. In analyzing this issue, the Sixth Circuit looked to the reasoning in *Sullivan v. Little Hunting Park, Inc*. 396 US 229, 231-37(1069) in which a White homeowner was allowed to bring a claim under a similar statute, 42 U.S.C. §1982, for his advocacy for a Black family to use the community recreations facilities. In *Sullivan*, the Court held that the White plaintiff could bring that claim because he was "the only effective adversary" of the restrictive covenant that denied Black people into the facilities. In other words, the Court effectively put the plaintiff in the shoes of the minority for purposes of determining the validity of the claim.

After reviewing other cases and the history of these statutes, the *Johnson* Court reasoned that if Title VII and §1981 were interpreted to preclude a person who is responsible for implementing racial reforms from bringing their own discrimination claim *because of* this advocacy, it could circumvent the very wrongs the statutes were meant to remedy. The Court then concluded that allowing such a narrow view of Title VII would "turn[] back the hands of time on this issue of civil rights and equality in employment." *Id.* at 577-578. Thus, the Court held that to state an associational claim of discrimination under Title VII, a plaintiff need only allege that he was discriminated on the basis of his association with a protected class. *See also Winston v. Lear Siegler*, 558 F.2d 1266, 1270 (6th Cir. 1977)(Plaintiff could state associational discrimination claim under Title VII because he was terminated as a result of his involvement with a "racial situation.").

The reasoning in *Johnson* was reaffirmed in *Barrett v. Whirlpool Corp.*, 556 F.3d 502 (6th Cir. 2009) where White employees brought claims for association and advocacy discrimination under Title VII and §1981 claiming that they suffered adverse actions because of their relationship with Black co-workers. The district court dismissed the associational claims on the grounds that Plaintiffs could not show anything more than a "casual, friendly relationship." *Id.* at 512. After reviewing cases involving a variety of types of relationships between the plaintiff and the minority community, the *Barrett* Court concluded that the degree of association is not relevant to an associational or advocacy claim under Title VII. *Barrett*, *supra* at 512-513; *see Kengerski v. Harper*, 6 F.4th 531, 539 (3rd Cir.

2010)(For Title VII associational claim, degree of association between plaintiff and minority at issue "is irrelevant."); *Fitzgibbon v. R & L Carriers Shared Servs.*, LLC, 2010 U.S. Dist. LEXIS 152529, *6-8 (Western Dist. Okla. March 29, 2010).

Defendant here, however, relies on the reasoning of *Cano-Rodriquez v. Adams Sch. Dist. No. 14.*, No. 19-CV-01370-CMA-KLM, 2020 U.S. Dist. LEXIS 192551, 2020 WL 6049531, at *3 (D. Colo. Apr. 22, 2020), in which the Honorable Magistrate Judge Mix recommended dismissing plaintiff's Title VII associational discrimination claim because the plaintiff did not allege "associational discrimination based on [p]laintiff's own race." *Id.* In that case, the Court stated that association discrimination claims had to be based on an "interracial association" such as an interracial marriage or biracial child.[1]

The reasoning of *Cano-Rodriguez* was rejected in *Grillot v. Okla. ex rel. Univ. of Okla. Bd. of Regents*, 2021 U.S. Dist. LEXIS 246195, 2021 WL 6101667. *Ex. 1, Grillot v. Okla. ex rel. Univ. of Okla. Bd. of Regents.* In *Grillot*, the Court examined

[1] Defendant cites *Hartog v. Wasatch*, 129 F.3d 1076 (10th Cir. 1997) in support of its contention that there must be "a relative or close associate" in the protected class to prove an association/advocacy claim, but the degree of association was not directly addressed in that case because it involved a familial relationship. Defendant also cites *Salazar v. City of Commerce City*, 2012 U.S. Dist. LEXIS 60463, *31, 2012 WL 1520124 (D. Colo. May 1, 2012) but the holding in that case is less clear as to whether plaintiff associational case under § 1981 was dismissed because of a lack of evidence or on the grounds that it had to be pled as a retaliation claim. The *Salazar* Court did hold that plaintiff had met a prima facie case of retaliation under § 1981 for her advocacy on behalf of the rights of a minority co-worker.

