IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-CV-00731-STV

---

VANESSA WILSON,

Plaintiff,

vs.

CITY OF AURORA,

Defendant.

---

# DEPOSITION OF JASON BATCHELOR

---

Thursday, March 13, 2025

9:11 a.m.

PURSUANT TO NOTICE and the Federal Rules of Civil Procedure, the above-entitled deposition was taken on behalf of Plaintiff at Fennemore Law Firm, 3615 Delgany Street, Suite 1100, Denver, Colorado, before K. Michelle Dittmer, Registered Professional Reporter and Notary Public within Colorado.

Response to MSJ Ex. 2

report?

A. The Attorney General and staff have indicated that was one of the primary driving forces behind their reason for opening the investigation.

MS. GREISEN: You want to mark this exhibit.

(Deposition Exhibit 2 was marked.)

THE COURT REPORTER: Exhibit 2.

Q. (By Ms. Greisen) We put Exhibit 2 in front of you.

Can you tell us or do you recognize the person who's in that picture?

A. That is a picture of Elijah McClain.

Q. Okay. And Mr. McClain was killed in August of 2019; is that -- is that right?

A. I believe that is -- yes, that's -- I think that's the date. I don't remember exactly, but I think that sounds right.

Q. He was walking home from a convenience store, and somebody called and reported that a man in the neighborhood looked sketchy.

Do you recall that?

A. I do.

Q. And that young man turned out to be Elijah McClain, right?

A. That is correct.

Q. And you understood that prior to the encounter with officers, Elijah -- at the Aurora Police Department, Elijah McClain had never been arrested or convicted of any crime; is that right?

A. I don't -- I don't -- I'm not familiar with his criminal history.

Q. Are you aware that Elijah McClain was described as a very peaceful, gentle young man who played the violin and worked at an animal shelter?

MS. ORTIZ: Objection. Foundation.

A. I -- yes, I'm familiar that there were press reports afterwards that his character was consistent with what you had said.

Q. (By Ms. Greisen) He worked as a massage therapist.

Were you aware of that?

MS. ORTIZ: Objection. Foundation.

A. Again, I heard that, yes, in the months afterwards.

Q. (By Ms. Greisen) And three officers arrived on the scene pursuant to that call about a sketchy man walking around in the neighborhood, right?

A. Yes.

Q. To make a long story short, there was a

struggle, they wrestled him to the ground and put him in a chokehold until he lost consciousness, right?

A. They used a carotid hold, yes.

Q. Which essentially means putting their arm around somebody's neck and squeezing, and they did that until he lost consciousness, correct?

A. Correct.

Q. Paramedics arrived and injected him with a sedative, right?

A. Correct.

Q. And that young man died, right?

A. Yes.

MS. GREISEN: And I'll ask you to mark an exhibit.

(Deposition Exhibit 3 was marked.)

THE COURT REPORTER: 3.

Q. (By Ms. Greisen) We've put in front of you the exhibit marked --

MS. GREISEN: Is that 4?

THE COURT REPORTER: 3.

MS. GREISEN: That's 3, sorry.

Q. (By Ms. Greisen) Do you know what that's a picture of?

A. This is a picture that those three officers in the picture took in the months afterwards.

MS. GREISEN: I don't know whether it's been a discovery or not.

Q. (By Ms. Greisen) I'm going to play it and ask you if you've seen it before.

MS. ORTIZ: If it hasn't been disclosed, I have a problem with using it in this deposition without having previously disclosed it, and I'm going to assert an objection on the record to that.

MR. MEDLOCK: Which one, Paula?

MS. GREISEN: The Kelly.

(Deposition Exhibit 9 was played.)

Q. (By Ms. Greisen) Have you seen that video before?

A. I have.

Q. Do you recognize the video as Ms. Shataeah Kelly?

A. Yes.

Q. And did you understand that Ms. Kelly was stopped by officers and hobbled, put into a hobbled position?

A. Yes.

Q. And again, that's where we talked about her hands and feet were handcuffed and then those handcuffs were tied together, right?

A. Yes.

Q. You're aware that Ms. Kelly was then picked up by her shoulders and legs and put into the back of an APD vehicle?

A. Yes.

Q. And you're aware that she was left in the vehicle for 21 minutes?

A. Yes.

Q. And that she cried out numerous times that she couldn't breathe?

A. Yes.

Q. And that even when the officer, APD officer, got into the car, that white officer left her in that position all the way to the police station?

A. Yes.

MS. GREISEN: And we'll put the video into evidence.

Q. (By Ms. Greisen) But Ms. Kelly was a black woman, right?

A. Yes.

Q. And did you hear her in the video, when you reviewed it, refer to the officer as "Master"?

A. Yes.

Q. And that she said, quote, Master, I'll be good?

A. Yes.

Q. That the officer then ignored her pleas and rode her to the jail while she remained hobbled upside down, right?

A. Yes.

Q. That was the same year Mr. McClain was murdered, right?

A. Yes.

THE COURT REPORTER: So will the video be Exhibit 9?

MS. GREISEN: Yes.

(Deposition Exhibit 10 was marked.)

MS. ORTIZ: This also --

THE COURT REPORTER: Exhibit 10.

MS. ORTIZ: -- doesn't have a Bates number on it. Was this disclosed?

MS. GREISEN: I don't believe that has been disclosed.

MS. ORTIZ: Okay. And just for the record, there are several documents that don't have Bates numbers. Am I correct that none of those have been disclosed?

MS. GREISEN: I think if you're referring to the pictures, they probably -- they have not been disclosed.

MS. ORTIZ: Okay. We're --

MS. GREISEN: Not that I'm aware.

MS. ORTIZ: -- going to object to the ongoing use of documentation that's never been disclosed to opposing counsel. It's inappropriate.

Q. (By Ms. Greisen) Do you know who is reflected in Exhibit --

MS. GREISEN: Is it Number 10?

THE COURT REPORTER: Yes.

Q. (By Ms. Greisen) -- Exhibit 10?

A. Again, the exhibit is labeled "Dr. P.J. Parmer."

Q. Do you know who Dr. P.J. Parmar is?

A. I do.

Q. Okay. And Dr. P.J. Parmar, you recall, is an Indian American doctor?

A. I -- I don't know his ethnicity. I know he's a person of color.

Q. Mr. -- Dr. Parmar was trying to park at a refugee center that the doctor operated, do you recall that, when he encountered APD?

