MS Harrison Consulting

Vanessa Wilson, Plaintiff

vs

City of Aurora Colorado, Defendants

# Expert Report of Michael S. Harrison



Response to MSJ Ex. 5

## Police Practices and Criminal Justice Management Experts

Although police practice and criminal justice management experts are usually found with advanced degrees in law, pathology, psychology, and medicine, most experts that are not use-of-force are non-scientific experts whose knowledge and opinions are based on professional education, training, and experience. I undertake this review as a professional practice, non-scientific expert.

Police practices and management experts are typically practitioners or former practitioners who rely on continuing education, conference presentations and committee work, trade publications that summarize current issues in the profession, and innovative practices and strategies to combat immerging local and national policing issues.

Police practice expertise is often the product of on-the-job lessons learned that are shared through academy classroom training, field training, continuing education training, professional development and informal on-the-job discussions. Expertise in management of criminal justice personnel is also based on experience, education and professional development.

## Education

I have a bachelor's degree in criminal justice from University of Phoenix New Orleans campus. I also hold a master's degree in criminal justice from Loyola University of New Orleans.

## Work Experience

I have 33 years of experience in law enforcement. I served in the New Orleans Police Department for 28 years, nine of which were in Internal Affairs, at the ranks of Sergeant, Lieutenant, and Commander. In 2014, I was promoted to Superintendent of Police by Mayor Mitchell Landrieu and was charged with leading the department through the most comprehensive, exhaustive consent decree in the history of the country. In its investigative findings, the DOJ cited the NOPD as “the most troubled police department in America.” This mandate challenge was exacerbated by a three-year hiring freeze which caused an attrition from 1500 sworn officers to 1100 sworn officers. At the end of 2018, we rebuilt the staffing from 1100 sworn to nearly 1300 and had great success moving the department into compliance in several areas in the consent decree.

I was recruited to Baltimore to be the Police Commissioner to bring the department into compliance with its federal consent decree. As Commissioner, my job was to lead that department in its everyday operations, both strategic and operational crime fighting. My charge was to create and implement strategies to prevent and reduce crime while simultaneously implementing the mandated reforms in the federal consent decree, implementing national best practices, and changing the culture of the Baltimore Police Department.

At the time of the DOJ's investigative findings, the DOJ labeled the Baltimore Police Department as the "most dysfunctional" police department in America and the investigation confirmed the pattern and practice of unconstitutional and unlawful policing.

Under my leadership, by 2023, the Baltimore Police Department had navigated successfully through what was the most expansive consent decree in the country. I was then and I now remain the only police chief in America to manage and lead two police departments that were under federal consent decrees because of a pattern and practice of race-based policing, both of which were in cities challenged with high violent crime and extreme manpower shortages due to the national anti-police sentiment crisis.

Since March 2024, I have been the Co-Lead Independent Evaluator (Monitor) hired by the City of Minneapolis and leading a ten-person team overseeing the mandated reforms outlined in their state Settlement Agreement brought by the Minnesota Department of Human Rights. The state settlement agreement is the result of a pattern and practice investigation conducted after the murder of George Floyd in the summer of 2020. An investigation was done by an independent review panel and then a separate federal pattern and practice investigation was done by the United States Department of Justice Civil Rights Division. Both investigations revealed patterns and practices of unconstitutional and unlawful policing by the Minneapolis Police Department. The Minnesota department of Human Rights brought forth a state settlement agreement, which the city entered into committing to make the reforms agreed upon in the agreement. The US Department of Justice brought forth a federal consent decree which has now been withdrawn. However, the state settlement agreement by the Minnesota Department of Human Rights remains for at least the next four years.

# Publications

## National Policing Institute Council on Policing Reform and Race

- In October 2020, the National Policing Institute, formerly the National Police Foundation, announced the formation of the Council on Policing Reforms and Race, an independent initiative to support excellence in policing, address racial disparities, and build and enhance trust and legitimacy. The Council was composed of public safety experts, corporate executives, academics, political & philanthropic leaders, and police department executives. I served on the Council as the only active law enforcement executive from a major American city.

