PIKE REPORTING COMPANY

**CIVIL ACTION NO. 1:24-CV-00731-SKC-STV**

# VANESSA WILSON

V.

# CITY OF AURORA

**DEPOSITION OF:**

**VANESSA WILSON**

**DATE:**

**April 17, 2025**

PIKE REPORTING COMPANY
YOUR PATH THROUGH LITIGATION
(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Response to MSJ Ex. 8

decision making, and actually parting of, you know, arguing about what the sentence should actually say and, you know, tweaking it, that type of thing. Marc Sears is actually the officer that told me about the Elijah McClain photo, and he's the president of the FOP.

**Q. Okay.**

A. Judy Lutkin called me -- would call me when she was the president of the APA before Doug Wilkinson took over. She would call me and say, is this true that you said this, or, is this true that you said that? And I remember one time she was very angry that I had gone in front of the Denver Black Ministerial Alliance, and they were very upset about the family that was gun pointed on August of 2020. The young -- the mom with her young children, African American family. And she said, did you say that if this was a -- a white family, that it would've -- it wouldn't have happened that way? And I said, yes, I did. I said, I don't believe it would've happened the same way if that would've been a 5-year-old girl with a tiara on that stepped out of that car that they would put her on the hot pavement and point guns at her. So she was very angry at my response. And she goes, this is going to be a big problem for you. And I said, bring it on. So --

**Q. And we should clarify for the record, there**

**Q. And what's his name?**
A. Matthew -- Matthew Longshore. Just let it go. Sorry.
**Q. It's all right.**
A. I really apologize.
**Q. No worries.**
A. I'm so stressed out here.
**Q. What was his rank?**
A. He, at the time, was officer. I believe he's an agent now. And he was my public information officer.
**Q. Okay. And do you know what month this was?**
A. No. Well, it was before the District 1 situation. May or June. And I just want to point out that those two -- those two officers worked directly with me and chose to kneel with me. And there were probably 40 officers that chose not to kneel and stood away from us.
**Q. Okay. And were you ever disciplined for this picture, for the -- or for your conduct in the picture?**
A. Disciplined, no.
**Q. Did somebody talk to you about kneeling at this protest?**
A. As far as my bosses, no.
**Q. How about these two officers? Do you know if either of them were disciplined?**

A. No, they work for me.
**Q. Okay. Did any city council members talk to you about your participation in this protest?**
A. No, ma'am.
**Q. And is it correct to call this a protest?**
A. It's a demonstration, peaceful. It wasn't -- there was nothing wrong -- I mean, nothing violent other than -- there was nothing violent at all, I should say. I shouldn't say, other than. I did allow them to march in the streets. I felt like they had a right to do so.
**Q. And you said there were about 40 other officers. Were they there to march with you? What -- why were the other officers there?**
A. They were there to stop traffic as we walked along and to, I guess, protect me if something happened to me.
**Q. And nothing did; correct?**
A. Oh, no. No, not at all.
**Q. Okay. All right. Did you participate in other demonstrations or protests while you were interim?**
A. Yes, I did. I was invited to several peaceful protests on the Great Lawn. One where Elijah McClain's mom was there and I met her that day. Sorry, it's just a little bit emotional. But anyway, I met her and she actually hugged me and said, I know you're trying to do



Response to MSJ Ex. 8

right.

**Q. And we should -- for the record, the Great Lawn is what?**

A. Oh, I'm sorry. That's the major. It's a -- the City -- there's the police department. The city is like, there's three major buildings: the library, the courthouse, the -- the police department, and then the Aurora Municipal Center, all surround this huge, green patch of lawn. And we call that The Great Lawn.

**Q. Okay. So other than this one in this picture, and the demonstration protest on The Great Lawn, did you participate -- while you were interim, did you participate in any other protests or demonstrations?**

A. There were, like, prayer vigils and such demonstrations pretty much every weekend. Quite a few. And then as far as participating in, obviously, we talked about the violin vigil, and I had responded to the command center in Denver protests. So I think I've covered them all.

