

EXHIBIT 56
WIT: Amsler
DATE: 4/3/25
Shelly Dittmer, RPR

# Recommendations for the Aurora Police Department

21CP Solutions

EXHIBIT D
AURORA 00023

August 2021

Response to MSJ Ex. 12

group-based disparities among enforcement activities. APD observes that its new data analytics and records platform will facilitate this type of analysis.[186]

## Bias-Free Policing

**Recommendation 11. APD should revise its current policy on bias (Directive 08.32, "Biased Based Policing") to provide more specific and detailed guidance to officers.**

APD's current policy addressing bias-based policing is Directive 8.32. It defines biased-based policing and expressly prohibits officers from taking "enforcement action based on a trait common to a group, without actionable intelligence to support consideration on that trait," including race, ethnicity, gender, national origin, language, religion, sexual orientation, gender identity, age, and disability.[187]

21CP recommends that APD revise its policy to include, first, a broader statement of the values that drive the Department's requirements relating to bias-free policing. This stronger, broader statement can better reflect that "bias-free policing is a critical cornerstone for upholding professional ethics in law enforcement" and that "public trust and confidence can be easily destroyed if we let biased decision making control police behavior or to serve as a short cut in performing law enforcement duties."[188] For instance:

- **Newark Police Department** – "It is the policy of the Newark Police Division that all decisions and actions by members shall be fair, impartial, and free of bias and unlawful discrimination. This policy applies equally to all law enforcement activities and the provision of all police services.

  Bias-based conduct is strictly prohibited . . . . Treating a person differently based upon that person's specific characteristics degrades the public's confidence in the Division and is detrimental to effective law enforcement because it fosters distrust in the community and undermines the Division's ability to enforce the law."[189]

- **Seattle Police Department** – "The Seattle Police Department is committed to providing services and enforcing laws in a professional, nondiscriminatory, fair, and equitable manner. The Department recognizes that bias can occur at both an

186 Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 5.
187 APD Directive 8.32, Section 8.32.
188 International Association of Chiefs of Police, *Bias-Free Policing* (Nov. 1, 2003), https://www.theiacp.org/resources/resolution/bias-free-policing-0.
189 Newark Police Division, General Order 17-06), http://www.newarkpdmonitor.com/wp-content/uploads/2018/07/NPD-Bias-Free-Policing-Policy.pdf (Sept. 19, 2017).



EXHIBIT D
AURORA 00083

Response to MSJ Ex. 12

> individual and an institutional level and is committed to eradicating both. Our objective is to provide equitable police services based upon the needs of the people we encounter. The intent of this policy is to increase the Department's effectiveness as a law enforcement agency and to build mutual trust and respect with Seattle's diverse groups and communities."[190]

Second, like the Newark policy above, APD's policy should reflect that bias-free policing principles extend to all of an officer's activities and actions – and not just "enforcement action."[191] For instance, it is not clear that APD's current bias-free policing policy would extend to issues arising in the context of voluntary encounters, individuals expressing a desire to make a complaint, and other circumstances.

Third, most of APD's current policy on biased-based policing focuses on either instances where issues surrounding bias most frequently arise (pedestrian and traffic stops) or where individuals make complaints alleging bias. As noted above, the policy guidance surrounding stops is insufficiently specific. The other policy guidance on complaints is useful but does not address core officer performance. The **Newark** and **Seattle** policies cited above contain substantially more general guidance to officers relating to bias-free and discriminatory policing issues. APD should likewise expand its treatment of these issues in revised policies.

APD says that "[t]he newly added Community Relations Section Manager will be establishing and implementing guidance on Diversity, Equity and Inclusion (DEI) training which has already occurred" and that "[p]olicies will continue to be updated as guidelines are established."[192]

**Recommendation 12. APD should provide training to officers about revisions to its policies relating to bias, the histories and experiences of Aurora's diverse communities, and cross-cultural communication.**

To implement updated policies on bias-free policing, and to enhance officer awareness of the histories and experiences of communities from across Aurora, APD should collaborate with the community to design in-service training for all officers on bias-free policing, discriminatory policing concerns, the histories and experiences of Aurora's communities, and approaches to optimize understanding and empathy in cross-cultural exchanges.

