IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-CV-00731-STV

---

VANESSA WILSON,

Plaintiff,

vs.

CITY OF AURORA,

Defendant.

---

DEPOSITION OF CHRISTOPHER JAMES AMSLER

---

Tuesday, June 3, 2025

8:58 a.m.

PURSUANT TO NOTICE and the Federal Rules of Civil Procedure, the above-entitled deposition was taken on behalf of Plaintiff at Fennemore Law Firm, 3615 Delgany Street, Suite 1100, Denver, Colorado, before K. Michelle Dittmer, Registered Professional Reporter and Notary Public within Colorado.

Response to MSJ Ex. 13

Colorado and probably around the country?
A. Yes.
Q. Okay. And it's fair to say, isn't it, that the training was not met with open arms by many APD officers?
MS. ORTIZ: Objection. Form. Foundation.
A. Yes. That's fair to say.
Q. (By Ms. Greisen) You're aware -- or are you aware of the reaction that at least some officers -- negative reactions that some officers had to the training?
A. Yes, I am.
Q. Okay. And you know -- or would you agree that one of the officers that had strong objections to the mandatory training was president of the Aurora Police Association, Doug Wilkinson?
A. Yes.
Q. And how is it that you're aware of Doug Wilkinson's reaction to the training?
A. He had pushed out a survey in reference to the training, and I think a copy of that survey ended up in the chief's office.
Q. So you saw it?
A. Yes.
Q. Okay. And were you aware that it was

distributed to the news media?
A. Oh, yes, I was.
Q. So I'm going to ask you about some comments that were made by officers with respect to that training.
If you want to see the information that Doug Wilkinson put out to refresh your memory at any point, let me know --
A. Okay.
Q. -- and I'll direct you to specific cites, but let's see if you recall.
Do you recall that there were comments that the training was a part of the, quote, wokeness movement?
A. Yes.
Q. And that the -- there were officers that made comments that the DEI or the diversity training was, quote, liberal propaganda --
A. Yes.
Q. -- do you recall that?
Do you recall that there was comments that the diversity training was really soft-pedaling of critical race theory?
A. Yes.
Q. Do you recall that there was a comment

that there is no systemic bias in law enforcement and, therefore, objections to having to attend this training?

A. Yes.

Q. Comments that the training was just -- I can't read my own writing -- a simple form of the liberal socialist society platform?

A. Yes.

Q. Comments that the training was some form of neo-Marxist political theory?

A. Yes.

Q. Comments that it was offensive that the person presenting the training opened up the training by saying something about, quote, the murder of George Floyd. That was offensive.

Do you recall that?

A. Yes.

Q. Comments that, quote, equity is the new buzzword on the left.

Do you recall that?

A. Yes.

Q. And a comment that the equity training was, quote, the -- the, quote, usual crap.

Do you recall that?

A. Yes.

Q. There were several -- I didn't count --

but comments that the equity training was a complete waste of time?
A. Yes.
Q. One of the comments was, it was, quote, frustrating to have this type of agenda constantly rammed down our throats?
A. Yes.
Q. And a comment that Chief Wilson should be removed from her position due to the lack of leadership demonstrated in allowing a myopic bigot to present training to the entire department in the guise of diversity and equity?
A. Yes.
Q. Do you recall that?
A. Yes, I do.
Q. Okay. So it is fair to say that the diversity and equity training that Chief Wilson provided pursuant to Recommendation 12 was met with hostility by at least some of the police officers?
A. Yes, it was.
Q. Okay. Did you take the training?
A. I did.
Q. Do you believe -- did you agree with these type of comments about the training?
A. I did not.

