CIVIL SERVICE COMMISSION, CITY OF AURORA, COLORADO

---

**FINDINGS, CONCLUSIONS AND ORDER**

---

IN THE MATTER OF DISCIPLINARY PROCEEDINGS AGAINST:

EDWARD ACUTI, A MEMBER OF THE AURORA CIVIL SERVICE, AURORA POLICE DEPARTMENT,

Petitioner.

---

This matter involves Officer Edward Acuti's appeal of discipline imposed by former Aurora Police Chief Vanessa Wilson based on allegations that Petitioner Acuti violated Directive 5.3 Use of Physical Force, Directive 14.2.21 Police-Community Relations, Directive 14.2.1 Conduct Unbecoming, Directive 14.2.15 Unsatisfactory Performance, and Directive 14.2.14 Conduct Toward Superior and Subordinate Officers and Associates, resulting in Chief Wilson demoting Petitioner from the rank of Sergeant to Officer and ordering Petitioner to complete forty hours of de-escalation training.

Petitioner's appeal was heard by the Aurora Civil Service Commission in the Aurora City Council Chambers on May 24 and 25, 2022. Chair Harold Johnson, Vice-Chair Desmond McNeal, Commissioner Barbara Cleland, and Commissioner Matthew Snider were present with counsel, Scotty P. Krob. Chief Wilson was represented by Assistant City Attorneys Peter Ruben Morales and Isabelle Evans. Petitioner Acuti was present and represented by Brian Reynolds of Reynolds Gillette, LLC.

## 1. PROCEDURAL HISTORY

On February 28, 2022, Chief Wilson issued a Disciplinary Order demoting Petitioner Acuti from Sergeant to Officer and ordering Petitioner to complete 40 hours of de-escalation training. On March 9, 2022, Petitioner, through his counsel, filed a Petition for Appeal with the Civil Service Commission.

## 2. DIRECTIVES INVOLVED

Chief Wilson sustained Petitioner Acuti for violating five directives of the Aurora Police Department. Those directives provide, in relevant part, as follows:

5.3 USE OF PHYSICAL FORCE

Use of physical force is defined as the application of physical force through the use of techniques or tactics, chemical agents, or weapons upon another person.

Members shall apply nonviolent means, when possible, before resorting to the use of physical force. Members will only use reasonable and appropriate force; and only when legally justified. When practicable sworn members will attempt to use de-escalation

techniques to control the situation so that lesser force, or possibly no force, is required. Additionally, when sworn members use force they will de-escalate the amount of force used when that force is successful, and control is gained.

Members may use physical force only if non-violent means would be ineffective in

1. effecting an arrest,

2. preventing an escape, or

3. preventing an imminent threat of serious bodily injury (SBI) or death to the sworn member or another person.

14.2.1 Conduct Unbecoming

Members will conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Department. Unprofessional conduct and irresponsibility will include that which brings the Department into direct disrepute, publicly or amongst its members, reflects direct discredit upon the member, or impairs the operation or efficiency of the Department or member.

14.2.14 Conduct Towards Superior and Subordinate Officers and Associates

Members will treat superior officers, subordinates, and associates with respect. They will be courteous and civil in their relationships with one another.

14.2.15 Unsatisfactory Performance

Unsatisfactory performance may be demonstrated by…an unwillingness or inability to perform assigned tasks, the failure to conform to work and/or training standards established for the member's rank, grade or position, the failure to take appropriate action on the occasion of a crime, disorder or other condition deserving police attention…

14.2.21 Police – Community Relations

The Aurora Police Department is committed to Community Policing, which involves a commitment to improving community relations…Members will be courteous to the public. Members will be tactful in the performance of their duties, will control their tempers and exercise the utmost patience and discretion and will strive to avoid engaging in argumentative discussions.

## 3. FINDINGS AND CONCLUSIONS

Based on the facts stipulated to by the parties in advance of the hearing, as well as the evidence presented during the hearing, the Commission unanimously finds and concludes as follows with regard to the directive violations asserted against Petitioner:

This case primarily involves six separate incidents referred to collectively in this ruling as "the escalation incidents" that occurred during May and June 2021, and whether Petitioner

committed multiple violations of the directives related to his interactions with members of the public, and also whether Petitioner mistreated his subordinate during a meeting with the Gang Intervention Unit (GIU). Throughout this time, Petitioner was the Sergeant in charge of the GIU. All six escalation incidents were captured on Body Worn Camera (BWC) footage from Petitioner's BWC that was presented to the Commission during the hearing.