the contrasting analysis between *Johnson, supra* and *Cano-Rodriguez, supra.* *Grillot* involved a White professor who brought a Title VII claim based on her advocacy for minority students. The district court dismissed the advocacy claim on the grounds that the plaintiff did not allege discrimination "because of" the plaintiff's own race, as was held in *Cano-Rodriguez*. The *Grillot* Court, however, found that the reasoning in *Johnson* was more persuasive because of the legislative history of Title VII. The Court concluded that the White plaintiff had sustained her burden by showing that she was fighting budget cuts to minority student programming. *Id*. at LEXIS *14-15. *See also Alatorre v. Ole Mexican Foods*, Inc., 2023 U.S. Dist. LEXIS 198690, *5-6, 2023 WL 7308117 (W. D.. Okla. November 6, 2023)(Plaintiff may bring racial discrimination under Title VII because of her association with minorities.); *Kauffman v. Maxim Health Care Servs., Inc.*, No. 04-CV-2869, 2006 U.S. Dist. LEXIS 47514, 2006 WL 1983196, at *3 (E.D.N.Y. July 13, 2006) (there is a "wealth of support in the prior decisions" recognizing Title VII associational claims because "the preclusion of such claims would be inconsistent with the "express Congressional intent behind Title VII[.]") *citing Johnson, supra at* 573-74; *see Fitzgibbon v. R & L Carriers Shared Servs*., LLC, *supra* at *6-8 (Although the Tenth Circuit has not yet ruled on whether a Plaintiff can bring a Title VII associational discrimination claim, it has allowed a §1981 associational claim and the reasoning in *Barrett* and *Drake* are persuasive, and thus a White plaintiff can assert Title VII discrimination claims based on his association with Black team member.)

Plaintiff contends that the reasoning of *Johnson* and *Fitzgibbon* are more persuasive and that the degree of association for a claim of discrimination under Title VII is not relevant. This is in harmony with the Tenth Circuit's recognition that a White employee can bring a claim of retaliation under §1981 because of the employee's association with a Black co-worker. *See Phelps, supra; Skinner* v. *Total Petroleum, Inc.*, 859 F.2d 1439, 1444-1447 (10th Cir. 1988)(White employee had valid claims under both Title VII and §1981 for his advocacy and association with Black employee; verdict on one claim is normally conclusive on liability under the other statute) *superseded on other grounds; cf. Sullivan, supra* (White plaintiff may sue community organization for association discrimination under 42 U.S.C. § 1982 for expelling him when he leased to Black person, holding that both § 1982 and §1981 are derived from the Civil Rights Act of 1866 and contain similar language and intent); *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1082-1083 (10th Cir. 1997)(The legislative history in the ADA would make it illegal for an employer to discriminate against employee because employer knew employee was doing volunteer work for the AIDS community.)

Defendant next argues that Plaintiff cannot show that 1) her association with the minority community caused her termination, or that 2) Defendant's reason for firing Plaintiff was pretextual. These claims are without merit.

To establish a prima facie case of associational or advocacy discrimination based on race, a plaintiff must demonstrate that 1) the employer was aware that plaintiff was associated with or advocated for a racial minority group, 2) the

plaintiff was performing her job satisfactorily, 3) that she suffered an adverse action, and 4) the circumstances surrounding the adverse action create an inference of discrimination. *See Johnson*, *supra* (Plaintiff advocated for affirmative action policies that were intended to benefit racial minorities); *Chew v. City & Cnty. of San Francisco*, 2016 U.S. Dist. LEXIS 19987, *33-34. "The key questions are whether Plaintiffs were discriminated against, and whether the reason for the discrimination was their advocacy for protected employees." *Barrett*, *supra* at 513-514. It is well-settled that the evidence used to support the causal-connection portion of a prima facie case of discrimination can also be used to establish pretext under the *McDonnell Douglas* analysis. *Wells v. Colo. DOT*, 325 F.3d 1205, 1218 (10th Cir. 2003).