A. Yes.

Q. And one of the APD cars was blocking him, and he honked at the police car, right?

A. Yes.

Q. And in response, the white APD officer got

out of his car and drew his gun on Dr. Parmar, right?
A. Yes.
Q. And said to Dr. Parmar, quote, Let me see your fucking hands.
Do you recall that?
A. Yes.
Q. And he -- the officer also demanded to know what Dr. Parmar was doing at that building, right?
A. Yes.
Q. And Dr. Parmar informed the officer that he owned that building, right?
A. Correct.
Q. And the officer did not back away from the incident at that point, correct?
MS. ORTIZ: Objection. Form and foundation.
A. Not sure of the exact timing, but the officer, I think, did eventually lower his gun, but I think it was not immediately.
Q. (By Ms. Greisen) After Dr. Parmar went inside the building, right?
A. I -- again, I don't remember the exact details of it, but -- yeah.
Q. We talked about Elijah McClain and the three pictures. Let's look at another incident.

MS. ORTIZ: Has this one been disclosed?

MS. GREISEN: No.

Q. (By Ms. Greisen) These are videos that I'm going to ask you whether you've seen.

MS. GREISEN: Gilliam.

MR. MEDLOCK: Gilliam?

MS. GREISEN: Uh-huh.

They have all been disclosed in the sense that they are referenced, all this stuff is referenced in the investigation.

But, Shelly, I'm not going to ask you to transcribe the video.

(Deposition Exhibit 11 was played.)

Q. (By Ms. Greisen) Have you seen that video before?

A. I have.

Q. And I'm going to paraphrase it since Shelly didn't transcribe it.

Would you agree that's a disturbing video?

A. Yes.

Q. It's a picture of white police APD officers stopping a family with young kids in their car, right?

MS. ORTIZ: Objection. Form and foundation.

A. Again, the vehicle was in our system as stolen so the officers believed it was stolen.

Q. (By Ms. Greisen) I'm just going to ask my questions.

That video showed white police officers stopping a family with young kids in the car, right?

A. Yes.

MS. ORTIZ: Same objection.

Q. (By Ms. Greisen) And they had their guns drawn, right?

A. Yes.

Q. And they ordered the family, including the four young children, to lie face down on the hot summer pavement, right?

A. Yes.

Q. And they --

MS. ORTIZ: Objection. Form.

Q. (By Ms. Greisen) -- proceeded to handcuff the mother, right?

A. Yes.

Q. And they also proceeded, as shown in the video, to handcuff those children, right?

A. Yes.

Q. With their hands behind their back, right?

A. Yes.

Q. As the children laid on the pavement, right?
A. Yes.
Q. And these children aged in -- ranged in age from, I think it was about 6 to a young-teenager age, right?
A. I don't remember their exact ages.
Q. Okay. Well, would you agree that the young -- youngest one was around 6 years of age?
A. I -- there --
MS. ORTIZ: Objection --
A. -- there was --
MS. ORTIZ: -- foundation.
A. The children were various of age, from teenagers to, yeah, young adolescents.
Q. (By Ms. Greisen) Right.
And that during all this, the children were crying?
A. Yes.
Q. And they were screaming for their mom, right?
A. Yes.
Q. And the officers said that they thought the car was stolen, right?
A. Yes.

Q. And, in fact, the stolen vehicle was not even a car, right? It was a motorcycle that was the stolen vehicle, correct?

MS. ORTIZ: Objection --

A. Yes.

MS. ORTIZ: -- foundation.

Q. (By Ms. Greisen) Would you agree that that was an incident that was incredibly disturbing when you saw it as the deputy city manager?

A. Yes.

MS. ORTIZ: Objection. Form.

MS. GREISEN: I'm sorry, Shelly, did you get his answer?

THE COURT REPORTER: Yes.

Q. (By Ms. Greisen) Would you agree that it's incredibly disturbing to watch again today?

MS. ORTIZ: Objection. Form.

A. Yes.

Q. (By Ms. Greisen) Would you agree that it was a use of excessive force by white Aurora police officers against a black family?

MS. ORTIZ: Same objection.

A. I'm not sure that's the way I'd put it.

Q. (By Ms. Greisen) How would you put it?

A. I would put it as, I think, policies and

procedures that needed to be updated and I think that were addressed. I think that the officers did not utilize the appropriate discretion. I think they -- they followed their training at the time, and so that's been, I think, addressed in the Department.

Q. Do you think they used excessive force as shown in that video?

MS. ORTIZ: Objection. Form.

A. I think they followed their training.

Q. (By Ms. Greisen) I understand that.

Do you think they used excessive force?

A. I think they followed their training.

Q. Can you have an opinion, one way or another --

A. I think they --

Q. -- for whether --

A. -- followed their training.

Q. -- whether or not that was appropriate behavior by a police officer in that situation?

A. They followed their training.

Q. They may have, but was it appropriate?

A. That is what we expect our officers to do, is to follow their training.

Q. So that was the expected protocol by officers at the time that stop happened?

A. When they're doing a high-risk stop, that was the training that they were given. And then the Department updated that training to make sure that we didn't have situations like that again.

Q. So they were -- the video depicted them acting in accordance with how they were trained to act; is that correct?

A. From a tactic standpoint. There were some individual items in there where some of the officers' comments were not what we expected, and they were disciplined for those.

Q. What were those?

A. I don't remember off the top of my head. I believe one of the officers that was over on the children made some comments to the children that, again, I think ultimately Chief Wilson wound up disciplining them for, and then I supported that discipline.

Q. You don't remember what the comment was?

A. I don't remember the exact one. I -- I don't.

Q. Was that the only thing that deserved discipline that you saw in that video?

A. Again, I think in terms of the -- I think I trust that the chief took the appropriate actions for that, both from a policy and training standpoint, and I

also trust that she took the appropriate disciplinary action.

Q. I'm not asking you about whether she did. I'm sure she did.

I'm asking about your opinion now, as the city manager, and at the time, as the deputy city manager: Did you have any opinion on whether or not that was appropriate?

A. I --

MS. ORTIZ: Objection. Form.