- Co-authored the Council's report and developed recommendations related to how law enforcement agencies should develop policy and procedures on the following topics: traffic stops, mental health and substance abuse, body-worn cameras, community-based violence prevention, the culture of policing, fines and fees, policing in schools, and other important aspects of policing.

## US Conference of Mayors Working Group Report on Police Reform and Racial Justice

- In wake of the murder of George Floyd in May 2020, the US Conference of Mayors convened a Working Group comprised of the Mayors of Chicago, Tampa, and Cincinnati, and the Police Chiefs/Commissioners of Phoenix, Columbia, and Baltimore with the goal of providing guidance to major cities on how to reform policing and confront long-standing mistrust between law enforcement and communities of color.

- Co-authored the Working Group's report and developed recommendations related to how law enforcement agencies should embrace reform and focus on the following key areas: trust & legitimacy, redefining the role of police, sanctity of life, equality & due process, community policing, transparency & accountability.

## Teaching experience

### University of Phoenix, New Orleans Campus Faculty Instructor

### April 2010-August 2014

- Provided instruction to students in the following course work: Contemporary Issues and Futures in Criminal Justice, Organizational Behavior and Management, Criminal Justice Management Theory and Practice, Managing Criminal Justice Personnel, Juvenile Justice Systems and processes, Current Issues/Futures in Criminal Justice Management, Forecasting and Strategic Planning, Criminology, Research Methods, Criminal Law, Policing Ethics, Organized Crime.

## Professional Development

### Federal Bureau of Investigation National Executive Institute (NEI), class #40 September 2017

Provided three weeks of instruction to students in the following course work: Contemporary Issues and Futures in Criminal Justice, Organizational Behavior and Management, Criminal Justice Management Theory and Practice, Managing Criminal Justice Personnel, Juvenile Justice Systems and processes, Current Issues/Futures in Criminal Justice Management, Forecasting and Strategic Planning, Criminology, Research Methods, Criminal Law, Policing Ethics, Organized Crime.

### Police Executive Research Forum Senior Management Institute for Police (SMIP) June 2014

SMIP provides senior police executives with three weeks of intensive training in the latest management concepts and practices used in business and government. It also features discussions of the most challenging issues facing law enforcement executives today.

**Northwestern University Center for Public Safety School of Police Staff and Command class #288 August 2009 to October 2009**

An intensive ten-week residency management and leadership program that prepares law enforcement managers for senior positions by uniquely combining academic principles with practical applications.

**International Association of Chiefs of Police I ACP leadership and police organizations LPO program**

IACP's flagship three-week leadership development training program, the LPO is modeled after the training concept of dispersed leadership ("every officer a leader") and delivers modern behavioral science concepts and theories uniquely tailored to the law enforcement environment.

## Orientation

I have been retained as an expert in police practices and in criminal justice systems and personnel management by Greisen Medlock, LLC in the matter of Vanessa Wilson against the City of Aurora, Colorado.

The documents and statements I considered in forming my opinion in this matter are attached as Exhibit A.

This information is briefly summarized as follows:

On December 13, 2024, I conducted a virtual interview of former Chief of Aurora Police Vanessa Wilson. She explained that she was a career member of the Aurora Police Department who rose through the ranks. Chief Wilson explained that she was offered the job of Interim Chief of Police by City Manager Twombly. and she accepted. She continued that she was charged with leading the police department through its state consent decree resulting from the findings of a pattern and practice investigation that revealed that the Aurora Police department had engaged in racially based, unlawful and unconstitutional policing. Twombly charged Wilson with changing the culture of the police department and rebuilding community trust, which was poor and further

eroded with the killing of Elijah McClain. Wilson explained that Twombly promised to support her in her role as they both were aware of the challenges of managing as a new police chief, managing public safety and crime fighting, restoring community trust, navigating a manpower shortage, and managing with diminishing police morale.

I reviewed the Attorney General's investigation into the Aurora Police Department which found that:

- Aurora Police had a pattern and practice of racially biased policing.
- Aurora Police had a pattern and practice of using excessive force.
- Aurora Police had a pattern and practice of failing to document stops as required by law.
- While it administered ketamine, Aurora Fire had a pattern and practice of using ketamine in violation of the law.