**Q. Okay. And you certainly didn't hide that you were?**

A. Oh, no.

**Q. I mean --**

A. Yeah.

**Q. -- looking at this picture, certainly not**



Response to MSJ Ex. 8

**hiding that --**

A. Correct.

**Q. -- you were part of this protest?**

A. Correct.

**Q. Okay. Were there other police officers who -- other than the two in this picture, that is in Exhibit 43, were there other police officers, to your knowledge, were participating in demonstrations or protests from Aurora?**

A. So my executive officer may have gone with other -- gone with me to other protests. Or other people -- people would invite me from the community. Chief, will you come pray with us? Will you come be with us? And I'd say, yes. And so whenever I was invited, I would go. And so he may or may not have been with me or maybe one of my PIOs, Mr. Longshore, or a different PIO may have gone with me.

**Q. Okay. What's a PIO?**

A. Public information officer. So they're the ones that talk to the media -- field -- field media calls. That type of thing.

**Q. Did Mr. Twombly ever direct you to stop participating in those protests?**

A. No, ma'am.

**Q. How about Mr. Batchelor?**

A. I believe I was introduced to her by Marc Sears. She was on a ride along with him.

**Q. Okay.**

A. I think I met her just briefly.

**Q. Do you recall anything about that meeting?**

A. No. It was just a, nice to meet you, sort of thing.

**Q. How about Dustin Zvonek?**

A. You just -- just reminded me of something. She and Dustin Zvonek were at a community -- I believe it was Marsha Berzins's community picnic, and they were there, I guess, campaigning. And I met the two of them there. So I met Jurinsky again there. Very, like, hello. How are you? No conversations. And then if you're going to ask me about Sundberg, I met him at a National Night Out. I was at a barbecue or something, a National Night Out barbecue, and he was grilling. And I said, hello to him. And he didn't speak to me.

**Q. Okay. Other than those kind of meet and greet type situations, did you have any meetings with them before they were elected?**

A. I did not.

**Q. Okay. So during this -- during 2021, let's just go there. From January 2021 to November 2021, how was your relationship with the APA?**

**Q. We can move on.**
A. Okay.
**Q. I just --**
A. This officer approached Mr. Nunn, told him, you know, do you know why I pulled you over? He said, no. He told -- explained to him why. The officer -- I mean, the citizen apologized, you're right. Whatever. He said, can I see your license and registration? Mr. Nunn reached in to get that. And he had a, in my opinion, an overwhelmingly, inappropriate response, and draw -- drew his weapon, and shoved it in his face.
**Q. Okay. And why did you reopen an investigation into that?**
A. Because my Force Review Board and my command staff had said this was a legitimate use of force. And I -- once I saw it, I disagreed very much. And so I pulled him off the street, and I asked it to be investigated. I had not seen it until I had seen -- I think the news ran a story on it or they were going to or something.
**Q. Okay. Was it -- how many times -- I'm trying to figure out how to ask this. So why hadn't you -- if it was going through an investigation, since you reopened an investigation, why didn't you review it before the investigation closed?**

A. So I -- I misspoke. So Use of Force Board Review, not an investigation. So the Use of Force Board Review reviewed it, and said that his actions were okay. Nobody brought it up to my level. It was kind of like, it didn't make it to me. When I did see it, I said, oh, no. This is not good. And I felt that the officer was going to hurt somebody. If that was the kind of reaction he was going to have, and he was gun pointing the man after he told him to get his license and registration, and he was doing exactly what he was told to do, I pulled him off the streets because I was worried. I wanted to get -- to have a look at him, make sure he's okay, and see if he needed new training or what have you. And then I wanted to get to the bottom of, you know, what -- what -- I wanted it investigated. I wanted to know everything about that case. What happened? You know, who made the decisions to say it's okay?

**Q. And can you understand why officers would be upset that this had passed once, and then you later reopened it?**

MS. GREISEN: Object to form.

THE WITNESS: They don't know the whole story of what had happened. And so I -- if they don't know the whole story, then they're not educated as



Response to MSJ Ex. 8

as Watermelon Park. But not by me. Also -- gosh, I get in front of you, and I go blank. Hang on one second.