---

190 Seattle Police Department, Policy Manual, Section 5.140, Bias-Free Policing, https://www.seattle.gov/police-manual/title-5---employee-conduct/5140---bias-free-policing (Aug. 1, 2019).

191 APD Directive 8.32, Section 8.32.

192 Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 5.

President Obama's Task Force on 21st Century Policing recommended that "[l]aw enforcement agencies . . . engage community members in the training process."[193] In some jurisdictions, this type of engagement has included community members giving input into the type and design of training provided to officers in order to ensure that instruction reflects the specific needs and characteristics of their communities. In others, community members serve as presenters or instructors for relevant training, which can be especially impactful where the training focuses on experiences, backgrounds, and histories of particular communities. Regardless of the form and type of engagement, police-community collaboration on officer training can enhance the quality of training and foster enhanced police-community relationships.

To this end, APD conducted a training on diversity, equity, and inclusion in February 2021 via Zoom with an outside facilitator for Department personnel, which 21CP attended. Even as future opportunities could benefit from in-person training opportunities and the addition of expanded community voice, 21CP personnel found the training to be an important start to ongoing training in the area. We also understand from APD representatives that additional cultural competency training will be provided by APD's Chief Community Relations Officer going forward, in addition to culturally-specific training conduct by community leaders. "APD has already incorporated community members of color into our Academy Training curriculum where their experiences involving police are shared with the recruits."[194]

**Recommendation 13. APD policy should require the regular, independent analysis of data on officer and aggregate departmental performance to determine if any of its activities, programs, or enforcement approaches are having a disproportionate impact on specific groups, communities, or types of individuals.**

As discussed previously in the context of non-voluntary encounters, the Department needs to regularly and systematically analyze data on officer performance to determine if any of its activities, programs, or approaches may be disproportionately affecting particular groups, communities, or individuals. That is, across all forms and types of officer performance and APD activities, collected information should be systematically analyzed to determine whether the Department's performance or activities are having unwanted, disparate impacts.

Police departments are increasingly working with their communities to formalize approaches to systematically consider the ways that their activities may be burdening or affecting some individuals more, or differently, than others. For instance, the **Seattle Police Department**'s policy on bias-free policing commits that department "to eliminating policies

---

193 *Final Report of the President's Task Force on 21st Century Policing* 54 (2015).

194 Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 6.



EXHIBIT D
AURORA 00085

Response to MSJ Ex. 12

and practices that have an unwarranted disparate impact on certain protected classes."[195] To foster this objective, the policy expressly requires the department to "periodically analyze data which will assist in identification of SPD practices . . . that may have a disparate impact on particular protected classes relative to the general population . . . . Where unwarranted disparate impacts are identified and verified," the Department must work with community stakeholders to identify if, "equally effective alternative practices . . . would result in less disproportionate impact."[196]

Commendably, APD told 21CP that its "staff will reach out [to] other agencies to gauge current best practices for gathering and reporting this data."[197] The process of a law enforcement agency systematically gathering data about its activities, analyzing such information to determine if the burdens or impacts are falling disproportionately on particular populations or communities, and exploring whether alternative approaches could address or alleviate disparity is critical to implementing a comprehensive approach to policing that is committed to equity and fairness.