A. Yes.
Q. In fact, were you aware that the president of the Aurora Police Association announced as a result -- well, let me -- let me rephrase that. It was a poorly worded question.
As a result of Chief Wilson deciding to open up a new investigation into that matter, the president of the APA called for a no-confidence vote against the chief.
Did you -- were you aware of that?
A. Yes.
Q. And, in fact, the president of the Aurora Police Association was very upset that Chief Wilson had called for that reinvestigation, right?
A. Yes.
Q. The tenor of -- or the tone of the objection was: This has already been investigated. No fault has been found. Chief Wilson does not have our back because she's now opening up this investigation again?
A. Yes.
Q. Okay. So the president of the APA, Doug Wilkinson, then said he did a -- conducted a no-confidence poll by sending out a -- like, a SurveyMonkey poll, right?

A. Yes.
Q. Did you see that poll?
A. I did.
Q. Okay. Did you participate in that poll?
A. I did.
Q. Jason Batchelor, the current city manager, testified that he had no faith in the veracity of that poll.
Do you agree with him?
A. Yes, I do.
Q. Why?
A. Because I was curious to see if -- how it worked, if you could actually vote more than once. And I found that you were able to do so, so I voted a second time. All I had to do was pull up a different web browser and click on it.
So that right there proved that that poll was -- there was no type of security measures in place to make sure that it was accurate on polling.
Q. Okay. So do you doubt the veracity of that poll?
A. Yes.
Q. Were there officers who were upset by the fact that Chief Wilson asked for the incident to be reinvestigated --

about it?
A. People that were friends, associates, my colleagues, of course -- because, again, that, of course, was leaked to the media, so we had to handle communications for that.
Q. Do you know who leaked it to the media?
A. I don't. It -- it felt like everything in the department was being leaked to the media to -- to undermine Chief Wilson.
Q. And was there -- well, let me ask you:
Did you talk about the -- this poll with at-the-time Deputy City Manager Batchelor?
A. I don't recall.
Q. What about with City Manager Twombly?
A. No, I don't recall.
Q. Do you recall ever being questioned about it?
A. No.
Q. Do you recall stating whether you thought it should be believed to anyone?
A. The poll results?
Q. Yeah.
A. No.
Q. Okay. In the fall of 2021, you're aware that the Colorado Attorney General's Office also issued a

the police department who disagreed that the City should have entered into the consent decree?

A. Yes.

MS. GREISEN: Shelly, could you show Lieutenant Amsler Exhibit 19.

Do you need a copy, Holly?

MS. ORTIZ: No, I've got it right there.

MS. GREISEN: Okay.

Q. (By Ms. Greisen) I'm going to ask you, have you seen -- we've previously marked this as Exhibit 19 in this case.

Have you seen this before, Lieutenant?

A. Yes, I have.

Q. Okay. What do you recognize this as?

A. This was the letter that Doug Wilkinson sent out to the membership of the APA in reference to the consent decree.

Q. Okay. I'm going to ask you some questions about it, and if you need to stop and look at it in order to refresh your memory, feel free to do so.

A. Okay.

Q. Would you agree that in this email that he sent out to members of the police department, that he called -- essentially called the consent decree "racist"?

A. Yes.

Q. And that the consent decree represented leftist identity policy?
A. Yes.
Q. And is in essence saying that the only way to get diversity in the police department was by lowering the hiring standards?
A. Yes.
Q. And agree that his letter or email made several disparaging comments about members of the minority community --
A. Yes.
Q. -- in Aurora?
A. Yes, it did.
Q. And would you agree that Chief Wilson publicly opposed the comments that Officer Wilkinson made in this email?
A. Yes, she did.
Q. Would you agree she made it clear that she would not tolerate this kind of talk at the -- or conduct at the APD?
A. Yes. Her actions did.
Q. Right.
And her actions were to fire Doug Wilkinson, right?
A. Yes.