A. Incident 1

This incident was the primary focus of the hearing and it is the incident Chief Wilson relied on in finding that Petitioner violated Department Directive 5.3 governing the use of physical force by an Aurora police officer. In this incident, other members of the GIU had stopped a vehicle with two occupants. The driver was Ms. Davis, a juvenile. The passenger was Ms. Davis' boyfriend and, according to Ms. Davis, the father of her child. As shown on Petitioner's BWC, when Petitioner arrived on scene, Ms. Davis was out of the vehicle, and had already been handcuffed behind her back by Officer Gruszeczka. Shortly after Petitioner arrived another officer sought to remove the passenger from the vehicle. The passenger broke free from the officer and fled. During a brief pursuit, a nine-millimeter handgun with expanded clip fell from the passenger's clothing. Petitioner chased the passenger, tripped on a divot, fell to the ground, and the passenger escaped. When Petitioner returned to the vehicle Ms. Davis was seated on a nearby curb. She was extremely distressed, yelling for the officers to call her mother and telling them that her child had been taken to the hospital for treatment of a gash he received on his head. Officer Gruszeczka was attempting to calm Ms. Davis down, but without success.

Visibly agitated, Petitioner began yelling at Ms. Davis, telling her, in part, "shut the fuck up" and "fuck you" several times. The situation escalated, as Ms. Davis responded to Petitioner in kind and stood up from the curb, screaming "fuck you" and "help" as loud as she could. At that point Petitioner and Officer Gruszeckzka grabbed Ms. Davis from each side and, using a leg push maneuver, put her back in a seated position on the curb.

After Ms. Davis was again seated, she resumed yelling and Petitioner became concerned she would again try to stand up and possibly escape or injure herself. Petitioner pinched Ms. Davis' trapezoid muscles from behind and pushed down with his hands on her shoulders restraining her in the seated position. Photos taken of Ms. Davis showed red marks in the areas of Ms. Davis' neck and shoulders where Petitioner had pushed with his hands.

Ms. Davis remained seated, but after a brief period of relative calm again began screaming "help" as loud as she could. Petitioner resumed his screaming match with Ms. Davis, yelling, among other things, "Don't tell me how to do my job." "You're old enough to drive a car, without a license, you're old enough to have a son. Act It!" "You think I'm out here playing fucking games, you're out of your fucking mind. And I'll tell your mom the same fucking thing. I'm sure your mom will be real happy that your fucking man's got a gun in his fucking waistband. Running around fucking town, Right? Whose fucking car is this? Tell me, whose fucking car is this? 'cause it's going to go to the fucking impound and I don't give a fuck how you get around. Are we fucking clear? You better keep your fucking mouth shut! I'll make your life a living fucking hell from this fucking day forward."



**Response to MSJ Ex. 15**

**Wilson 000790**

The Force Review Board (FRB) reviewed both the leg push maneuver used by Petitioner and Officer Gruszeczka to seat Ms. Davis on the curb, and the pressure point application to the trapezoids used by Petitioner to keep her seated. The FRB concluded the leg push maneuver was policy compliant. However, the FRB found that Petitioner's use of the trapezoid pressure point against Ms. Davis was policy non-compliant because Ms. Davis was handcuffed and was "clearly smaller" than the two officers who were on either side of her. Accordingly, such force was not necessary or justified. During the hearing Officer Cancino testified that the FRB actually found Petitioner's use of the trapezoid pressure point tactic was compliant and that the FRB's report setting forth its conclusion to the contrary was in error. However, Chief Juul subsequently testified that he authored the FRB report and that it accurately reflected the findings of the FRB.

Directive 5.3, Use of Physical Force, regulates the conduct of a police officer before, during, and after physical force is applied to a person. Before using physical force, an officer is required to "apply nonviolent means" and "attempt to use de-escalation techniques to control the situation" before resorting to the use of physical force. Once an officer determines they will use physical force they must "only use reasonable and appropriate force." The use of physical force is to be stopped once physical control is gained.