In this case, there is an abundance of evidence to show that Chief Wilson's association with the minority community and her advocacy for reforms that benefited this community were the reasons she was terminated and that the Defendant's proffered justification for her termination is pretextual.

It is undisputed that there has been a history of APD White police officers using excessive force against Black people. DUMF 7, 8, 21, 33, 45, 47; Response to DUMF 7, 8, 18, 21, 32, 42, 45, 46, 47, 48 ; PAFs 2, 3, 4, 6, 8. Chief Wilson was well known for her advocacy for the minority community and her implementation of reforms to eliminate racially biased policing. DUMF 13, 14, 18, 21, 22, 23, 26, 31, 34, 43, 47, 62; Response to DUMF 21, 26,43, 46, 47, PAFs 1, 3, 4, 5, 6, 7, 8, 12, 14, 15. From the beginning of her appointment as Chief of Police, she was very vocal

about her intent to reform racist policing practices, which CM Twombly publicly supported, along with her focus on building trust with the minority community in Aurora. *Id; PAFs 3, 5.* Chief Wilson repeatedly disciplined white officers who engage in racist conduct or used excessive force against Black citizens. DUMF (and Responses) 18, 20, 21, 32, 33, 34, 45, 46, 47 , 50, 51, 62; PAFs 2, 3, 6, 7, 8, 13, 14. When the Consent Decree was entered, Chief Wilson was outspoken in her dedication to implement the mandated reforms required to remedy the long history of systemically racist policing by the APD. DUMF 49, 61, 62; Response to DUMF 53, 61; PAF 7, 8, 12, 14.

The leadership of the police union, however, did not support these reforms. Public criticism from the union members included comments that the DEI and implicit bias trainings amounted to "wokeness," "liberal propaganda" and "soft peddling of critical race theory." DUMF and Response 43, 53. When Chief Wilson opened an investigation into the use of excessive force by a white officer against a Black man, it angered the president of the police union, Doug Wilskinson, who initiated a so-called "no confidence" vote against Chief Wilson. DUMF (and Responses) 50, 51, 52, 53, 54, 55, 56: PAF 8.

Union leadership was also publicly critical of the Consent Decree. Immediately after it was formally entered, union president Wilkinson distributed a racist and sexist email to all union members stating that the mandated reforms amounted to systemic racism and sexism against the White, male officers. DUMF (and Response) 61. Chief Wilson encouraged the women and minority officers who

were offended by these comments to file complaints. PAF 12. As a result, three EEO complaints were filed alleging that Wilkinson's statements created a hostile work environment based on race and sex. *Id.*

In the beginning of 2022, the conservative City Council candidates who had been publicly supported by the police unions took over a majority of Aurora City Council. DUMF 59, 60; PAF 10, 11. These council members, especially Danielle Jurinsky, were vocal opponents of the Consent Decree, did not believe there was systemic racism in the APD, and did not agree with the reforms taken by Chief Wilson to implement the Consent Decree including the DEI training, and believed that the union president should not be disciplined for his racist statements. PAF 10, 11, 15, 16, 18. In January 2022, Jurinsky started a campaign to undermine Chief Wilson, inappropriately attending police briefings where she criticized Chief Wilson, called Chief Wilson "trash" on a prominent radio show, and began making frequent public statements and social media postings demanding that Chief Wilson be fired. DUMF 65: PAF 10, 11, 16, 17, 19 ,20. On February 3, 2022, Chief Wilson fired the president of the police union for his racist and sexist comments. DUMF (and Response) 62; PAF 13.