A. I have to -- under the city code, I have to sign off on the discipline, and so I did. So I agreed with the discipline.

Q. (By Ms. Greisen) And I think you agreed with, my memory is, every discipline that Chief Wilson handed down, right?

A. Correct.

Q. I'm not asking that question.

I'm asking, as a person sitting here right now, you were in the role as deputy city manager at the time, did you think that anything was inappropriate, regardless of whether it followed policy or not?

A. I think that the discipline that was taken was appropriate, and I think it addressed the behaviors that were there. And I think that the incident

disclosed.

MS. ORTIZ: But the video has not, correct?

MS. GREISEN: I'm asking him if he's seen it, so no, I don't believe it's on a disclosure list.

(Deposition Exhibit 13 was played.)

MS. GREISEN: Please stop it, Scott.

Q. (By Ms. Greisen) Have you seen that video before, Mr. Batchelor?

A. Yes.

Q. And do you recognize that as Mr. Nunn, who was stopped in his car?

A. Yes.

Q. He was a black -- young black man driving the car?

A. Yes.

Q. And he was stopped by white APD officers.
Do you recall that?

A. Yes.

Q. And that once he was stopped and exited the car, the officers tackled him to the ground, right?

A. Yes.

Q. Put him in a chokehold, right?

A. No.

Q. They tased him twice?

A. Yes.
Q. Okay. After he was already on the ground and had several officers on top of him, correct?
A. Yes.
Q. As deputy city manager, do you think there was anything wrong with that encounter?
A. Yes.
Q. What was wrong?
A. The officer, I think, did not do as well of job as he should have at de-escalating the situation.
Q. And the officers had their guns drawn on Mr. Nunn as well, correct?
A. Yes.
Q. Are you aware of a situation in Aurora where a white Aurora police officer screamed profanity at a black teenager who was accused of speeding?
A. I'm not familiar -- I would need more details.
Q. Okay. Well, a white police officer stopped a black teenager for speeding and said, quote: You think I'm out here playing fucking games? You're out of your fucking mind. You better keep your fucking mouth shut.
Do you remember an incident like that?
A. I would need more -- I don't -- based off

The video with Officer Rosen was marked Exhibit 12. The video with Mr. Nunn being arrested was marked as Exhibit 14.

THE COURT REPORTER: 13.

MS. GREISEN: 13, sorry.

Q. (By Ms. Greisen) And I've put in front of you what's been marked as Exhibit 14.

Do you recognize that person?

MS. ORTIZ: Objection. For the record, this is another nondisclosed exhibit.

Q. (By Ms. Greisen) Do you recognize Exhibit 14?

A. The exhibit is labeled "Haubert," and that does look like former Officer Haubert.

Q. Okay. So you recognize Exhibit 14 as an officer that used to work at the APD?

A. Yes.

Q. Okay. And are you aware of an incident with Officer Haubert?

A. Yes.

Q. All right.

MS. GREISEN: We'll mark it as Exhibit 15.

Q. (By Ms. Greisen) I'm going to ask you if you've seen this video before?

MS. ORTIZ: Has this video been disclosed?

MS. GREISEN: The subject matter of the video has been disclosed, and I believe Mr. Batchelor has seen it, but we'll play it and see if he has.

MS. ORTIZ: So for the record, has the video itself been disclosed?

MS. GREISEN: It's not a disclosure --

MS. ORTIZ: So we're -- 15 --

MS. GREISEN: -- that I know of.

MS. ORTIZ: -- 15 out of -- we are literally at 13 out of 15 exhibits that have not been disclosed.

MS. GREISEN: Go ahead and play the video, Scott.

(Deposition Exhibit 15 was played.)

MS. GREISEN: We can stop it.

Q. (By Ms. Greisen) I can play the rest, but I'm going to ask you if you've seen this.

Have you seen this full video?

A. Yes.

Q. Okay. Do you need me to play any more to refresh your memory on what happened in --

A. Depending --

Q. -- that incident?

A. -- on what you ask me, I -- I can -- I can -- we can either -- if I need to see the video, I'll

reference it.

Q. I'm happy to play the rest of the video for you.

Do you agree that the video depicts white police officers stopping a black man who appears to be sitting in the shade?

A. Yes.

Q. Okay. And the white officer quickly escalated the situation for no apparent reason?

A. Yes.

Q. And, in fact, that white officer drew his gun on Mr. Nunn.

Do you recall that?

A. I believe you --

Q. I'm sorry. That -- let me rephrase that.

It's actually not Mr. Nunn; it's a Mr. Vinson?

A. Yes.

Q. Does that remember -- does that refresh your memory?

A. Yes.

Q. Okay. So Mr. Vinson was the person, the black man sitting in the shade.

Officer Haubert --

Is that how you say his name?

A. I believe so.

Q. Okay.

-- approached and escalated the situation very quickly --

A. Yes.

Q. -- right?

And, in fact, he pistol-whipped Mr. Vinson, didn't he?

A. Yes.

Q. And there was no indication that Mr. Vinson was armed, correct?

A. No.

Q. And Mr. Haubert held a gun to Mr. Vinson's head, right?

A. Yes.

Q. And threatened to shoot him, right?

A. I don't remember if he threatened to shoot him. He did tell him he had a gun pointed at his head.

Q. All of the incidents that we've been through today, they were all made public, right?

A. Yes.

Q. And all media coverage about black -- white Aurora police officers engaging with black and brown members of the Aurora community, right?

A. Yes.

develop ties with the community. Do you recall City Manager Twombly talking about that was one of her particular strengths?

A. I do recall him talking about as, again, one of her strengths.

Q. Right.

And so she was expected to reach out to the minority communities and navigate this very difficult time, but spending time with the minority communities and listening to their concerns, right?

A. Yes.

Q. And she did so; she went out and built alliances with members of the minority community, right?

A. I would say relationships. If you want to classify as alliances, you can. I would say she built relationships.

Q. Okay. And relationships in which she was listening to them and hearing their complaints and giving them a voice in what was happening, fair?

A. Yes.

Q. Okay. Relationships with entities like the NAACP, right?

A. Yes.

Q. And the Interfaith Alliance --

A. Yes.

(Deposition Exhibit 18 was marked.)

THE COURT REPORTER: Exhibit 18.