The investigation revealed, "Most failures with Aurora Police relate to systematic and severe culture problems, created by several factors."

> **"First**, Aurora Police's culture leads to the frequent use of force, often in excess of what the law permits. Training is ad hoc and does not address specific needs of the organization as shown by officer behavior. Policies are short on detail or practical guidance, often doing little more than reciting the legal requirements set forth in court cases and applicable statutes or regulations. In short, Aurora Police have failed to create and oversee appropriate expectations for responsible behavior."
>
> **"Second**, Aurora Police does not meaningfully review officers' uses of force, relying on formal and informal systems that favor findings that officers followed policy and that hamper candid feedback on how to improve."
>
> **"Third**, the Aurora City Charter gives the Civil Service Commission total control over entry-level hiring and the right to reverse all meaningful discipline that the Chief of Police can impose. The Commission overturns discipline in high-profile cases in a way that undermines the Chief of Police's authority, such that as result, Aurora Police officers who violate law or policy often remain on the force. And because of the Commission's hiring practices, Aurora Police officers do not reflect the diversity of the city."

The findings resulted in the entry of a consent decree which mandated changes in the APD's policing practices, primarily to eliminate racial discrimination in police practices in the use of force. In my opinion, the mandated changes were required to bring about a change in leadership, policies, and practices to comport with generally accepted police practices to stop patterns and practices and rebuild community trust. The consent decree was entered as an Order on the Court.

I reviewed the Police Chief employment offer letter from City Manager Twombly to Chief Wilson along with her termination letter from him and her previous performance evaluation at the rank of lieutenant, which was an overall excellent evaluation. I also reviewed City Manager Twombly's press conference wherein he confirmed that Vanessa Wilson was not fired because of the APD's "records problem."

I reviewed "A New Way Forward" PowerPoint presentation and The New Way Forward actual plan which was broken down into 5 areas.

1. Operating
    a. new shift structure
    b. staffing efficiencies
    c. streamline technology
2. Leadership
    a. Promotional process
    b. leadership training
    c. Culture surveys
3. Service
    a. Wellness factor
    b. compensation
    c. training
4. Accountability
    a. Policy Committee
    b. special assignment process
    c. use of force
    d. discipline

5. Engagement
    a. communication
    b. community relations

In my opinion, the plan was exhaustive and comprehensive and represented an important path to address the issues and challenges facing the APD. The Plan was not only aligned with the mandates of the consent decree to eliminate racially-based unconstitutional police practices, but also aligned with the generally accepted national police practices in twenty-first century policing management.

I reviewed the photograph of Chief Wilson kneeling during a Black Lives Matter protest and am aware that there were certain members of the union who did not agree with Chief Wilson's actions. It is not uncommon for police executives and chiefs to join in with protests as a show of solidarity and trust building with the community. During the summer of 2020, I also kneeled with protesters in solidarity against unlawful and unconstitutional police actions.

I reviewed several emails sent to the APA members by its then President Doug Wilkinson. I reviewed an email by Wilkinson to the APA regarding his views of the DEI training required by Chief Wilson and that he had shared the results of the survey with the press.

I reviewed an email from Wilkinson to Mayor Coffman in September 2021 describing his disagreement with Chief Wilson's decision to open an independent investigation into use of force by a white officer against a black man which reflected the concerns of the consent decree along with the results he claimed were part of a "No Confidence" vote concerning Chief Wilson. In my opinion, Chief Wilson's decision to open this investigation was mandated by the reforms outlined in the investigation and comported with generally accepted standards of police practices.

The third email from Wilkinson was to inform members of upcoming council elections and to garner alignment with those who represent their ideology, who he called, "pro police."

I also reviewed the email on November 17, 2021 to the members of the Aurora Police Association written by Wilkinson. That email evinced opinions that appeared racist, sexist, inflammatory and appeared to reflect Officer Wilkinson's views of minority groups. This email stated that "Weed smokers, child molesters, and crackheads" are attributed to a certain group while intelligence, personal ethics, courage, and merit are attributed to another group or the



**Response to MSJ Ex. 5**

group he identifies with. In my opinion, Chief Wilson's decision to take swift and decisive disciplinary action and terminate Wilkinson was mandated not only by the consent decree, but also by acceptable standards of police practices.