**Q. That's all right. It's not uncommon.**

A. It's -- okay. Oh, I was not in the academy at the time, but an officer shared an experience that -- a story that had happened in the academy. And one of our officers, I remember his name. His -- he was -- name was Eric Cherry. He was in a shooting with some suspects. And so this was a training officer at the training academy, was talking to the recruits about, you know, this is how you survive an incident like this. This, that, and the other thing. So he was telling a story of what happened the night before. Luckily, the officer was alive, and he was telling the story. And he goes, and then the suspect's gun jammed. And so he was making monkey noises and pretending that he was trying to clear a malfunction in his gun. And I had told that officer, I go, you need to go forward with that. And he's like, I'm not doing that. And I didn't either. It was just not the -- it's not the client or the -- it wasn't the culture to -- to come forward with that because you would be, you know -- they wouldn't back you on calls or what have you. So that was incidents of that nature. As I moved up the ranks, I wasn't a division chief at the time, but the now-APA president,

Paul Cancino was -- had a stuck mic, and this was recorded on the -- on the air. They -- dispatch had called and said there was a -- I think it was -- what street was that on? The Joli Apartments were on fire or something. And his mic was stuck, and he was on the phone with someone, and he said something to the effect of, this is not verbatim, but something to the effect of, I hope it burns down with all the Ns in it. And he was referring to the slur, nigger. I think he actually said the slur. So anyway, that -- there's is a couple more instances. And then of course, when I was the division chief, I remember it came to my attention that Sergeant Graham Dunne had -- there was a complaint that came in from a citizen that Sergeant Graham Dunne was berating him on a call -- I can't remember what the call was, if it was a traffic stop or anything. But there was a Black, an African American gentleman, and he said you -- he was saying something. The -- the African American male said something to Sergeant Dunne, and he goes, listen, boy, you're not even good enough to -- to shine my boots. And so that went up. I know that I sent that up, and that went to Internal Affairs, and to Nick Metz, so --

**Q. And do you know what happened with it? After that?**



Response to MSJ Ex. 8

A. I believe that Nick Metz did not discipline him because his - - his defense was that was a military term and that he wasn't being racial. But he happens to be the same officer that was making the monkey sounds with the gun back in the academy years earlier.

**Q. Did you inform Nick of that background when you sent it up?**

A. Oh, yeah, I did, so.

**Q. What was his response when you told him that?**

A. I mean, he wasn't happy. You know, he thought it was not good. But for whatever reason, you'd have to ask him why he chose not to discipline him, but.

**Q. Okay. Anything else?**

A. Like I said, there's probably more, but that's all I can remember right now.

**Q. All right. I'm going to hand you our next exhibit, which we should have talked about earlier.**

MS. GREISEN: Are we on --

MS. ORTIZ: Sorry, Paul

THE WITNESS: That's okay.

MS. GREISEN: What number?

MS. ORTIZ: 45.

(Exhibit 45 was marked for identification.)

THE WITNESS: 45. Contract.

A. Because I -- I didn't trust her.

**Q. Why not?**

A. Because she had made it clear from the time that she won the election, that -- that she was looking at me, coming for my job.

**Q. Okay. So tell me about that. How had she made it clear? So she won the election in November. And this lunch was in January 2021?**

A. December 28th, I believe.

**Q. December 28th. So between the time she won the election to December 28th, what did she do that made it clear she was coming for you?**

A. Comments that I have heard through officers, of when she would talk to them, that she would be looking at getting rid of me, as well as, I think she made a quote in one of the newspapers, that leadership was a problem within the organization, the police leadership.

**Q. So anything else about that?**

A. I'm trying to remember if -- yeah, that's -- that -- I had -- I had heard rumors and -- and heard things that she was saying through the grapevine, and I was concerned.

**Q. Okay. And what were you hearing? What rumors and things through the grapevine were you hearing?**

A. That she was angry that I didn't speak out on the officer's behalf during the consent decree, when that was initiated, and that she didn't think there was racism within the police department, which I disagree with her. Obviously, I just gave you examples of that. And that she -- she was going to fight -- fight against the consent decree and that I -- that I was just bowing down, I guess, to the attorney general or the liberal woke City council members.