**Recommendation 14. APD should make information about complaints relating to bias, profiling, and discrimination available on its website, along with information about the adjudication of investigations of such complaints.**

"Open data in areas like public complaints, officer-involved deaths, and use of force provides the foundation for informed research, policy reforms, and oversight."[198] The United States Conference of Mayors indicates that "[i]n an effort to promote transparency, departments should . . . publicly report data related to biased policing."[199]

Although APD "provides an annual report that is posted online which includes information pertaining to officer complaints,"[200] as part of an ongoing commitment to identify and address bias in a meaningful and transparent manner, APD should make information about civilian complaints pertaining to bias, profiling, and discriminatory policing available on its website. In doing so, the Department should provide information about the status and/or ultimate adjudication of such complaints. APD tells 21CP that it "will reach out to other agencies that

---

195 Seattle Police Department Policy Manual Section 5.140, Bias-Free Policing, https://www.seattle.gov/police-manual/title-5---employee-conduct/5140---bias-free-policing.
196 *Id.*
197 Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 6.
198 Open Government Partnership, *Transparency and Accountability at the Frontlines of Justice: Police Data Transparency* (July 8, 2020), https://www.opengovpartnership.org/documents/transparency-and-accountability-at-the-frontlines-of-justice-police-data-transparency/.
199 The United States Conference of Mayors, *Equality and Due Process*, https://www.usmayors.org/issues/police-reform/equality-and-due-process/ (last visited Apr. 20, 2021).
200 Aurora Police Department, *Response to 21CP Solutions Recommendations for the Aurora Police Department* (June 17, 2021) at 6.



EXHIBIT D
AURORA 00086

Response to MSJ Ex. 12

have interactive complaint tools to determine best practices and feasibility for implementation."[201]

## Crisis Intervention

**Recommendation 15. APD and the City of Aurora should either recommit to the full implementation of its current CIT model or consider implementing alternative response mechanisms to individuals experiencing mental health and behavioral crisis.**

The Centers for Disease Control estimates that more than 50 percent of Americans will be diagnosed with a mental health disorder at some point in their life; one in five will experience a mental illness in any given year; and approximately one in 25 Americans are living with a chronic, serious mental illness, such as schizophrenia, bipolar disorder, or major depression.[202] Consequently, police officers frequently respond to situations involving individuals experiencing mental health, substance abuse, and other behavioral health challenges. Indeed, studies suggest that as many as 10 percent of all police encounters with the public involve individuals experiencing a behavioral health crisis.[203]

Especially over the past 20 years, some communities and their police departments have looked to provide specific tools, resources, or mechanisms for addressing the particular needs of individuals experiencing mental and behavioral health crises. One major paradigm is the so-called "Memphis Model" of crisis intervention. Officers receive training on responding to individuals in crisis, with specially-trained "CIT officers" being dispatched to calls implicating behavioral health issues.[204] Steering committees of community stakeholders, including social service providers, clinicians, individuals of affected populations, and other community representatives, come together to discuss system-wide responses to mental health, substance abuse, and other behavioral issues.

At least on paper, the Department appears to be structured to implement the "Memphis Model." Specifically, Directive 6.13 requires that, when possible, one or more members of the Crisis Response Team ("CRT") should be assigned to handle calls involving a person in crisis as a result of a mental health issue. If the CRT is not available, Crisis Intervention Trained ("CIT") members or any sworn member may respond. Meanwhile, APD Directive 8.36

---

201 *Id.*

202 Centers for Disease Control and Prevention, *Mental Health, Learn About Mental Health* https://www.cdc.gov/mentalhealth/learn/index.htm (last visited Apr. 21, 2021).

203 Martha W. Deane, "Emerging Partnerships Between Mental Health and Law Enforcement," 50 *Psychiatric Services* 99 (1999).

204 *See, e.g.*, Amy C. Watson & Anjali J. Fulambarker, "The Crisis Intervention Team Model of Police Response to Mental Health Crises: A Primer for Mental Health Practitioners," 8 *Best Practices in Mental Health* 71 (2012); University of Memphis, *CIT Center*, http://www.cit.memphis.edu/overview.php?page=2 (last visited Apr. 21, 2021).



EXHIBIT D
AURORA 00087

Response to MSJ Ex. 12