Q. And by firing, she made it clear that she opposed his continued employment, right?
A. Yes.
Q. And that she was firing him for the kind of racist -- racist comments he made in this email, right?
A. Yes.
Q. And do you know if there were employees, officers, in the APD who complained about this email?
A. Yes, there were.
Q. Okay. And how did you become aware that -- well, let me ask you this:
To your knowledge, did those employees tell Chief Wilson that they were upset by this email?
A. Yes, they did.
Q. And these were members of the black and brown community who were officers at the APD; is that correct?
A. Yes.
Q. And did -- to your knowledge, did Chief Wilson encourage those employees to make a formal complaint about the email?
A. Yes, she did.
Q. And do you know -- do you know if they actually did file a formal complaint about Doug

Wilkinson's email on Exhibit 19?
A. I believe so, yes.
Q. Okay. And did the complaints made by those -- were there two employees?
A. I don't know the exact number.
Q. Okay. Were those -- to your knowledge, did those employees complain about, essentially, that this was exhibiting racist comments or that this was a discriminatory email that was sent by the president of the APA?
A. Yes, I believe so.
Q. So is it fair to say that the complaints made by the employees at the APD were complaints of a hostile work environment based on race?
A. Yes.
Q. Okay. And do you know if -- would you agree that Chief Wilkinson supported the employees when they made their complaints -- Wilson?
A. Wilson did, yes.
Q. Chief Wilson. I'll rephrase that. That was a really poorly --
MS. ORTIZ: I was like, Whoa.
Q. (By Ms. Greisen) See what happens when I get low blood pressure?
MR. MEDLOCK: Lots just happened there.

Q. -- misogynistic, and homophobic?
A. Yes.
Q. Okay. Do you -- was it upsetting to you --
A. Very upsetting.
Q. -- this email?
Were you aware of other members of the department that it was upsetting -- that found this upsetting?
A. I haven't talked to anyone who thought that what was in that letter was appropriate or representative of the vast majority of the members of the Aurora Police Department.
Q. Okay. So again, we're talking about the time period of fall of 2021.
Were you aware during that time period that there were candidates running for city council who were also critics of Chief Wilson?
A. Yes.
Q. Were you aware that there were candidates running for city council during this time period who were critical that the City agreed to enter into the consent decree?
A. Yes.
Q. And were you also -- so I'll just put it

out there. I'm talking -- I want to make sure we're talking about the same candidates.

There were three candidates: Jurinsky, Zvonek, and Sunderberg?

A. Sundberg.

Q. Sundberg.

Those are the three candidates we're --

A. Yes --

Q. -- talking about?

A. -- they are.

Q. And I probably jumped forward a little bit because it was the same time, fall/winter 2021, that the City did enter into the consent decree, right?

A. Yes.

Q. And these candidates were critical of the fact that the City had agreed to enter into this consent decree?

A. Yes.

Q. They -- candidates were -- publicly stated that they supported the police officers and didn't think the City should have entered into the consent decree, right?

A. I believe so, yes.

Q. On the other hand, you're aware that Chief Wilson publicly supported and embraced the consent

Q. Okay. It was -- fair to say that it was -- I think you said it -- a plan that focused more on internally how to improve issues in the APD, right?
A. Correct.
Q. Okay. Were you aware at this time, in late 2021/early 2022, whether there were other police departments around the country also having problems with attrition and morale?
A. Yes, there was. It was a national -- nationwide problem.
Q. Okay. What were -- to your knowledge, what were the contributors to the problems with morale and attrition at police departments?
MS. ORTIZ: Objection. Foundation.
A. Again, I'd say the biggest thing was, 2020, the death of George Floyd and police reforms coming out of that. Also, too, you know, the public's attitude towards the police had changed. So there was a lot more negativity towards the police.
So, yeah, a lot of officers were leaving because it was like: Why is it worth all of this added stress and emotion to myself and my family? And so they were moving on to -- to different careers.
Q. (By Ms. Greisen) So as the executive officer, were you talking to other police departments?

come on board.

Q. Was anybody else in the executive leadership team summarily terminated like that?

MS. ORTIZ: Objection. Form.

A. Well, Deputy Chief Parker, who was -- he was away at the FBI's National Academy in Quantico, so he was away while all of this was taking place.