The evidence presented to the Commission was disputed as to whether Petitioner violated the directive during the period physical force was applied to Ms. Davis' trapezoid muscles and shoulders. There were red marks on Ms. Davis from Petitioner's application of pressure. However, no bruising was observed and it was unclear whether Ms. Davis was again trying to stand or how much pressure was needed or applied to prevent her from doing so. Petitioner testified he used the pressure point tactic to gain control, to avoid her escaping and to prevent her from suffering injury since she was handcuffed. Admittedly, Ms. Davis was in a highly excited state and had once before succeeded in standing up contrary to the direction she was given by Officer Gruszeczka. However, at the time Petitioner applied physical force, Ms. Davis, who appears to be a few inches over five feet tall and of slight build, was seated on the curb, handcuffed behind her back, with substantially larger and more powerful officers restraining her on each side. Under these circumstances the Commission concludes the use of force was not necessary.

In addition, the Commission concludes Petitioner violated the portions of the Physical Force directive requiring him to use de-escalation techniques before resorting to physical force. When he returned to where Ms. Davis was seated after unsuccessfully pursuing the passenger, Petitioner initiated the use of profanity toward Ms. Davis, and, through its continued use in reply to Ms. Davis' responses, Petitioner escalated the tension of the situation. The Petitioner's BWC footage revealed no effort by Petitioner to try to calm Ms. Davis through any means other than yelling and intimidation which were obviously counterproductive. In doing so, Petitioner violated the portions of Directive 5.3 obligating him to try to de-escalate the situation before resorting to the use of physical force.

Accordingly, the Commission finds and concludes that Petitioner's conduct in Incident 1 with Ms. Davis violated Directive 5.3 by failing to attempt to de-escalate the situation and by failing to exhaust non-violent means to control the situation before resorting to physical force. In addition, the Commission concludes that physical force to control Ms. Davis was not necessary because she was seated and handcuffed, between two much larger officers.

The Commission also finds that Petitioner's conduct in Incident 1 violated three of the other Directives relied on by Chief Wilson. Petitioner's interaction with Ms. Davis violated every part of Directive 14.2.21. which addresses Police-Community Relations. Petitioner was not courteous or tactful in performing his duties. He completely failed to control his temper. Rather than exercise the utmost patience and discretion he showed none. Instead of avoiding argumentative discussions with Ms. Davis, he largely initiated them and carried them forward. His conduct was absolutely antithetical to everything Directive 14.2.21 mandates.

Petitioner's actions also violated Directive 14.2.1, Conduct Unbecoming. Petitioner's behavior did not reflect most favorably on the Department, brought the Department into direct public disrepute, and reflected direct discredit on Petitioner. Finally, Petitioner's interactions with Ms. Davis in Incident 1 constituted Unsatisfactory Performance by Petitioner under Directive 14.2.15 in that he failed to take appropriate action on the occasion of a crime, disorder and other condition deserving police attention.

Accordingly, in connection with Incident 1, violations of Directive 5.3 Use of Physical Force, Directive 14.2.21 Police – Community Relations, Directive 14.2.1 Conduct Unbecoming, and Directive 14.2.15 Unsatisfactory Performance, are SUSTAINED.

B. <u>Incidents 2 through 6.</u>

All of the misconduct in Incidents 2 through 6 involved the same three directives, Police – Community Relations, Conduct Unbecoming, and Unsatisfactory Performance. Though separate and distinct events, they share common patterns of misconduct by Petitioner.

<u>Incident 2</u>

In this incident, other members of the GIU had stopped a vehicle occupied by three men and a woman, with a rifle case visible in the back seat. As a result, the occupants were removed from the vehicle at gun point and were seated on the sidewalk and grass nearby. Shortly thereafter, Petitioner arrived on scene and engaged in a discourse with two of the men. As shown on Petitioner's BWC footage, one of the men expressed fear and concern over the traffic stop and then stated, "You're supposed to be protecting us" to which Petitioner responded, "I am protecting you, you're sitting there breathing right?" At one point Petitioner told one of the men, "Listen to me. I need that person to be scared and paying attention to me and my guys." The conversation between Petitioner and the man became escalated with both individuals talking over each other. Petitioner persisted in the conversation, yelling, "Are we going to continue to go back and forth about this shit?... Are you going to tell me how to do my fucking job?...Then our conversation is over… We do things the way we fucking do things. That's why you're actually sitting there." Later Petitioner engaged with the female who had been in the vehicle and was sitting on the lawn, telling her, among other things, "Shut the fuck up with this shooting people. Every fucking night I deal with your bullshit. You're all sitting here breathing aren't you?" In response to a comment from the woman, Petitioner said, "So shut up and just keep breathing."