In February 2022, a city council member filed a request for sanctions against Jurinsky for directing the City Manager Twombly to fire Chief Wilson because the Aurora City Charter prohibited city council from interfering in the hiring or firing of city employees. PAF 20. Jurinsky claimed she had a First Amendment right to tell CM Twombly to fire Chief Wilson. PAF 21. The City Attorney warned Chief

Wilson that she should get an attorney because Jurinsky and the police union were trying to get Chief Wilson fired. PAF 25. On March 9, 2022, CM Twombly and Chief Wilson discussed the outcry from the police union and the City Council members demanding that she be fired. On March 14, 2022, the majority of conservatives on City Council blocked the attempt to sanction Jurinsky and stopped the investigation into her conduct. PAF 24, 27. At this point, CM Twombly understood that there were no longer any guardrails on Jurinsky's conduct. Response to DUMF 74, 75; PAF 24, 27. By March 21, 2022, less than one week later, CM Twombly made the decision to fire Chief Wilson. *Id.*

The timing of CM Twombly's decision to talk to the three officers *he knew were aligned* with Jurinsky, the vote by city council to stop sanctions against Jurinsky, and the repeated threat to CM Twombly that he would be fired if he did not fire Chief Wilson --- all show that the real reason Chief Wilson was fired was because of the threats from city council, along with the criticism by the police union that Chief Wilson was engaging in "liberal propaganda" and "soft peddling of critical race theory" and forcing unwanted reforms on the APD to eradicate racist policing. CM Twombly was fully supportive of all of Chief Wilson's reforms until the new city council took control, threatened his job if he did not fire the Chief, and the "guardrails" came off Jurinsky. Given the totality of the circumstances, there is more than sufficient evidence that Chief Wilson's association with and advocacy for the minority community and reforms that benefited that community were the driving force behind her termination.

Defendant argues, however, that Chief Wilson cannot establish pretext because there was an "independent investigation" that was the basis for her firing. Again, this argument misses the mark.

The Tenth Circuit recognizes that a "cat's paw" theory is applicable when the decision-maker takes an adverse action because of the discriminatory animus of another party. Defendant does not dispute the applicability of the cat's paw analysis in this case but rather argues that there was an "independent investigation" into the allegations against Chief Wilson and such investigation is the legitimate reason for her termination. Defendant claims that such an independent investigation occurred when "Twombly independently reached out to several current and former officers" who said that morale in the APD was low and the officers had lost confidence in Chief Wilson's leadership and that Twombly also "met with Wilson to discuss the concerns." Despite these assertions, no such independent investigation occurred.

First, CM Twombly was not "independent" because he was the person who was being threatened --- either fire Chief Wilson or you will be fired. PAF 18. CM Twombly did not conduct an "independent" investigation but rather justified his termination decision by talking to the three officers whom he knew were aligned with Jurinsky and who did not want the reforms mandated by the Consent Decree. PAF 26. Further, the meeting referenced by the Defendant, the March 9th meeting, *was at the request of Chief Wilson* who wanted to talk to CM Twombly about the negative statements made against her by Jurinsky and the police union. Response

to DUMF 71. No "investigation" was conducted, formally or informally, at that meeting. Finally, CM Twombly only made the decision to terminate Chief Wilson *after* he learned the city council had stopped the sanction investigation into Jurinsky, thereby removing any guardrails on Jurinsky's conduct. PAF 24, 27; Response to DUMF 74.

Defendant admits that Jurinsky was a very vocal critic of Chief Wilson but claims that there is no evidence that Jurinsky, alone, could have caused CM Twombly to terminate Chief Wilson. This argument ignores the reality of the events. This was a campaign, led by Jurinsky with the stated support of other conservative city council members Zvonek and Sundberg, and a very vocal police union, to call Chief Wilson "trash" and demand her termination. PAF 17. As CM Twombly stated, he understood that if they kept saying their complaints "loud enough and long enough" people would start to believe they were true. Response to DUMF 71. It is also clear that the conservative majority blocked any sanctions against Jurinsky for demanding that CM Twombly fire Chief Wilson, PAF 24, and if a majority of city council voted to block these sanctions, there is every reason to believe that the majority would have stood with Jurinsky and fired CM Twombly if he refused to fire Chief Wilson. Ultimately, what caused Twombly to fire Chief Wilson is for a jury to decide.