Q. (By Ms. Greisen) Have you seen what's been marked as Exhibit 18?

A. Yes. I saw the photo. I was not there in person, but I'm familiar with the photo.

Q. Were you aware that Chief Wilson took a knee to show support for the peaceful protests against racial -- racist policing?

A. Yes.

Q. Did you support her doing that?

A. Yes.

Q. Did you talk to City Manager Twombly about her doing that?

A. I don't recall having a conversation with him about it. I may have, but I don't remember there certainly being any repercussions for it.

Q. Do you recall him being upset by Chief Wilson doing that at all?

A. I don't.

Q. Were you aware that there were police officers at the APD that did not like the fact that Chief Wilson had marched with protesters?

A. Yes.

Q. And they were upset that she would stand

was that diversity training is to the effect of woke liberalism being shoved down their throat?

A. Things like that. I don't know if those words were used, but certainly, again, questioning the merits of the training, absolutely.

Q. Well, not just questioning it, but that kind of sentiment, that this is woke liberalism and it's being shoved down our throat.

Would you agree that that's the sentiment --

A. Yes.

Q. -- that was being expressed?

A. Sure.

Q. Okay. The APA let it be known that it did not agree with the Attorney General's findings, right?

A. Yes.

Q. So the president of the union, Doug Wilkinson of the APA, was a very vocal critic of the Attorney General's investigation report, right?

A. I don't remember specific instances, but if you say so, I don't have any reason to doubt you.

Q. Well, I'm asking you:

Do you recall that he was very, in general, critical of the report and of the consent decree? Do you recall that?

A. In general, yes.
Q. Okay. And he was very adamant that there was no racism in the Aurora Police Department.
Do you recall that?
A. Yes.
Q. And adamant -- well, back to the poll, that there were officers that said, to the -- the gist of it, that there was no systemic racism in policing.
Do you remember that sentiment?
MS. ORTIZ: Objection. Form.
A. As a sentiment, yes, I think -- I think certainly that there were officers that did not believe that.
Q. (By Ms. Greisen) And some -- well, at least one officer called it quote, Neo-Marxist political theory, talking about the diversity training.
Do you recall that?
A. I don't recall those exact words.
Q. Do you remember somebody complaining that they didn't want to participate in the training anymore because the training -- the person who was giving the training early on made a comment that George Floyd was murdered, and they thought that was objectionable.
Do you recall that?
A. I don't recall that -- again, that

firefighters accountable for violating policy."

Q. Okay. So holding officers responsible for violating policy was a part of what the consent decree mandated, correct?

A. Yes.

Q. And as we've talked about before, it's not just a practice; this is actually what the Order of the Court has become, right?

A. Yes.

Q. Okay. Did you understand or would you agree that Chief Wilson took her obligations under the consent decree seriously?

A. I don't want to speak for Chief Wilson. I -- you know, my experience with her, my perception was that she took it seriously.

Q. And did you agree, at least from your perception, what you saw, that she acted in accordance with the mandates in the consent decree?

A. Yes.

Q. And do you remember -- you can put that away because we're not going to talk about anything specific in it right now.

In -- and I'm going to paraphrase this, so you tell me if I get it wrong.

But there was a press conference, after

Q. Okay. And that's what he did, right?
A. Yes.
Q. And did you think that anything that Chief Wilson did about opening up that investigation was improper?
A. No. And I believe my comments at the time after the no-confidence vote reflect that.
Q. And we'll get to those.
So essentially there is -- or what we hear about, at least, is that the APA holds a, quote, no-confidence, unquote, vote, and Wilkinson announces that the majority of officers voted no confidence in Chief Wilson, right?
A. Yes.
Q. Now, this was an anonymous poll, right?
A. Yes.
Q. And no evidence that it was scientifically done in any way, right?
A. Yeah. I think we raised -- we had a number of concerns on that. I think we expressed those to different folks at the time, right? Because it was -- I think it was a SurveyMonkey.
Q. Right.
A. It was -- there was no proof that somebody couldn't vote multiple times.

Q. Right.
A. So yeah, it was -- so -- and because of that, I think we --
Q. So not only -- I mean, you didn't know who was voting, and you didn't know how many times any person was voting, right?
A. Uh-huh -- yes.
Q. So the poll was, would you agree, not something anybody could trust in terms of its veracity, correct?
A. Correct.
Q. But Wilkinson distributed -- or said to the press that the poll overwhelmingly showed union members did not have confidence in Chief Wilson, right?
A. Correct.
Q. And he -- Wilkinson again circulated what he claims were the poll results -- what he claims were actual comments made during the poll results.
Did you see that?
A. I -- I remember that; that, yeah, in addition to sort of the numerical values of the vote, he did also include -- I forget whether it was an Excel spreadsheet or a Word document or something, but com- -- I think, yeah, the -- the poll, I think, did allow for folks to provide text comments, and so he did release

those as well.

Q. And I don't -- I haven't seen the Excel spreadsheet. All I saw was what Wilkinson sent to the media, which are, like, little snippets --

A. Snippets.

Q. -- of comments.

Have you seen what I'm talking about?

A. Yes.

Q. Okay. And the comments were all over the place. I'm not going to spend the time today to get into them, but the -- the gist of the comments were -- I'm going to give you a couple things.

Some of them were that she should have fought the consent decree, right?

A. Yes.

Q. And that opening an investigation into what happened to Mr. Nunn was, quote, a bridge too far.

Did you see those comments?

A. Again, I don't remember the specifics, but again, I think there was -- between the -- reopening the investigation, between that, I think the patterns and practice folks wanted to push back harder on. And then the other one was, I think, there were still lingering resentment over how Chief Wilson had handled the District 1 protest.

in the September report?

A. I don't remember as early as August. I remember the -- I think we knew that there were -- they were going to release their findings, and I think what was interesting about that is it seemed like: Hey, we're going to release our findings. And then two weeks would go by: Where are they? "We're going to release our findings."

And so I remember being kind of there. I don't remember having a heads-up in terms of what it was. We knew it was out there, but they finally did release it in the middle of September.

Q. So there was discussions, though, around this time that there was going to be a consent decree, because I see people talking about the consent decree before a consent decree was entered as an order.

Did that happen?