I reviewed the investigative report prepared by the Independent Review Panel Pursuant to a City Council Resolution in July of 2020. While the review was not to determine misconduct, I agree that the findings and recommendations were necessary to implement generally acceptable police practices to address the deficiencies found in the areas below:

- Review Training and Supervision of Officers.
- Use of Force/De-Escalation.
- Transition from Aurora Police Department to Aurora Fire.
- Build Culture of Patient Advocacy.
- Training to Complete EMS Assessment.
- After-Incident Review.
- Implicit Bias.
- Crisis Intervention.
- Independence and Separate Authority of Medical Personnel.
- Administration of Ketamine.

**Disciplinary Decisions.**

I reviewed numerous disciplinary determinations and appeals that were made during Chief Wilson's tenure.

I reviewed the disciplinary appeal case in the matter of Officer Doug Wilkinson regarding the email he sent which I referenced above. Chief Wilson concluded the email violated City of Aurora Employee Manual Policy 1.2 Anti-Harassment Policy and Aurora Police Department Directive 10.9 Discrimination, Harassment and Sexual Harassment Complaint Procedure. Officer Wilkinson appealed, relying primarily on his assertion that his email was protected speech and therefore could not be used as the basis for imposing discipline, which was termination. Officer Wilkinson appealed to the Civil Service Commission.

The appeal was heard by the Civil Service Commission who sustained the violations and upheld Chief Wilson's decision to terminate Officer Wilkinson.



**Response to MSJ Ex. 5**

I reviewed the disciplinary appeal case in the matter of Jason Rosenblatt who, according to Chief Wilson, violated Directive 14.2.1 Conduct Unbecoming, resulting in termination. Officer Rosenblatt appealed the discipline to the Civil Service Commission.

The appeal was heard by the Civil Service Commission who sustained the violations and upheld Chief Wilson's decision to terminate Officer Rosenblatt.

I reviewed the disciplinary appeal case of Officers Erica Marrero and Kyle Dittrich, who, according to Chief Wilson violated Directive 14.2.1 Conduct Unbecoming, resulting in their termination. Officers Marrero and Dittrich appealed the discipline to the Civil Service Commission.

The appeal was heard by the Civil Service Commission who sustained the violations and upheld Chief Wilson's decision to terminate Officers Marrero and Dittrich.

I reviewed the disciplinary appeal case in the matter of Officer Edward Acuti, who, according to Chief Wilson violated Directive 5.3 Use of Physical Force, Directive 14.2.21 Police-Community Relations, Directive 14.2.1 Conduct Unbecoming, Directive 14.2.15 Unsatisfactory Performance, and Directive 14.2.14 Conduct Toward Superior and Subordinate Officers and Associates, resulting in Chief Wilson demoting Petitioner from the rank of Sergeant to Officer and ordering Petitioner to complete forty hours of de-escalation training. Officer Acuti appealed the discipline to The Civil Service Commission.

The appeal was heard by the Civil Service Commission who sustained the violations and upheld Chief Wilson's demotion of Officer Acuti, as well as her requirement that he complete 40 hours of de-escalation training.

I reviewed the disciplinary appeal case in the matter of Officer Levi Huffine, who, according to Chief Wilson, violated Directive 14.2.1 Conduct Unbecoming, resulting in termination. Officer Huffine appealed to the Civil Service Commission.

The appeal was heard by the Civil Service Commission who sustained the violations and upheld Chief Wilson's decision to terminate Officer Huffine.

Most of the above incidents involve white APD officers and the use of force or inappropriate conduct involving or concerning black people. The conduct at issue in these cases reflects the

racially biased policing concerns that were identified in the Attorney General report and the consent decree. It is my opinion that all of the above discipline by Chief Wilson was in accordance with the mandates of the consent decree and in accordance with the generally acceptable standards of police practices. This is supported by the findings of the Civil Service Commission, who after hearing the facts through an appeal process, concurred with Chief Wilson in every decision.