**Q. Okay. And did you hear her say those things directly?**

A. No, ma'am.

**Q. Or is that the rumor?**

A. It was rumors, yes.

**Q. Okay. Did you ever ask her about, hey, I hear you saying these things? Let's talk about it.**

A. She was in a position of power, and I didn't really want to poke the bear.

**Q. Well, she wasn't your direct supervisor; right?**

A. She -- she acted like it.

**Q. She didn't -- it's governed by the City charter; correct?**

A. Yes. It should be.

**Q. And she doesn't have any authority to**



Response to MSJ Ex. 8

Twombly was a problem, something of that nature. And, you know, she was upset about the consent decree. And that she, and Zvonek, and -- and Sundberg were really fired up, and they wanted to fight it. And she said -- she talked about -- God, it was, like, an hour. She talked about the officers and Elijah McClain, and whether I think they murdered Elijah. I said, I don't believe they went out that day thinking that's what they were going to do. But unfortunately, the circumstances led to that. She talked about -- oh, God, let me think. Oh, she said that my -- the rank and file hated my deputy chief, Darin Parker. She wanted me to get rid of him, and she gave me names of people she thought would be better at the job. I told her that I needed Darin, and he -- that he's did a lot of good things for me. Some -- you know, this isn't verbatim, but that's my recollection. She then said I need to rebrand my image within the organization. And maybe if I got rid of Darin, that -- that would go a long way for me. I mean, that Sundberg felt the same way. So like I said, she gave me names of people. She thought I should replace Darin with. And I was, you know, sitting there trying to be polite, but knowing I was not

going to do that, because, you know, Darin and I were both implementing reforms and -- and -- and doing things that the consent decree was asking for, and that trying to eradicate the racism that we both saw within the organization. And then she said -- she went on to talk about -- oh, she brought up Doug Wilkinson from the APA, and said, if I, you know, if he lives through this, if you give him a chance, or something of that -- that -- that's not verbatim, that you'll see a different Doug, and that she didn't think what he said was racist, and that someone she had referred to, like a previous council meeting, where someone said something and she thought that was racist. It was actually an African American reverend who was talking about bringing in more African American applicants. And she was -- she took offense to that for some reason, that they were being treated special. I don't know. What else? Oh, God. Oh, she said that one of the trainings that I was pushing through, which is called Justified, but Was It Necessary? And it was a training that taught -- was talking about de-escalation and that, even though you're justified to do something, is there a better way to not do it? And she said that she had



Response to MSJ Ex. 8

MS. GREISEN: Asked and answered. Go ahead. You can answer again.

THE WITNESS: There was -- there was question and answer back and forth in these meetings that I was in. I wasn't talking at them. We were having -- I would say, is there any questions? They would raise their hand, throw a question at me, I'd answer it. And so there was back and forth, yes. I would answer their questions.

BY MS. ORTIZ:

**Q. Did you ever have a meeting where you, for example, with the APA or FOP, where you said we got this report, there's a lot -- people are saying that they feel unsupported by leadership. What can I do to make that better?**

A. Yeah.

MS. GREISEN: Object to form. Go ahead.

THE WITNESS: Okay. Yes. I -- we did say, you know, we're here to help you. If you have suggestions. In A New Way Forward plan, we talked about having an officer review panel that would come in with their own suggestions. I brought officers in to write directives with me, to look at them before I implemented them. There was interaction with the officers. Now disgruntled



Response to MSJ Ex. 8

officers that didn't want to change and didn't want to go forward with the reforms that I was making, they were always going to be disgruntled and there was no getting through to them.

BY MS. ORTIZ:

**Q. Okay. All right. We can put that one side.**

A. Oh, you need all this back, right? Are we going back to these, ma'am? Any of these?

**Q. I don't plan to. We'll see.**

A. I don't want to mess them up.

**Q. And I will keep them out. Yeah. All right. Let's talk a little bit about the records backlog issues. Talk to me about that. Tell me when you learned about it.**

A. Records backlog issues? There has been a records issue with staffing and records backlog for years. When I became -- I -- I had sat in meetings when John Schneebeck, when I was deputy chief, would ask for more personnel or asked for a better system and it never came to fruition. Whether it was the chief blocking that or City manager blocking that, or ultimately Council saying, no, we're not going to send that money for that request, that SLAR, if you will, which is a -- oh, God, acronyms again. What does SLAR stand for? Staffing level adjustment request. So I know that those had



Response to MSJ Ex. 8

like that to me.