But when he came back, he retired. And the rumor was that he was told by Oates that he was going to be demoted to lieutenant if he stayed on the department, which would be -- which would have been back to his Civil Service rank before he got appointed to that deputy chief position, which is how our system works with Civil Service employees.

Q. (By Ms. Greisen) Anybody else that was demoted?

A. No, not -- not right away.

Q. So you said you were put in as the acting captain of the Special Ops unit, but you were away at a conference the first week, and then you were on vacation for two weeks.

So for the other three weeks, were you the acting cavity --

A. Captain.

Q. -- captain --

A. Yeah.
Q. -- captain of Special Ops?
A. Yes, I was.
Q. And then what happened?
A. Oates came in and he -- I don't want to say demoted me because it was just an acting position. So he -- he took the person that was filling in as the acting division chief and put him back into that captain's spot.
So I was covering someone who they had elevated to an acting division chief position, if that makes sense.
Q. What happened to you?
A. Well, I got a phone call and was pretty much told, "We don't know where to put you, so we're going to put you in community relations."
Q. You got a phone call from who?
A. Chris Juul.
Q. What does that mean: "We don't know where to put you"?
A. We don't know where -- because they didn't have an opening anywhere, so -- Paul Poole was going to retire, and so they -- they put me into his spot.
Q. Did you want to go back to community relations?

MS. GREISEN: Okay. Well, you can preserve your question. I'm --

MS. ORTIZ: I'm going to --

MS. GREISEN: -- going to go ahead --

MS. ORTIZ: -- direct him not to answer any questions about this document. This is attorney work -- this is privileged information that was inadvertently disclosed.

MS. GREISEN: No. Actually, there's a direct answer to the question: The Chief's Youth Violence Committee "was active from 2021 and concluded in 2022." That's what I'm going to ask him about, whether that's correct. I don't think that's privileged. That's just the answer to the question.

So you can preserve your question, we can take it to the Court.

But I am going to ask you about these different committees and when they stopped and started.

MS. ORTIZ: I mean, as far -- and I will say, I'm not objecting to the list of committees on 1162.

I'm objecting to the disclosed emails on 1161, which are privileged emails.

MS. GREISEN: Well, this page I'm talking about right now is simply --

MS. ORTIZ: Yeah.

MS. GREISEN: -- a question and answer.
Okay. Well, you can --
MS. ORTIZ: I mean, 1162 --
MS. GREISEN: -- preserve your record.
MS. ORTIZ: -- I'm not objecting to 1162.
MS. GREISEN: Okay.
MS. ORTIZ: I'm going to direct him not to answer questions about 1161 because that is work product.
Q. (By Ms. Greisen) Well, I'm going to ask you the questions.
The Chief's Youth Violent Advisory Committee, is it your understanding that was active from 2021 and concluded in 2022?
A. Yes.
Q. Okay. That was -- the Chief Youth's Advisory Committee was stopped after Chief Wilson was terminated; is that correct?
A. Yes.
Q. Okay. The Chief Youth Advisory Team, did that also stop after Chief Wilson was terminated?
A. Yes.
Q. The "Hero Fest" -- and I think there's a flyer on the Hero Fest -- that also stopped after Chief Wilson was terminated, right?
A. Yes.

Q. The "Summer Kick-off" that there's a flyer for, that was just a one-time event in 2021 during Chief Wilson's tenure, right?

A. Yes.

Q. The "Juneteenth Celebration," that's a celebration -- Juneteenth is known as the celebration to mark the freedom of black people in the United States from slavery.

Are you familiar with the Juneteenth?

A. I am.

Q. That was an approved community event under Chief Wilson's command, right?

A. Yes.

Q. And that was also ended after she was fired, right?

A. Yes.

Q. The "Aurora Youth Night," that was started under Chief Wilson's tenure, right?

A. Yes.

Q. And that was also stopped after she was fired, right?

A. Yes.

Q. The -- there's also something called -- and I think you talked about this before, and I'm not quite sure if it's called the "Community Task Force" or