Incident 3

This incident involved a traffic stop by other officers of a vehicle for misuse of license plates. Petitioner arrived on scene and conducted a consensual search of the vehicle that revealed, among other things, multiple IDs. The woman driver provided Petitioner a vague explanation of who sold her the car and how long she had it. At one point she told Petitioner she was 42 years old, but had only been driving for a year. When the woman was unable to explain why she has the multiple IDs, Petitioner responded, "Don't fucking sit here and bullshit me. Goddamn I don't care about fucking Mad Man, you only know him by his fucking moniker and he gives you some fucking car with some shit key and you're going to tell me you've only been driving for a year at 42 years old? Bullshit. There's a dozen IDs in here, you want to play cards? I'm going to jam it so far up your ass reference all this shit, you're fucked."

Incident 4

After a stopping a vehicle for expired tags, officers discovered a gun that was reported as stolen. Officer Roberts was talking to one of the passengers who was sitting on the curb. Although Petitioner did not appear to be involved in the direct conversation he interjected himself stating, among other things, "If he wants to be rude, we can probably go about it another way you and I were discussing…I'll put the gun on both of you." At that point the passenger admitted he was on probation for possession of cocaine, to which Petitioner responded, "Doesn't that fucking suck?" The passenger said he did not know there was a gun in the car and Petitioner replied, "Then why don't you listen to what my officer's trying to talk to you about? And if you don't want to say anything and you want to keep acting like a dick, we're just going to fucking charge you. Then shut your fucking mouth and open your fucking ears. You're an adult. I'm going to talk to you like a fucking adult. You are fucking under arrest right now. Are we fucking clear? For fucks sake."

Incident 5

This incident involved a traffic stop by other GIU members of a vehicle being driven by a woman the GIU believed was associated with a local drug dealer. The driver did not stop immediately and when she did eventually stop and the officers approached her vehicle, she refused to roll down her window or get out of the car. By the time Petitioner arrived on scene the woman had gotten out of the vehicle and was leaning on the trunk, speaking to another officer. Petitioner approached the woman driver and proceeded to yell, among other things, "You don't dictate traffic stops. We do. We dictate traffic stops. Am I clear? You're going to go to jail, on a summons at a minimum because you didn't stop for my officers. I dictate the traffic stops." Petitioner went on in an agitated voice and with an aggressive demeanor to tell the woman, "You're lucky they didn't smash the window and rip you out of the car. Because I guarantee if you weren't out by the time I got here, that was exactly what was going to happen." Petitioner concluded his discussion with the woman by saying, "Maybe you'll learn a Goddamn lesson today. I'm tired of everybody's shit."

Incident 6

On this occasion another GIU member conducted a traffic stop and Petitioner went to the scene to provide back up. When he arrived, the driver and passenger were out of the car. According to Petitioner, the passenger appeared "off" and "spacey" with dilated pupils and slurred speech. The officers were concerned the passenger, a juvenile, had ingested a controlled substance so they called for medical assistance. Petitioner attempted to get the driver to tell him what the passenger had ingested and when the driver declined to do so Petitioner became angry and yelled, among other things, "Who the fuck you think you're talking to? I'm the motherfucking sergeant here, you fucking understand me? So if he ate something…listen to me, shut your fucking mouth and listen. If he ate something that you know about you're just as liable. So then shut your fucking mouth. Keep your fucking mouth shut. Get the fuck out of here before I throw your ass in fucking jail. You don't give a shit? You want to go for a DUI? You don't give a fucking shit, huh? You'll give a shit when you're fucking sitting in jail with the big boy, fucking crying. You think I'm fucking playing? Try me again, open your mouth and you go to jail. I promise you. Are we clear?"