<u>2. Retaliation Claims Under Title VII and §1981</u>

a. Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, a plaintiff must show that she engaged in protected activity, suffered an adverse action, and that there is a casual connection between her protected activity and the adverse action. *Iweha v. Kansas*, 121 F.4th 1208, 1233 (10th Cir. 2024). The Defendant then must provide a legitimate reason for the termination. *Id.* At that point, the burden then shifts to the plaintiff to show that the articulated reason is a mere pretext for retaliation. A period of one and a half months between Plaintiff's protected activity and the adverse action is sufficient temporal proximity alone to establish a prima facie case of retaliation. *Downs v. Jostens, Inc.*, 23 F. Supp. 3d 1332, 1338 (10th Cir. 2014).

Chief Wilson engaged in a variety of "protected activity" in this case, including but not limited to being a vocal supporter of DEI and implicit bias training and changes in APD policies to eradicate racism, establishing relationships with the minority communities and listening to their concerns about racially-biased policing, refusing to terminate members of her staff (Parker) that supported her in making these reforms, disciplining officers who used excessive force against Black citizens, supporting officers who complained about a hostile work environment because of race, and firing Wilkinson for making racist and sexist statements.

Defendant argues, however, that Chief Wilson cannot show a casual connection between her protected activity and the adverse action. In support of this argument, Defendant states that Chief Wilson's protected conduct was "too remote" from her ultimate termination. This argument is baseless.

There is no dispute since she first became the Chief of Police, Chief Wilson began holding officers accountable for racist conduct, was vocal about her support for eradicating racially biased policing at APD, and for supporting the minority community. In the fall of 2021, she opened another investigation into a White officer's use of excessive force against a Black man. When the Consent Decree was formally entered, Chief Wilson publicly vowed to implement the mandated reforms. In February 2022, Chief Wilson terminated union president Wilkinson for making blatantly racist and sexist statements.

What changed in 2022 was the political composition of the Aurora City Council who supported the police union that was openly opposed to the reforms implemented by Chief Wilson. In solidarity with the union leadership, the vocal MAGA-type conservative, Jurinsky, began publicly demanding that Chief Wilson be fired for her "woke" reforms, was inappropriately attending police briefings and undermining the Chief, claimed that Chief Wilson's discipline of white officers for using excessive force amounted to "throwing officers under the bus," and was critical of Chief Wilson for terminating union president Wilkinson for his racist and sexists comments. Jurinsky made it clear that if she had her way, she would get CM Twombly fired if he did not fire Chief Wilson. Although some on City Council tried to stop Jurinsky, the conservative majority thwarted these attempts on March 14, 2022. It then became clear that there would be no guardrails on Jurinsky's conduct --- and that Jurinsky and the union were going to be the *de facto* decision-makers about Chief Wilson's fate with the APD. In essence, Chief Wilson

effectively got a new boss in March 2022 --- a boss that did not like her protected activity and finally had the power to do something about it. It was then that Chief Wilson got fired. That is the casual connection that is relevant to this case.

Defendant, however, attempts to cherry-pick certain events, like the DEI training or Chief Wilson's refusal to terminate Deputy Chief Parker who was responsible for helping Chief Wilson implement reforms, as isolated events that do not amount to "protected activity." Contrary to Defendant's assertion, Chief Wilson's mandating DEI training and implementing policies to eradicate racist policing, as well as retaining officers who are assisting her in those reforms and firing officers that engage in racist conduct --- is all protected conduct under Title VII. All of this conduct was related to implementing the reforms needed to eradicate racially biased policing for the benefit of the minority community. *See Johnson*, *supra* (Plaintiff's advocating for policies that benefit racial minorities is protected activity). Here, the totality of the circumstances surrounding her termination establishes genuine issues of fact that she was terminated because of the reforms she was making to eradicate racism in the APD and build trust with the minority community. At a minimum, the less than one and one half month time between Chief Wilson's protected activity of firing APA President Doug Wilkinson for making racist statements on February 3, 2022 and the decision to terminate Chief Wilson made on March 21, 2022 is sufficient temporal proximity to establish a prima face case of retaliation.