A. I don't -- that, I don't recall. I know that -- again, as soon as we got this, I remember having conversations that given that 60-day timeframe, we -- you know, we needed to move quickly.

Q. And get the consent decree done?

A. Yes.

Q. So the news that this no-confidence vote had been taken by the union and they had come out against

Chief Wilson, that was big news in the state.

Would you agree?

MS. ORTIZ: Objection. Form and foundation.

A. I would say it was news and it was another news story confounding Aurora. As you've -- as we've discussed today, there was a number of high-profile incidents, and that was just another high-profile incident involving the Aurora Police Department.

Q. (By Ms. Greisen) It was another high-profile incident and a high-profile incident that resulted being on the front page of the newspaper and the lead story in, I think, every media outlet.

Does that sound right?

A. It certainly was broadly covered.

Q. You certainly heard about it at the time, right?

A. Yes.

Q. And you alluded to this earlier:

In response, you actually went out publicly and held a press conference in support of Chief Wilson, right?

A. I don't think it was a press conference. I think we put out a press release. Because we were getting lots of questions about: What is the City's

response to, you know, the vote of no confidence, and I think at that point, we did a press release.

Q. Maybe it was because I have quotes instead of a video, so I'll read the quote and you tell me if -- if it is consistent with your memory.

That you said, quote: Chief Wilson accepted and embraced her role knowing significant challenges were ahead. She is responsible for making difficult and at times unpopular decisions to meet the needs of both employees and the community.

Does that sound like what you said?

A. Yes.

Q. Okay. And did you -- I'll go on because that actually wasn't the end.

And you went on to say, quote: Over the last 21 months, she has been a vocal champion for Aurora police officers while also making it clear that she supports implementing best practices. This vote comes at a time when there are a lot of changes underway for the policing profession. I believe we all share the same goal of supporting our officers and look forward to working with the union to address their concerns and restore trust.

Right?

A. Yes.

Q. You understood that if Vanessa Wilson, as chief of police, was going to change the practices of the APD, it would not be a popularity contest, right?

A. Yes.

Q. And if she did the full job she was required to do, there was little doubt it was going to upset at least some of the status quo, right?

A. Yes.

Q. And that necessarily meant that some officers would get upset, right?

A. Yes.

Q. Was it your understanding that City Manager Twombly agreed with the statement that you gave?

A. I don't have any reason to believe he disagreed with it. He didn't tell me so.

Q. Did he tell you that he was supportive of the chief?

A. I don't recall that.

Q. Well, did you all have discussions at the time about not putting veracity in the no-confidence poll?

A. We did. I think we had some conversations there. I think this is probably about the time that we started trying to shift Vanessa and the Department's focus to -- there had been a number of high-profile

time?

A. I -- again, if that's -- it sounds about right time frame.

Q. And it's also during this time frame where your office, including Chief Wilson, is negotiating the settlement connected with the Elijah McClain case, right?

MS. ORTIZ: Objection. Form.

A. I would say that the City was negotiating that. We were going through a number of different folks, including our excess insurance carrier, city attorney's office, and yes, Chief Wilson was involved in -- I don't know if all of them, but certainly a number of those settlement negotiations.

Q. (By Ms. Greisen) Chief Wilson actually went to the mediation involving Elijah McClain's family, didn't she?

A. We both did, yes.

Q. Right.

And that was at the request of Elijah McClain's mom, right?

A. I believe that's correct.

Q. Because she trusted Chief Wilson and wanted to hear Chief Wilson's voice during the mediation, right?

A. Yes.

far, they are going to be stuck wringing their hands."

And then he goes on to call the consent decree ". . . literally systemically sexist and racist."

Are those fair quotes?

A. Yeah. You have -- you have appropriately and precisely recited the portions of the email.

Q. In response to this email, there were employees at the Aurora Police Department that filed -- minority and female, that filed EEO Complaints, right?

A. Yes.

(Deposition Exhibit 20 was marked.)

THE COURT REPORTER: Exhibit 20.

Q. (By Ms. Greisen) Do you recognize Exhibit 20 as an email chain between yourself and Mr. Twombly discussing the fact that there were EEO Complaints from two officers filed in response to Mr. Wilkinson's email that we just went through?

A. Yeah. I think I would summarize the email chain of: This was Chief Wilson; myself; Pat Sylvester, who's the City's EEO officer; Ryan Lantz, the director of HR; and Laura Perry, who at that time was the deputy city manager over HR.

This was forwarding the EEO Complaints from two officers in response to Doug Wilkinson's email.

I forwarded it without comment to

Mr. Twombly, just to make sure -- he was not copied on it, so I wanted him to be aware of it, so I sent that to him.

Q. And that's Mr. Twombly's comment at the top, right?

A. Yes.

Q. So it quickly became well-known that Mr. Wilkinson had sent this email out; would you agree?

A. Yes.

Q. The Complaints in general -- and we'll get into the specifics -- but the Complaints that were made by these officers was that this email created a hostile work environment based on race and gender in the workplace, right?

A. I don't remember the specific charges in the Complaint. I would have -- I would want to look at that before commenting on it. I know that they filed the Complaint.

Q. Okay. Well, we'll look at them.

Do you understand that the Complaints, the EEO Complaints, were alleging that this was -- the email itself was sexist and racist?

A. Yes, absolutely.

Q. Okay. And I'm not going to get into all the details, but Chief Wilson found that this email --

A. Yeah. She's in the center there, blond hair, wearing jeans and a red shirt.

Q. And it's essentially a Facebook post that she's out supporting the APD and that -- announcing that she and another council member have both been endorsed by the APA and the FOP, right?

A. Yes.

MS. ORTIZ: Objection. Form.

Q. (By Ms. Greisen) And the other person she's referring to is Dustin Zvonek?

A. Yes, he's in the picture as well.

Q. Standing next to her in the blue plaid?

A. Yes.

Q. And they were -- along with a third candidate, Steve Sundberg, they were all closely aligned and got the support of the police unions.

Do you remember?

A. I don't remember -- it -- that sounds correct. I don't -- I did not follow who endorsed who, but that sounds correct.

Q. Well, Jurinsky, I mean, to -- as well as Sundberg and Zvonek, but to a great extent, Danielle Jurinsky aligned herself with the police department during the campaign, didn't she?