In my opinion, her disciplinary decisions in these cases were required in order to achieve the consent decree mandate to transform the APD's culture into a culture of accountability.

I reviewed the report of the assessment conducted by 21CP and report, which was similar to investigation done by the independent review panel. The assessment covered the following areas:

- Critical Operation
    - Use of Force
    - Stops, Searches, and Arrests
    - Bias Free Policing
    - Crisis Intervention
- Community Engagement
    - Community Policing, Problem Solving Policing, and Engagement in Aurora
    - The Role and Function of Police in Aurora
- Organization and Command Structure
    - Organization Structure
    - Deployment and Staffing
    - Command Staff
- Selection, Supervision, and Support Personnel
    - Recruitment, Hiring and Selection
    - Training, Field Training Officer Supervision, Selection and Training
    - Early Intervention and Peer Support
- Accountability
    - Officer Misconduct and Complaints
    - Transparency and Oversight
- Equipment, Technology and Data Systems

21CP made 47 recommendations for the APD to address the deficiencies observed during the assessment of the above six core areas and subsections of the core areas. Chief Wilson's New Way Forward Plan was aligned with the assessment recommendations made by 21CP and the recommendations made by the independent review panel resulting from a City Council resolution in July of 2020.

I reviewed several emails between City Manager Twombly and Deputy City Manager Batchelor regarding the "records" issue. The emails reveal and confirm there were longstanding severe issues with the APD records systems which predated Chief Wilson, and neither cited Wilson as the cause nor being responsible. She was, however, included in the communications about solutions.

**Depositions and Statements**:

I reviewed the deposition of council person Jurinsky in which, among other things, she expressed her support for the President of the APA, Doug Wilkinson, her claim that he should not have been fired, testimony about Chief Wilson and her comments described above. I also reviewed social media and other public statements by council person Jurinsky after she was elected to City Council.

In a podcast show, Jurinsky talked about speaking with officers of the Aurora Police Department at roll calls, at her office, and out in the community. She spoke about her support of the police officers and she made clear that, "change is in the works" and "change is coming." She explained that she was aligned with council members Steve Sundberg and Dustin Zvonek for being the most vocal advocates for change. She went on to tell Aurora residents, "You are not safe in Aurora." When asked about the solution to the crime and attrition problem, she answered "We remove the chief immediately. And with her, takes out the trash of the Deputy Chief, Darin Parker." She repeated that the "chief of police, Vanessa Wilson, and the deputy chief of police, Darin Parker, need to leave the Aurora Police Department immediately -- immediately." Claiming that the Chief and her deputy were ruining officer's lives and destroying the reputation of the police department, council person Jurinsky stated "Chief Vanessa Wilson is trash."

The council member told the host that she met with Chief Wilson and gave her "one chance" by offering her the solution of removing her Deputy Chief but that ultimately Chief Wilson

"ignored" her. She claimed that another council member had a similar conversation with Chief Wilson.

There was no evidence that council person had any previous experience in law enforcement administration. She did state that she had served as a "military police officer." She also testified that prior to becoming a city council person she "had never heard of an HR department in her life." She did not give any information about how she knew that decisions were made internally within the department, other than appearing to base her comments on information provided by Aurora officers. She blamed Chief Wilson for the attrition in the APD. In a July 2023 Public Safety and Civil Service Committee meeting after Chief Wilson's termination, Jurinsky stated that low officer morale and attrition was attributed to Chief Wilson's "over disciplining" of officers. During that meeting, Jurinsky stated "if you are not as committed to rebuilding our image with the community as you are to rebuild the trust within the department, I don't care who it is in the Chief's Office, you can get the fuck out."

I reviewed the deposition of John Schneebeck who was manager of administrative services for the City of Aurora. Much of this deposition concerned the record systems and backlog, the effort or the lack thereof to make improvements and take corrective action, and his management of the records department personnel.