**Q. So we --**

A. But we were already dealing with it. We already knew there was a problem because we had already told him there was a problem.

**Q. So when did you first discuss -- or when did Mr. Twombly first discuss with you the potential of your separating employment with the City?**

A. I believe it was March 9th.

**Q. Okay. And you record -- that's the -- one of the recorded meetings?**

A. Yeah.

**Q. Tell me -- who called that meeting? Did you ask for that meeting? Did he?**

A. I did.

**Q. Okay. And why?**

A. Because of the rumors that were swirling, and officers telling me I was going to be gone in less than three weeks. And they were pretty much correct.

**Q. Okay.**

A. So they had information from and they -- the rumors were that Jurinsky was telling people that. And then others -- Terry Brown and Jad Lanigan were telling people that I was going to be fired.

**Q. Okay. And why didn't you just ask Jim**

go back and look at the recording that stated there was a problem in leadership because of this report.

**Q. But other than something he said in meeting, do you have any evidence that Mr. Twombly was meeting with Dustin Zvonek?**

MS. GREISEN: I'm sorry. I spaced. I lost the question. Are you asking her for any evidence she has that Twombly met with Jurinsky or with Zvonek; is that right?

MS. ORTIZ: We are -- we're done with Jurinsky. We're on to Zvonek.

MS. GREISEN: Okay. So any evidence that Twombly met with Zvonek?

MS. ORTIZ: Yeah.

BY MS. ORTIZ:

**Q. So what evidence do you have that Twombly met with Zvonek?**

A. The only evidence I have is from the now City Attorney Pete Schulte telling me that the three city council members were pressuring Jim. Jim was getting pressure, and that I was "being fucked," and I need an attorney.

**Q. And when did Mr. Schulte tell you that?**

A. It was prior to my -- it was prior to me hiring Ms. Greisen, and so I could look at the date of



Response to MSJ Ex. 8

when I called her. I don't have that in front of me now.

**Q. Where did that meeting take place?**

A. It wasn't a meeting. It was in my office. He came in and said, you're -- you're getting fucked. And then he came back a few days later and told me that he was confronted by his supervisor at the time, Jack Bajorek, saying, did you really tell her she needed a lawyer? And he said that he told him, yes, I did. So he had confirmed that he said it, and then confirmed that he was questioned about saying it, and then told me about that he was questioned about saying it.

**Q. And was anybody -- are there any witnesses to this meeting?**

A. I'm not sure if Danelle Carrel heard him or not. She was my executive assistant. She could have heard him.

**Q. All right.**

A. And I don't know who else he was telling this to because he liked to.

**Q. So I just want to be sure I have the record clear. What he said to you is that Twombly was under pressure, and you're getting fucked?**

A. Jim is being pressured by those council members. You need to get an attorney because you're

**Q. Ms. Ortiz asked you about whether, when you terminated officers, you gave them their badge and their LEOSA cards?**

A. I didn't give them.

**Q. Oh, you didn't?**

A. Yes.

**Q. When you terminated officers, was it for cause or not for cause?**

A. It's for cause, for criminal or directive violations.

**Q. Okay. Do you know if they left without cause, whether they were allowed to keep their badges?**

A. Yes.

**Q. So just so the record's clear, were they allowed to keep their badges --**

A. Yes.

**Q. -- when terminated without cause?**

A. If they left without cause, then they were allowed to keep their badges and given a LEOSA card if they served ten years within the Aurora Police Department.

**Q. Okay. And the only other question I had, because I was a little unclear on the answer because Scott's notes are better than mine, but I still can't tell, so I'm going to ask you again. On Exhibit 52, you**



Response to MSJ Ex. 8