With regard to Incidents 2 through 6, Petitioner admitted during the IA investigation and at the outset of the hearing before the Commission that his conduct in each of Incidents 2 through 6 was inappropriate and violated Aurora Police Department directives. Specifically, Petitioner admitted that his actions on all five occasions violated the directive regarding Police – Community Relations, which is Directive 14.2.21. The Commission agrees and accepts Petitioner's admission. In each case Petitioner was discourteous to members of the public, exercised little tact in performing his duties, failed to control his temper, showed no patience, and actively engaged in argumentative discussions - sometimes initiating them and consistently extending them unnecessarily through repeated use of unacceptable language.

In Incidents 2 through 6, Petitioner also violated Directive 14.2.1 – Conduct Unbecoming, by conducting himself in an irresponsible and unprofessional manner that reflected direct discredit on Petitioner and the Department, and sometimes impaired the operation and efficiency of the GIU. Petitioner's performance in all five of Incidents 2 through 6 was unsatisfactory and in violation of Directive 14.2.15. Petitioner's multiple inappropriate actions were plainly evident to the Commission from the footage of Petitioner's BWC.

Although much of the evidence and arguments related to Incidents 2 through 6 were combined during the hearing, there is one aspect of Incident 2 that warrants further discussion. As described in greater detail above, Incident 2 involved Petitioner's interaction with three individuals, all of whom were Black. In the course of his comments Petitioner told one of the Black men, "I am protecting you, you're sitting here breathing right?" He told the Black woman, "Shut the fuck up with this shooting people. Every fucking night I deal with your bullshit. You're all sitting here breathing aren't you?" In response to a comment from the woman, Petitioner said, "So shut up and just keep breathing."

Petitioner's reference to police shootings and his instructions directed toward the Black citizens involved in Incident 2 to just keep breathing was an undeniable and indefensible reference to the George Floyd shooting, the death of Elijah McClain, and other incidents



Response to MSJ Ex. 15

Wilson 000794

between police and citizens resulting in the deaths of Black individuals. Petitioner acknowledged in his interview with the IA investigator and in his testimony before the Commission that it was a poor choice of words on his part. Given the tragedies involved in those prior events, the discord within the City of Aurora over race relations, and the position of Petitioner as a supervisor who is responsible for training and setting an example for his subordinates and all others he comes into contact with as an officer and representative of the Aurora Police Department, Petitioner's comments were deplorable and cannot be tolerated. This misconduct by Petitioner must never be engaged in again.

In connection with Incidents 2 through 6 collectively, the violations of Directive 14.2.21 Police – Community Relations, Directive 14.2.1 Conduct Unbecoming, and Directive 14.2.15 Unsatisfactory Performance are SUSTAINED.

C. Gang Intervention Unit Meeting

The six escalation events causing concern with Petitioner's interactions with citizens occurred during a relatively short period of time, commencing on May 12, 2021 and culminating with the June 29, 2021 incident involving Ms. Davis and Petitioner's use of physical force discussed above as Incident #1. In addition to the six escalation incidents involving the use of force and escalation of situations through intimidation, abusive, vulgar and otherwise unacceptable language toward members of the public, Petitioner was also disciplined for his conduct toward subordinate officers during a team meeting of the GIU.

After witnessing Petitioner's interaction with Ms. Davis as well as some of the other escalation incidents discussed above, on July 1, 2021, Officer Gruszeczka notified Petitioner's direct supervisor, Lieutenant Poppe, that he was concerned about Petitioner's "outbursts with community members." Officer Gruszeczka was reluctant to alert Lieutenant Poppe to Petitioner's behavior out of fear of retribution. That same day Lieutenant Poppe met with Petitioner and, among other things, suggested Petitioner meet with the members of the GIU because they clearly had concerns about him and Lieutenant Poppe felt it was best for Petitioner to sit down with his team and let them know what was going on and to apologize for his conduct.

Petitioner met with the members of the GIU the next day, July 2, 2021. At that meeting, rather than being conciliatory, Petitioner was hostile toward whoever complained to Lieutenant Poppe. Other GIU members became aggressive toward each other to the point that Petitioner had to direct one of them to leave. When Petitioner learned that it was Officer Gruszeczka who had gone to Lieutenant Poppe, Petitioner threatened to have Officer Gruszeczka removed from the GIU and returned to patrol.