All the evidence that supports Chief Wilson's association/advocacy discrimination claims also supports her prima facie case of retaliation with respect to her protected activity. At a minimum, there is sufficient evidence that her protected activity "played a substantial part" in the decision to terminate her. *See Deschenie, v. Bd. Of Educ. Of Cent. Consol. Sch. Dist. No 22*, 473 F.3d 1271, 1277.

b. There is Ample Evidence that Defendant's Reasons For Plaintiff's Termination Are Pretextual.

A Plaintiff may establish that an employer's proffered explanation for the adverse action is pretextual in a Title VII or §1981 claim of retaliation by showing that there are "weaknesses, implausibility's, inconsistencies, incoherencies, or contradictions in the employer's explanation." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015). "The plaintiff need not show both that the defendant's reasons were a pretext *and* that the real reason was discrimination—the fact of pretext alone may allow the inference of discrimination." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003).

As stated above, the same evidence (and arguments) that supports that there are genuine issue of material fact to show pretext related to her associational claims also apply to her claims for retaliation. In addition to the wealth of evidence already cited, Defendant's explanation for Chief Wilson keeps shifting. In discovery, Defendant claimed she was terminated because of 1) the results of the union poll, 2) complaints from police officers, 3) the attrition rate of police officers, 4), Chief Wilson did not provide a plan to rebuild her relationship with her officers,

and 5) the backlog problem. PAF 28. But City management testified that they did not give any veracity to the union poll, Response to DUMF 56; 2) CM Twombly only talked to officers aligned with Jurinsky and did not ask Wilson for any officer names, Response to DUMF 70; 3) the attrition rate for law enforcement during this time was a nationwide problem, Response to DUMF 64, 4) Chief Wilson had already presented a plan to Twombly and City Council on February 22, 2022 to improve her relationship with officers, Response to DUMF 67, and 5) Twombly admitted that he did not fire Chief Wilson because of the problem with the records backlog. PAF 23.

In 2026 at his deposition, Twombly claimed he made the decision to fire Chief Wilson because he learned that she got an attorney and believed that meant that she did not want to work with him. Response to DUMF 73. But he also testified that he understood that Wilson had retained an attorney because she was concerned about her job given what city council members and the police union were saying about her. *Id*. CM Twombly further testified that Chief Wilson had never indicated to him that she didn't want to work with him. *Id*. After Twombly fired Chief Wilson, he sent the personnel record that verified that he had fired her to Jurinsky. PAF 30, 31. Although Jurinsky sent a text to Twombly after she had her own deposition in this case, Twombly refused to disclose what Jurinsky said to him, claiming that the text was "private." Id.

The then-Deputy City Manager Jason Batchelor testified that Twombly terminated Chief Wilson because of officer morale, the increase in crime rate in

2021, and attrition in the APD. PAF 29. Batchelor, however, was unable to quantify any increase in crime that was attributable to Chief Wilson. *Id*. He also testified that he knew that implementing the reforms in the consent decree could not be a popularity contest and some officers would get upset. *Id*. These constantly shifting reasons for Chief Wilson alone create an inference that the proffered reasons for her termination are pretextual.

In summary, there is an abundance of evidence that supports a prima facie case that Chief Wilson was terminated in retaliation for her protected activities and that the stated reasons for her termination are pretextual.

## CONCLUSION

For all the reasons stated above, the Court should DENY the motion for summary judgment in its entirety.

## AI CERTIFICATION

Undersigned counsel certifies that no portion of the filing was drafted by AI.

Dated this 18th day of May 2026.

Respectfully submitted:

GREISEN LAW, LLC

*s/Paula Greisen*
Paula Greisen
6110 E. Colfax Avenue, Suite 4-216
Denver, CO 80220
(303) 876-7663
pg@greisenlaw.com

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2026, I electronically filed the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the United States District Court for the District of Colorado using the CM/ECF system, which will provide to the following via email:

Holly Ortiz
Michael Brent Case
Max S. Spiegel
1120 Lincoln Street, Suite 1308
Denver, CO 80203
(303) 595-0941
hortiz@semplelaw.com
bcase@semplelaw.com
mgray@semplelaw.com
mspiegel@semplelaw.com

*Attorneys for Defendant*

*s/ Stacey Klein*

Stacey Klein, Paralegal