A. You're saying "police department." I

would say she's aligning herself with the -- the FOP and the APA.

Q. Okay. The police unions?

A. Yes.

Q. Okay. In fact, during the campaign, Jurinsky -- so there's three of them. I'm going to primarily talk about Jurinsky.

But her and Sundberg and Zvonek, they held fund-raisers for the APA and the FOP, right?

A. I don't know if they held fund-raisers for the APA and the FOP or if it was the other way around. I don't know.

Q. The exhibit that you just looked at, that was Exhibit 22?

A. Uh-huh.

Q. That's Jurinsky and Zvonek standing in front of, looks like a SWAT vehicle; is that right?

A. It does, yeah. That looks like the -- I don't know if that's our MRAP or the Bear. I think that's -- and then it looks like she took a picture at -- at least what the email -- or the post says is National Night Out.

So typically, National Night Out is an -- is an event in August where the police are out and they're engaging with different community groups and

things like that, trying to promote police-community relationships.

Q. So there are seven police officers standing in uniform with an APD SWAT vehicle in the picture.

That's clearly being used as a part of her campaign, right?

A. That's what --

MS. ORTIZ: Objection --

A. -- she used it for.

MS. ORTIZ: -- form.

(Deposition Exhibit 23 was marked.)

THE COURT REPORTER: 23.

Q. (By Ms. Greisen) You recognize Exhibit 23 as another page in Jurinsky's Facebook page?

A. I don't have Facebook and I don't follow the -- the council member, but it looks like a -- a Facebook post from, yeah, Danielle Jurinsky.

Q. And she says on that post ". . . Aurora needs council members that will make public safety a priority and stand up to defunding the police."

Right?

A. Yes.

Q. You are aware that in response -- you've heard of the Black Lives Matter movement, correct?

A. Yes.
Q. And that in response to Black Lives Matter, she would tweet things like "hashtag All Lives Matter."
Are you aware of that?
A. I -- again, I don't have any social media, but it sounds consistent with what I've heard her say. But I, again, have no direct evidence of that.
Q. Okay. So the three of them -- Jurinsky, Sundberg, and Zvonek -- all got elected to city council, right?
A. Yes.
Q. And that means there's a new conservative-leaning majority on city council, right?
MS. ORTIZ: Objection. Form.
Q. (By Ms. Greisen) Well, do you not know what the meaning of the word "conservative" is?
A. No. I think I would say that there's an 11-member council, so those three were elected, along with --
Q. You don't have to tell me everybody.
I want to know if there's a majority, conservative majority -- conservative majority on city council?
A. Local elections are nonpartisan, but I

would say that given their expressions of leanings, that yes, there is a conservative majority on council after the 2021 election. And I'd say that that continued after the 2023 election as well.

Q. And the election happens, I think it's November 2; is that right? Around --

A. The first -- first Tuesday --

Q. -- the 2nd or --

A. -- first Tuesday in November.

Q. Okay. I have let my exhibits now get out of order.

So it's -- essentially if you look at Exhibit 19, right after the election, that Wilkinson then sends out this email that we've agreed is sexist and racist.

Do you see that?

A. Yes.

Q. And it's pretty clear -- well, right after the election happens, city -- the new city council members take their seat, right?

A. They are sworn in at the first meeting in December, so it's effectively, I think, the first or second week of December.

Q. A couple of weeks after the election, right?

A. I've heard her say similar things.
Q. And that she referred to Chief Wilson as the, quote, woke police chief?
You heard that?
A. I think that was among a number of things that she accused or called the chief.
Q. Right.
And you were also aware -- I'm going to say in January, February, don't have exact dates -- but you were aware that Jurinsky had been let into actual police briefings at APD and allowed to make comments about the chief at those briefings, right?
A. I had heard that report, yes.
Q. Does -- who's Jad Lanigan?
A. Jad Lanigan at the time was a -- Jad's yoyoed. I don't know if he was a division chief at the time, but he was either division chief or a commander in the Department.
Q. Did he tell you that he was doing it?
A. No.
Q. Who told you that Jurinsky was being allowed to attend --
A. I was --
Q. -- police --
A. -- hearing those reports from Chief

Wilson. She had said she had gotten reports from officers that she was there.

And so she and I talked about how to address that, both with the officers and then I was going to try and address it with council.

Q. How did you tell her to address it?

A. I did not tell her how to address it. I asked -- you know, left it to her discretion as to how to address it with her officers.

I think we talked about whether she wanted to do a policy or -- or directive. I think -- I don't remember exactly, but we talked about the different ways she was going to try to address it internal to the Department. I was going to sort of raise this as an issue, that it was inappropriate for a council member to be going to police briefings.

Q. She was being led into those briefings by police officers, right?

A. Yes.

Q. And she was making derogatory comments about Chief Wilson, right?

A. To my understanding.

Q. What did you do about it?

A. Again, so I think what we talked about was raising that issue. So I -- I think I spoke with Jim

A. It was certainly, I think, out there, yes.
Q. Widely known?
A. Widely known.
Q. You understood that Jurinsky and the city council members that were aligned with her believe the consent decree was part of woke ideology; would you agree with that?
A. I know they -- I don't know how they described it, but I know that they had expressed concerns about the impacts of the consent decree.
Q. It's not just concerns; they thought it was aligned with liberalist woke ideology.
You've heard that term before, haven't you?
A. I have heard the term.
Q. Right.
A. I don't -- I have not heard them specifically describe it to me, and -- and I've had discussions with each of those council members about the consent decree, how it came about, and the impacts of that consent decree on the Department and the City.
Q. And you're aware that the sentiment basically is that it's liberal buzz-of-the-day stuff?
MS. ORTIZ: Objection. Form.
A. I don't know what they -- again, I can

tell you about my conversations with them: They had concerns about it. They felt it was not needed. They felt it was damaging to the Department.

I do not remember them describing it to me as leftist woke ideology. They may have said that in other jurisdic- -- or other formats. They didn't describe it that way in their conversations with me.

Q. (By Ms. Greisen) They were critical of the consent decree, right?

A. Yes.

Q. And they were critical that there was an agreement to enter into the consent decree, right?

A. Yes.

Q. And would you agree that Danielle Jurinsky generally is very hostile toward anything that represents what we've come to call DEI principles?