I reviewed the deposition of Deputy City Manager Jason Batchelor. Mr. Batchelor testified extensively about the multiple police use of force cases involving white APD officers and black people, including the murder of Elijah McClain. I reviewed the information concerning interactions between those white police officer and the black and brown citizens that were discussed during his deposition.

He also testified about the police management system and various efforts or statements used by certain city council persons to cast a negative light on Chief Wilson. He agreed with the disciplinary decisions made by Chief Wilson and that she was implementing reforms mandated by the consent decree. He specifically agreed that terminating Wilkinson was the "right thing to do" and that the email Wilkinson sent to the union was racists and it attacked the validity of the consent decree. Batchelor testified that two members of the APD made EEO complaints about the email sent by Wilkinson in which they complained about discrimination. He agreed that the



Response to MSJ Ex. 5

gist of their complaint was that the email created an atmosphere where the black officers felt less qualified, less competent, less intelligent, and less deserving than their white male counterparts.

Batchelor testified that Chief Wilson had reached out and built relationships with the minority communities in Aurora to rebuild trust in the APD. He said that she promised the minority community that she would provide more transparency about officer conduct.

He testified that Wilson presented the "New Way Forward Plan" in 2022 to improve morale and communication with officers and that he had approved the Plan.

Batchelor testified that Chief Wilson's actions were in accordance with the mandates of the consent decree.

Batchelor testified that City Manager Twombly told him in early 2022 that he (Twombly) had talked to several officers and that Twombly had "lost confidence" in her ability to lead the Department. Batchelor testified that he thought "she was not effective in her leadership at that point. And that's not through a fault of her own, but the officers at that point were not engaging."

Although Batchelor was not responsible for making the decision to terminate Chief Wilson, he stated that he believed that she was terminated because of the attrition rates of officers, an increase in the crime rates and because of low officer morale. Mr. Batchelor could not provide any specific attrition that could be attributed directly to Chief Wilson. He said that he thought that in part, she was responsible for the increase in crime rate in 2021 because officers were not "engaging."

I reviewed the deposition of Vanessa Wilson who acknowledged she rose through the ranks of the Aurora Police Department for a 23-year career. She was chosen and she accepted the role of police chief of the Aurora Police Department and was charged with rebuilding community trust that had been severely damaged through a number of incidents; more specifically, the police murder of Elijah McClain that prompted an investigation by the state attorney general, a review of agency operations and policies mandated by the City Council and an independent assessment done by 21st Century Policing Solutions; all of which produced numerous recommendations for the department to make reforms.

In the role of police chief, she testified that she made disciplinary decisions to hold officers accountable, which were supported by her superiors, the Deputy City Manager and City Manager, and further support by the Aurora City Civil Service. She testified that she was working to restore trust with the minority community and to manage the APD in a manner consistent with generally acceptable police practices and that was aligned with the consent decree.

Wilson testified that she believed there was implicit bias and racism in the APD and that she told the minority community she would ensure the officers received training on these issues. She was also aware that certain officers opposed the DEI training she implemented. She testified that she went before the Black Ministerial Alliance and apologized for officer conduct involving a black family who had guns pointed at them by white police officers. Wilson testified that she then received a call from a member of union leadership who was angry at her for making an apology and told her that her apology was going to be a "big problem" for Wilson.

Wilson also acknowledged that many of her disciplinary decisions were unpopular with the APD's leadership and was often criticized by union leaders, including APA President Wilkinson. Wilkinson's actions resulted and disciplinary action taken by Chief Wilson in the form of termination, which was supported by her superiors and then again supported by the Civil Service Commission.

I reviewed the deposition of City Manager Twombly. In his deposition, Twombly confirmed that he hired Vanessa Wilson to be the chief of police and had full confidence that she could implement the reforms in the consent decree.

Twombly testified that the pattern and practice investigation by the Attorney General's office found racial profiling by the APD and particularly against black citizens. He stated he understood that in order to rebuild trust with the minority community, the Chief would have to hold officers publicly accountable for their conduct. He believed that Chief Wilson's decisions as the Chief were in conformance with the mandates of the consent decree.