Directive 14.2.14 obligated Petitioner to treat the members of the GIU he supervised with respect and to be "courteous and civil" in his relationships with them. Petitioner was directed by Lieutenant Poppe to conduct a conciliatory meeting with the GIU. Instead, Petitioner allowed the meeting to deteriorate to the point of having to tell one team member to leave the meeting, and matters escalated in a way that was discourteous and retaliatory, at least with regard to his team member and subordinate, Officer Gruszeczka.

Accordingly, the violation of Directive 14.2.14 – Conduct Towards Superior and Subordinate Officers and Associates, is SUSTAINED.

**4. DISCIPLINE**

Whether a member of the Aurora Police Department committed violations as asserted by a Police Chief is determined solely by the Commission as the trier of fact in disciplinary appeals. Once the Commission has determined whether the violations have been established, the Commission must then decide, after giving due consideration to the Chief's need for administrative control over the Aurora Police Department, whether the Chief's discipline should be affirmed, reversed or modified.

This matter is Petitioner's first formal discipline in his 17-year career with the Aurora Police Department other than two previous written reprimands. However, one of the written reprimands was for an incident that occurred on November 29, 2019 in which Petitioner was found to have violated Directive 14.2.21 Police-Community Relations for aggressive and antagonistic behavior. Petitioner was specifically counseled in the reprimand that "as a supervisor you have the responsibility to be in control and be a role model for those officers on scene, ..." Much of Petitioner's misconduct in the six escalation incidents involved in the present case, as shown on Petitioner's BWC footage, involved aggressive and antagonistic behavior, the same misconduct he was reprimanded for previously.

Following the completion of an investigation into the six escalation incidents and the GIU meeting, the matter was referred to the Chief's Review Board. The Chiefs Review Board concluded Petitioner violated all five directives, Directive 14.2.14 Conduct Towards Superior and Subordinate Officers and Associates, Directive 14.2.21 Police – Community Relations, Directive 14.2.1 Conduct Unbecoming, Directive 5.3 Use of Physical Force, and Directive 14.2.15 Unsatisfactory Performance. Based on those findings the Chiefs Review Board recommended Petitioner be demoted from the rank of sergeant to patrol officer.

Chief Wilson conducted a pre-disciplinary hearing with Petitioner on November 10, 2021 during which Petitioner had the opportunity to apprise Chief Wilson of matters he wanted her to consider in imposing discipline. Based on the findings of the investigation, the recommendation of the Chiefs Review Board, the pre-disciplinary hearing and the other matters presented to her, on February 28, 2022, Chief Wilson demoted Petitioner from the rank of sergeant to patrol officer and ordered that he complete 40 hours of de-escalation training.

The Commission viewed the footage from Petitioner's BWC for each of the six escalation incidents. The conduct of Petitioner shown in that footage is simply unacceptable by any member of the Aurora Police Department. This is particularly true for those in the position previously held by Petitioner of sergeant. Sergeants serve as front line supervisors and have an obligation to set an example of how Aurora Police Officers should conduct themselves when performing their duties and interacting with Aurora's citizenry. In almost every instance, Petitioner immediately escalated and aggravated the situation when, as the

supervisor, he should have demonstrated how to de-escalate and calm matters – or at least attempt to do so, particularly before using physical force.

Though less egregious than the escalation incidents, Petitioner's mishandling of the discussion with his subordinates during the GIU meeting was also unacceptable. Once again, he had the opportunity to lead and instruct, this time by demonstrating conciliation and team building. Instead he chose the path of hostility and retaliation, in violation of department directive.

Under these circumstances, and giving due consideration to the Police Chief's need for administrative control over the Aurora Police Department, the Commission finds and concludes that Chief Wilson's discipline demoting Petitioner to patrol officer and ordering him to complete 40 hours of de-escalation training was appropriate and supported by the evidence.

The Commission notes that Petitioner has completed the 40 hours of de-escalation training and commends him for doing so, as well as for undertaking counseling regarding these matters, which the Commission encourages Petitioner to continue. The Commission also recommends that future chiefs who order training as part of discipline be specific as to the particular courses or materials they require an officer to undertake.

**ORDER**

Based on the foregoing findings and conclusions, the Commission hereby sustains the violations and approves Chief Wilson's demotion of Petitioner Acuti, as well as her requirement that he complete 40 hours of de-escalation training.

ENTERED THIS 6th DAY OF JUNE, 2022.

AURORA CIVIL SERVICE COMMISSION

Harold Johnson, Chair