A. Yes.

Q. In fact, at a somewhat recent city council meeting, Jurinsky railed against you for the creation of a DEI office in the City of Aurora, right?

A. She -- she was critical of the creation of an -- of a DE- -- the DEI office, yes.

Q. And demanded you to explain why it even existed, right?

A. She did.

A. Okay.
Q. The second sentence.
MS. ORTIZ: And just for the record, I'm not sure if I missed it. Are we in the consent decree, or are we in Exhibit 1?
MS. GREISEN: Exhibit 1.
MS. ORTIZ: Okay.
A. Yes, that's what the sentence says.
Q. (By Ms. Greisen) And you've understood the investigation showed a pattern of racially based policing predominantly with the black community --
A. That's what --
Q. -- right?
A. -- the patterns and practice investigation says.
Q. Do you remember that Jurinsky vowed to sponsor a bill that would dismantle any DEI office in Aurora?
A. I don't remember that, but -- no.
Q. Is that consistent with the sentiments that she's expressed?
A. Something similar, sure.
MS. GREISEN: Would you mark another exhibit.
(Deposition Exhibit 25 was marked.)

THE COURT REPORTER: 25.

Q. (By Ms. Greisen) Would you agree, that's a Facebook page posted by Danielle Jurinsky, produced as Aurora 1154, in which she says, "I will be doing weekly interviews on multiple shows until the Chief is gone and our department is liberated"?

A. Yes. That's what the . . .

Q. Were you aware of that posting?

A. Not that I recall. Again, I don't -- I'm not a social media user.

(Deposition Exhibit 26 was marked.)

THE COURT REPORTER: 26.

Q. (By Ms. Greisen) Exhibit 26, do you recognize that as another posting by Danielle Jurinsky where she uses the hashtag "FireTheChief"?

A. Yes.

Q. And you said you're not a social media user, but these postings that we're going through, these were circulated by the media department in Aurora, right?

A. I don't know if they do every post that does that. I was aware that she was, again, continuing to stir the pot after her interview, so I don't remember this one specifically, but I knew she was posting.

Q. You knew she was using the hashtag "FireTheChief," right?

A. I think somebody told me that. I -- yeah.
Q. That is consistent with the sentiments she was expressing?
A. Yes.
Q. Did you and Jim Twombly discuss these -- well, let me start back.
Well, did you discuss the Tubbs interview that she did with Twombly?
A. I think I remember discussing with him, again, sort of -- I don't remember any individual conversation on the interview or the social media post. I just remember having discussions with Jim that she was being very vocal in a variety of sources. And again, that was part of that larger conversation about talking to the mayor, talking to others about how best to address that.
Q. When did you have that discussion, or was it a series of discussions?
A. It was probably a series of discussions in that January -- end of January time frame when -- you know, kind of contemporaneous with these reports.
Q. So you talked with him about the Tubbs radio show and the social media postings and the police briefings; is that right?
A. Yes.

Q. So you told me, with respect to the police briefings, Jim Twombly is going to take it up with the mayor --
A. Uh-huh.
Q. -- right?
Just answer "yes" or "no" --
A. Yes.
Q. -- for the record.
So what was the plan with respect to all this other stuff that Jurinsky was doing?
A. I think, in general, all of that was kind of being, in my mind, put together with: How does council wish to address this?
Q. I lost you there.
What did you and Jim decide you were going to do --
A. Jim --
Q. -- about it?
A. Jim was going to talk to the mayor about kind of all of -- the sum total of all of that.
Q. When was he going to do that?
A. I -- again, I don't have a recollection of those exact dates.
Q. Anything else, other than Mr. Twombly was going to talk to the mayor? Any other action --

spoke most days.

Q. Okay. So it was, if not daily, almost daily that you were having conversations with Chief Wilson?

A. Yes.

Q. So during this time when you were talking with Chief Wilson and you were talking to City Manager Twombly, was there anything done to stop what Jurinsky was doing?

A. Again, I think that was the -- the idea was that we were going to go to the mayor. You know, neither the city manager or I have the ability to silence a sitting council member or, for that matter, a non-sitting council member.

So all we could do is raise it as an issue with the mayor and then essentially allow the mayor and his colleagues determine, you know, if this is something that they wanted to see addressed.

And Jim was going to -- he had regular meetings with the mayor as well. He was going to kind of, I think, lay this out and see, you know, what the mayor's thoughts were and how we could best address it.

Q. What, if anything, did the mayor do to --

A. I don't know. I was not in those conversations.

Q. Did you talk with --
A. No.
Q. -- her about how that was in context about who's responsible for what?
A. I did not.
Q. Okay. Did you talk with Council Member Marcano about Exhibit 27?
A. Not in depth. I think it was a conversation. I think he let me know he was -- he was doing it. I think he might have even told me: You don't need to comment on it, but, just, I want you to know that I am taking this forth.
Q. Okay. So on Exhibit 27, the third paragraph says: "Your comments on social media and talk radio amount to public direction to terminate Chief Wilson and Deputy Chief Parker in direct violation of our city charter."
Did you agree with that statement?
A. Yes.
Q. Did you tell Marcano that you agreed with it?
A. Again, I don't think he -- I think he specifically directed me not to comment on it.
Q. Did you tell City Manager Twombly that you agreed with --

Q. Right.
A. -- that they feel supported.
Q. And that was all started in February of 2022, right?
A. We were having those conversations, again, about reengaging with the Department and building morale, I think probably starting as early as the last half of 2021.
Q. Fair.
But the "New Way Forward" plan was given to city council by Chief Wilson.
You know what I'm talking about --
A. I do.
Q. -- the "New Way Forward" plan?
A. Uh-huh.
Q. And, in fact, you signed off on that plan, right?
A. I did.
Q. It was her plan to improve morale and relationship with the police department, right?
MS. ORTIZ: Objection. Form.
A. It was a plan that was developed amongst a number of different folks that were taking input. So I -- our city communications team had some significant input --