Twombly acknowledged that there was an aggressive campaign by councilmember Jurinsky and the APA to have Chief Wilson removed as the chief of police. He stated he started keeping a list of officers to talk to about her performance in early 2022 because of the negative comments by

the new conservative city council members, Jurinsky, and the union. He also acknowledged that he had heard rumors that he would be fired if he did not fire Chief Wilson. He testified that he had not made the decision to terminate Chief Wilson at the time of his March 9th meeting with her. He stated that he had made the decision to terminate her by the time he met with her on March 21st. When asked what happened in the intervening time, he stated that he made the decision to terminate her when he learned she retained an attorney. He testified that she was not terminated for "cause."

I also reviewed the material regarding the proposed censure of council person Jurinsky for violation of Section 3-10 of the City Charter Rule that prohibits city council members from directing or requesting the City Manager to hire or fire any person. Twombly and Batchelor discussed the fact that Jurinsky's demands for the termination of Chief Wilson violated the City Charter.

## Recruitment and Retention.

Recruitment and retention in law enforcement was and remains a national issue, not unique to Aurora. The recruitment and retention issue was a nationwide issue long before the summer of 2020. Recruitment and retention became a serious national policing issue following the historic negative events in Ferguson MO, Baltimore MD, Chicago IL, and other cities where police involved shootings and in-custody deaths sparked national outrage and protest. The anti-police sentiment began to grow quickly where veteran officers who were retirement eligible were retiring in large numbers. Newer and younger officers were voluntarily leaving the profession altogether while only a small percentage were leaving to go to other policing jurisdictions. This dynamic was further exacerbated by the summer of 2020 with the killing of George Floyd in Minneapolis MN and Brianna Taylor in Louisville KY. The anti-police sentiment became very strong and there were reports of high levels of police attrition nationwide, both voluntary and involuntary. There were several issues that were driving the attrition. Police Executive Research Forum convened a conference exclusively to discuss recruitment and retention and below is a summary of the conference outcomes and the link to the conference report.



**Response to MSJ Ex. 5**

"Many agencies attribute the bulk of their recruitment and retention challenges to a combination of souring public perceptions of the policing profession, generational shifts in the values and expectations of younger workers, and changes in police roles and responsibilities. Increasing competition among law enforcement agencies to recruit and retain the best officers has contributed to the problem."

"Law enforcement agencies are using a variety of tactics to out-compete other agencies for the shrinking pool of applicants who meet the traditional profile of an officer, while also trying to attract a wider range of new recruits to the profession. At the same time, agencies are using a variety of tactics to retain their current officers."

Police Executive Research Forum's 2023 publication on Recruitment and Retention titled: Responding to the Staffing Crisis: Innovations in Recruitment and retention, which can be found at www.policeforum.org/assets/RecruitmentRetention.pdf.

The national recruiting and retention crisis as summarized in PERF's 2023 publication was perfectly aligned with research done and presented in an Aurora City Council hearing held on September 17, 2020. Their research revealed that APD officers were not leaving the agency solely because of their dislike of Chief Wilson's leadership as purported by Councilmember Jurinsky and others, but rather the reasons cited below.

The following is an excerpt taken from the summary of the issue and discussion as cited in the Civil Service Turnover Report. "Human Resources Director Dianna Giordano presented this item to the committee. Year-to-date data on turnover for Police and Fire was provided. Fire currently has a 2.8% turnover rate and trending for 4.8 for 2020. This will be a 2.3% decrease from 2019. Police currently have a 6.1% turnover rate and trending for 8.7%. This will be a 1.3% increase from 2019. That number could be even higher. Compared to other cities locally and nationally, Aurora is trending 9.5% of projected turnover. 2019 statistics for public sector jobs in the State of Colorado were at 19.6%. The top three reasons for people leaving are other jobs, retirement, and pay. Events impacting turnover include COVID-19, social/racial unrest impacts on the police department, and transition to a new police chief, increased accountability, and other police department incidents and media coverage. About 20% of the sworn members of police are eligible for retirement, not that they will but it's something they are mindful of."