Q. (By Ms. Greisen) Sure.
A. -- but ultimately, yes, it was issued by Chief Wilson in her role as the chief of police.
Q. Right.
And she presented it to yourself and Chief -- or City Manager Twombly, right?
A. Uh-huh, she did.
Q. And she presented it to city council, too, right?
A. I don't know if --
THE WITNESS: (To Ms. Wilson) Did you --
A. I don't remember if she did or not. But I knew she -- it was definitely put out there on the public, on the website, we talked about it. I think she did, but I don't remember the exact date.
MS. ORTIZ: Can I get a copy of that, please?
MS. GREISEN: Oh, yep.
MR. MEDLOCK: Here you go, you can have that one.
(Deposition Exhibit 29 was marked.)
THE COURT REPORTER: 29.
Q. (By Ms. Greisen) Do you recognize Exhibit 29 as the plan that Chief Wilson presented at the Public Safety Commission meeting, that I believe you

attended, for members of city council?
A. So, yeah, the Public Safety Committee meeting is three members of council.
Q. Right.
A. So, yeah, this looks consistent with that presentation.
Q. Happens to be the three council members we're talking about, right: Jurinsky, Sundberg, and Zvonek?
A. I don't know when this was presented. I don't remember if it was them. I think they did get appointed to the Public Safety Committee in January of 2022.
Q. Right.
It was presented in February of 2022; is that right?
A. It --
Q. That sound right?
A. Sure.
Q. It was a Zoom meeting that you attended, right?
A. No. It would have been probably a WebEx virtual meeting, yes.
Q. Fair enough. I meant Zoom -- we use that -- just generally like Coke now. It's just the --

MR. MEDLOCK: Xerox.

Q. (By Ms. Greisen) -- the name for a remote meeting --

A. Okay.

Q. -- right?

A. Yes.

Q. Okay. And this was -- talked about her plan to rebuild her relationship with members of the police department, right?

A. Uh-huh, yes.

Q. And talked about her going to -- actually having meetings with different officers to listen to their concerns and engage with them, right?

A. Yes.

Q. And, in fact, you went on several of those meetings, didn't you?

A. I went with some -- some of the different shift change briefings when we were talking about the consent decree, we were talking about this plan, yes, I did go to some of those.

Q. All right. Well, you went to the plans -- or to the meetings that are talked about in this exhibit where Chief Wilson went to listen to officers' concerns and enact the "New Way Forward" plan that's outlined in Exhibit 29, right?

A. Yes.
MS. ORTIZ: Objection. Form.
Q. (By Ms. Greisen) She was actually asked, when the new city council was seated, to put together a plan on how she was going to rebuild a relationship with the APD, right?
A. She was -- yes, that was, again, part of that -- those conversations --
Q. Right.
A. -- we were having with her about rebuilding morale and about --
Q. Right.
A. -- again -- yes.
Q. And this plan was put together in response to that, right?
A. Yes.
Q. You approved the plan that's shown in Exhibit 29, right?
A. Yes.
Q. You're aware that early in March, Chief Wilson told you she was going to ask City Manager Twombly for a meeting to discuss the rumors about her being terminated, right?
A. It sounds correct.
Q. Tell me about your discussion with Chief

violent crime rates in 2022, 2023 were -- were increasing.

Q. Vanessa was terminated in March of 2022.

A. I know, so . . .

Q. So you were using crime rates --

A. 2021 --

Q. -- in --

A. -- 2022, yes, we -- those were the crime rates.

Q. So you attributed the increase in crime in 2021 to Chief Wilson?

A. Again, I -- I -- I contribute our lack of a strategic plan for how to address it to Chief Wilson.

Q. No. That's a different question than what I asked.

A. Uh-huh.

Q. Did you attribute the rise in crime rates in 2021 to Chief Wilson?

A. No, not solely. I think, again, it's -- the expectation is that the chief, again, is having a vision for how to address the crime and how to bring it down.

Q. Did you ask her what her vision was to do that?

A. Yes. That was part of those conversations

After the AG announced their investigation, new city council is put into place, Wilkinson's fired, Jurinsky goes on her campaign.

You're saying that -- I asked you what events occurred between that time that made the decision to -- that was a catalyst in making -- in firing Chief Wilson, and what you've given me is -- I want to make sure I've covered them all -- officer morale, crime -- increase in crime, and attrition rates?

A. Yes.

Q. Is that it?

A. Yes.

Q. Anything else?

A. No.

MS. ORTIZ: It's about 4:30. Can we do a quick bathroom break --

MS. GREISEN: You bet.

MS. ORTIZ: -- and time check?

MS. GREISEN: That's a fine place to take a 10-, 15-minute break.

(Recess taken from 4:29 p.m. until 4:37 p.m.)

Q. (By Ms. Greisen) You would agree that Chief Wilson promised the minority community that she would provide more transparency about officer conduct at

the APD, right?

A. Yes.

Q. And in keeping with that promise, Chief Wilson probably provided more information than a lot of chief of police might have provided to the community, fair?

MS. ORTIZ: Objection. Foundation.

A. I -- I know she made it a priority and -- and really sought to make sure that she was fulfilling that promise that she made.

Q. (By Ms. Greisen) She didn't have to fire Officer Wilkinson. She could have imposed lesser discipline.

Would you agree?

A. I agree.

Q. She didn't have to reopen the investigation into what happened to Mr. Nunn, right?

A. Right.

Q. She didn't have to release the body-worn camera footage with respect to the treatment of Mr. Vinson, right?

A. Actually, under, I think, state law, she would have had to release it eventually. But she moved very swiftly to, I think, condemn the treatment and -- and take swift action.

A. No.
Q. And just so the record is clear, when I say "that" wasn't the message that the APA was giving out, I'm going to rephrase that so the record is clear.
The APA wasn't giving out the message that Vanessa Wilson was doing the right thing. The message was she's -- doesn't have our back.
Would you agree?
A. I would agree.
Q. Was there ever an investigation in -- at the APA -- I'm sorry, at the APD, to your knowledge, about who amongst the law enforcement officers was letting Jurinsky and Zvonek or Sundberg into the police briefings to undermine Chief Wilson?
A. I'm not aware. That would have been Chief Wilson's purview to -- to direct such an investigation.
Q. Did anyone else, to your knowledge, ever direct such an investigation?
A. No.
Q. So Twombly called Chief Wilson into a meeting and fired her, right?
A. Yes.
Q. Prior to that, was it your understanding that he was suggesting to her that she resign?
A. My understanding was that he was having