**Response to MSJ Ex. 5**

As discussed in the July 2023 Public Safety meeting, APD officer staffing continued to decline after Chief Wilson was terminated. According to reports by the Police Executive Research Forum (PERF), an organization of chief executives in law enforcement, there had been a national decline in law enforcement officers for several years prior to Chief's Wilson's tenure, and these declines continued during the pandemic and after the George Floyd murder.

Upon comprehensive review of the information presented and my experience, skill and knowledge, it is clear that Wilson fulfilled her responsibilities in accordance with the expectations of her hiring authority, City Manager Twombly, and the residents of Aurora. She embraced the mandated reforms outlined in the consent decree, which emerged from an investigation and an independent assessment that revealed patterns and practices of unconstitutional racist policing within the city of Aurora. Wilson prioritized restoring community trust in the Aurora Police Department by implementing policies that were previously lacking, revising outdated and antiquated policies, and adopting nationally accepted standards of police practices to transform the department's culture and foster accountability.

Wilson was never counseled or reprimanded for her decisions to alter the department's culture. Similarly, she was never counseled or reprimanded for any disciplinary actions taken against APD members who violated policies. Wilson was never placed on a job performance improvement plan and there were no documented deficiencies in any performance evaluation. To the contrary, her decisions were endorsed by her superiors and further validated by the Civil Service Commission, which included the termination of the Aurora Police Association President, Doug Wilkinson. Wilson's performance was in accordance with generally accepted police standards and was aligned with that of other American police chiefs leading departments under consent decrees, who all encounter opposition from unions. A police union's vote of no confidence is common against chiefs when they make agency decisions that include community partnership, enhance accountability, create fairness and equity in the selection, hiring, and promotional process, and disrupt the status quo. Testimony by Twombly and Batchelor was that the poll taken was not a reliable source of information.

Law enforcement unions represent both sworn and civilian members of law enforcement agencies, as well as collective groups of both sworn and civilian members. These unions advocate decisions that benefit individual officers and collective groups of individual officers. In contrast, police chiefs represent the agency, which comprises both sworn and civilian members and collective groups of both sworn and civilian members. Chiefs' decisions must align with the core values, goals, objectives, mission, and vision of the agency, not with any individual interest. Moreover, chiefs' decisions must also be made in ways that build community trust and restore trust that was broken, especially when that trust was broken by the actions or inaction of law enforcement.

Twombly testified that he made the decision to terminate Chief Wilson between the dates of March 9 and March 21, 2022. During that time, the record shows an email from Twombly to Officer Jad Lanigan asking him to provide the names of officers on March 11, 2022, who was a known ally of Jurinsky, and the decision by city council to withdraw any attempt to censure Jurinsky's conduct on March 14, 2022 which was then memorialized in a letter dated March 17, 2022. Twombly stated that this meant that the "guardrails" were off of Jurinsky.[1]

Although Chief Wilson was an at-will employee and not terminated for cause, in my opinion the evidence overwhelmingly shows that the driving force behind her termination were the calls for her termination from Jurinsky and the union because of her attempts to eliminate racially-based police practices.

Based on my knowledge and experience, police department cultures are often difficult to change, especially when there are allegations of racial policing. It is not surprising that there is often a correlation between implementation of serious department reforms and low officer morale. It would violate generally acceptable standards of care and criminal office management to allow the Chief of Police position to be determined by a popularity contest among officers or political winds seeking to curry the favor of those officers.

[1] The only other event during this time frame was the records backlog report but Twombly testified that it was not a cause for Wilson's termination.



Response to MSJ Ex. 5

Based on all the information I have considered, in my opinion Chief Wilson was terminated because she was implementing the reforms mandated by the consent decree to eradicate racially discriminatory policing and had aligned herself as an advocate for the minority community, including the minority police officers. Her termination was a serious violation of generally acceptable policing practices and standards, as well as a violation of the generally accepted standards of criminal justice management and the management of a police department.

______________________________ ______________

Michael S. Harrison Dated

## References

US Conference of Mayors, *Report on Police Reform and Racial Justice*, August 2020

PERF, *Responding To The Staffing Crisis. Innovations in Recruitment and Retention*, August 2020

National Policing Institute, *Council on Policing Reform and Race*, January 2023