IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-CV-00731-STV

---

VANESSA WILSON,

Plaintiff,

vs.

CITY OF AURORA,

Defendant.

---

# DEPOSITION OF JAMES M. TWOMBLY

---

Friday, August 22, 2025

9:07 a.m.

PURSUANT TO NOTICE and the Federal Rules of Civil Procedure, the above-entitled deposition was taken on behalf of Plaintiff at Fennemore Law Firm, 3615 Delgany Street, Suite 1100, Denver, Colorado, before K. Michelle Dittmer, Registered Professional Reporter and Notary Public within Colorado.

Response to MSJ Ex. 18

Q. Okay. And one of the recommendations that 21CP made was that there would be new policies developed based on biased-based policing; do you agree?

MS. ORTIZ: Objection --

A. Yes.

MS. ORTIZ: -- form.

Q. (By Ms. Greisen) So you mentioned the Attorney General's pattern and practice investigation.

That was ongoing in 2021, correct?

A. Yes.

Q. And they were also investigating racial bias in policing; would you agree?

A. Yes.

Q. And in the report that they issued about their investigation, they determined -- one of the determinations they made was that there was a pattern and practice of racial profiling against people of color as a whole but against black people particularly at APD.

Do you recall that?

A. Yes.

Q. And the Attorney General's report also recommended diversity or antibias training; would you agree?

A. Yes.

Q. Okay. Now, across the nation at this

time, 2020 and 2021, would you agree there was a lot of burnout in law enforcement across the nation because of the list of events we just talked about?

MS. ORTIZ: Objection --

A. Yeah, I'm not --

MS. ORTIZ: -- foundation.

A. I'm not sure I'd characterize it, from my impression, as burnout, as maybe -- I think there were probably -- officers were -- I -- I guess I couldn't characterize -- I don't know -- I think there were a number of different things that were impacting officers and their decisions about whether to stay in policing, what policing would look like in the future, things like that.

So --

Q. (By Ms. Greisen) Okay.

A. -- I'm not sure about the term "burnout."

Q. Okay. Fair enough.

There was -- nationwide, there was a higher attrition rate for law enforcement; would you agree with that?

A. Yes.

Q. Okay. And, in fact, one of the reports that I looked at, the FBI reported that law enforcement resignation had increased almost by 20 percent and

retirement rates had increased by 45 percent, just generally.

Are those the kind of -- is that the kind of information you were receiving as well?

A. Probably in those ranges. That -- that would be my impression of what was going on.

Q. Okay. And did you look at these reports at the time -- or I -- let me -- let me rephrase that. That was poorly stated.

In your capacity as city manager, were you aware that these attrition rates were hitting law enforcement officers, whether sheriff, police, any kind of law enforcement across the board and around the nation?

A. Yes.

Q. Okay. And you may be right, "burnout" may be too simple a way to put it.

But is it fair to say that the litany of things that were contributing to these high attrition rates ranged from pandemic, to George Floyd, to anti-public sentiment, to laws that took away qualified immunity, that there was a whole list of factors that were contributing to these attrition rates? Would you agree with that?

A. Yes.

Q. In fact, there was -- the poll was -- I think it was called, like, a SurveyMonkey poll.
Do you recall that?
A. Yes.
Q. So why did you give the poll partial veracity?
A. Well, because I think there's a possibility that it -- that it wasn't totally skewed, that it wasn't more than just a -- or that it wasn't just a handful of people taking the poll over and over and over again. There -- I didn't totally dismiss it as totally unreliable.
Q. Well, what steps did you take to determine its veracity?
A. I didn't take any steps.
Q. Okay. Well, the poll happened in 2021, right?
A. Yes.
Q. Okay. And after the -- Doug Wilkinson announced the poll to the media, the City issued a press release in support of Chief Wilson, right?
A. Yes.
Q. And the press release reaffirmed the City of Aurora's confidence in Chief Wilson's leadership, right?

A. Right.
Q. And you supported -- or you agreed with the statements in that press release, right?
A. Yes.
Q. So the poll did not make you decide to terminate Chief Wilson, right?
A. Correct.
Q. In fact, you didn't even take any steps to see what, if any, truth there was to that poll, correct?
A. Well, I wouldn't -- I wouldn't agree with that because I did begin talking with officers and trying to get a sense of their understanding what was going on in the department.
Q. So after -- after that poll was announced, what officers did you talk to to try to get a sense for what was going on in the department?
A. Two of them were Bob Wesner and Virgil Majors. I talked to a former officer, Steve Redfearn. Those are the three that I recall.
I had talked to a number of others that I don't recall the names. Some, I just picked out randomly. Some -- one of those three people said: You might want to talk to so-and-so, you might want to talk to this officer or that former officer.
Q. Anybody else --

January, early February of 2021 -- 2022; is that right?
A. January or February, yes.
Q. Okay. So did you talk with Chief Wilson after you had that discussion with Redfearn?
A. No, I didn't.
Q. Okay.
A. Not immediately.
Q. Okay. So when the poll came out in 2021, who did you talk to in 2021?
A. I don't know that I talked with any -- I don't remember if I talked with anyone in 2021.
Q. Okay. Okay. So we'll -- we'll come back to that.
Any other names that you can recall? Bob Wesner, Virgil Majors, and Redfearn. Any other names you can recall?
A. No.
Q. Okay. Can you look at Exhibit 19.
MS. GREISEN: Are these the exhibit books that you have in front of you?
(Discussion off the record.)
Q. (By Ms. Greisen) I put in front of you Exhibit 19.
Do you recognize this as the email that the union president, Doug Wilkinson, sent out in

Jason Batchelor testified that Council Candidates Jurinsky, Sundberg, and Zvonek aligned themselves with the police unions.

Do you agree with that?

A. Yes.

Q. In addition, is it fair to say late 2021 and early 2022, you were aware that Jurinsky was engaging in other activity in which she was publicly making negative statements about Chief Wilson?

A. Yes.

Q. For instance, she was going -- she went on a radio show and called Chief Wilson "trash."

Do you recall that?

A. Yes.

Q. Jason Batchelor talked generally -- you have a -- had a media department or a PR department that would regularly fill you and him in on events or statements that were made about Chief Wilson and -- and the Aurora Police Department.

Agree?

A. Yes.

Q. So you're aware that in early 2021 -- I'm sorry, early 2022, Council -- at-that-point Council Member Jurinsky publicly vowed that, quote, change was coming to the APD.

You're aware of that?
A. Yes.
Q. And that when she -- I believe that was on the Tubbs, the conservative radio show, she made statements about change was coming and that it would start with the removal of Chief Wilson as chief of police.
Do you recall that?
A. Yes.
Q. At -- Council Member Jurinsky, would you agree, she was pretty vocal that she did not think Doug Wilkinson should be fired.
Do you recall that?
A. Yes.
Q. And do you recall that she made statements to the effect of -- Jurinsky made statements that she was going to continue to speak out about the chief of police until Chief Wilson was gone.
Do you recall that sentiment?
A. Yes.
Q. Do you recall -- too many media posts to go through and I spent a lot of time with Jason Batchelor, so I'm not going through them ad nauseam -- but the "#FireTheChief" statement or saying that Councilwoman Jurinsky engaged in?

A. I'm not sure what the -- what the question is. Was I aware of that?

Q. Yeah.

A. Yes.

Q. Okay. Batchelor -- Jason Batchelor testified that Councilperson Jurinsky also told people she didn't believe that Aurora should have entered into the consent decree.

Were you aware of that sentiment?

A. Yes.

Q. And that she made statements that she did not think there was racism in the police department.

Were you aware of that?

A. I don't recall that being -- her saying that.

Q. Do you recall that sentiment being -- that she was making those statements or those types of statements?

A. Well, I suppose that's implicit in -- in not agreeing with the consent decree.

Q. Okay. Mr. Batchelor testified that Jurinsky was saying things to the effect that Chief Wilson was a, quote, woke police chief.

Do you agree with that?

A. Yes.

Q. And he also testified that Jurinsky was generally hostile to the concept of DEI.
Would you agree?
A. Yes.
Q. Mr. Batchelor also testified that you and he talked about the fact that Jurinsky was being let into police briefings and saying negative things, bad-mouthing Chief Wilson at those briefings?
A. Yeah. She was -- or she was invited to police briefings by officers, yeah.
Q. Well --
A. I mean, "let into." I mean, she was invited, is my understanding.
Q. She certainly wasn't invited by the City administration --
A. No.
Q. -- correct?
She wasn't invited by the administration at the police department, either --
A. No.
Q. -- right?
She was being let in the door by other officers without prior approval, right?
A. Right.
Q. Okay. In fact, at those briefings, she --

you're aware that she was also handing out gift cards to her restaurant to officers.

Were you aware --

A. I had --

Q. -- of that?

A. -- heard that.

Q. Mr. Batchelor testified that Jurinsky's conduct toward Chief Wilson was, quote, extremely inappropriate.

Do you agree with that statement?

A. I -- inappropriate in the sense that some of the things she was saying, I believe, were pretty close to charter violations in terms of -- of talking about getting rid of a person, an employee.

Q. Well, they weren't pretty close. They actually violated the city charter.

Let me go back.

City charter states that city council members cannot directly or indirectly ask for the removal of a city employee, right? You're aware --

A. Well --

Q. -- of that?

A. Yeah, they can't ask me to remove a city employee. I'm not sure what a public statement saying someone doesn't -- no longer deserves to be a city

department.
Do you agree with that?
A. Yes.
Q. He testified that you two talked about her conduct and that ultimately you two decided that you were going to talk to Mayor Coffman about the issue.
Do you -- do you agree with that statement?
A. Yes.
Q. Between the union and the new conservative council members, they were creating a lot of negative noise about Chief Wilson, weren't they?
A. Yes.
Q. And you understood that they wanted you to fire Chief Wilson, right?
A. I guess you could say that.
Q. Well, would you say that?
A. Well, I heard a lot of criticism from Jurinsky --
Q. My question was --
A. -- of actions that Chief Wilson was taking.
Q. And my question was that the stuff we've talked about with the union and these conservative city council members, you understood that they wanted you to

fire Chief Wilson; is that correct?

MS. ORTIZ: Objection. Form.

A. I would say yes to Jurinsky. I don't know about the others.

Q. (By Ms. Greisen) Did you ever tell anyone that the union wanted you to fire Chief Wilson?

A. Did I ever tell anyone that the union wanted me to fire Chief Wilson?

Q. Right.

A. I -- I don't recall.

MS. GREISEN: Let's mark another exhibit.

(Deposition Exhibit 68 was marked.)

THE COURT REPORTER: Exhibit 68.

MS. ORTIZ: Has that document been provided to us before?

MS. GREISEN: No.

MS. ORTIZ: All right.

Take a minute to read this. This has not been provided.

And for the record, we're going to object. We've had this issue before of use in depositions of documents that were never disclosed, which is inappropriate.

Q. (By Ms. Greisen) I put in front of you Exhibit 68.

Do you agree that this is a copy of an email between yourself and Marsha Berzins?

A. Yes.

Q. And you see in this email, the last comment you made was, "You'd think" they'd want me -- "you'd think since they want me to fire the chief, they'd give me the survey and comments - but no."

You said that --

A. I said that --

Q. -- correct?

A. -- yes.

Q. Okay. Let's -- you can put that away.

We're going to go to talking about another issue. Let's come up --

MS. GREISEN: Why don't we take a short break.

MS. WILSON: I'm sorry.

MS. GREISEN: That's okay. Let's just take a short break, okay?

We'll take a short break and be back in a minute.

(Recess taken from 11:16 a.m. until 11:23 a.m.)

MS. GREISEN: Okay. For the record, we do want to put on the record that we're asking you to return

Q. -- Jurinsky?

A. -- Jurinsky.

Q. And have you talked with Ms. Jurinsky?

A. No.

Q. How do you know that she was deposed?

A. She had texted me and said that she had just spent six hours in deposition.

Q. And she texted you right after her deposition, I take it?

A. Probably soon after.

Q. So the two of you have maintained email or text contact?

A. Maybe like once a year.

Q. And can you read her text --

MS. ORTIZ: Objection.

Q. (By Ms. Greisen) -- to me?

MS. ORTIZ: We're going to --

Q. (By Ms. Greisen) The text that she sent.

MS. ORTIZ: Objection.

Don't do that. It's not --

THE WITNESS: I don't know --

MS. ORTIZ: -- a document in evidence in this case. It's not even a document I've seen.

And --

MS. GREISEN: Can you --

phone and refresh your memory on --
A. No.
Q. -- what she said to you?
MS. ORTIZ: And for the record, I never agreed to get text messages from Mr. Twombly.
Q. (By Ms. Greisen) So I'm asking you on the record to look at the text message to refresh your memory, and you're saying that you refuse to do that; is that correct?
A. Yes.
Q. And can you tell me why?
A. I don't know why I would.
Q. Any other reason?
A. No. I mean, it's a private text message between two people.
Q. So you correspond or you communicate with Ms. Jurinsky through text messages, right?
A. I have.
Q. And have you looked back through those messages at all since --
A. No.
Q. -- this case was filed?
I'm sorry?
A. No.
Q. Have you been asked to?

in.

Have you gone back and watched any of the press conference that you gave when Chief Wilson was terminated?

A. No.

Q. Okay. Well, one of the things you said in that conference, press conference, was that you did not fire the chief because of the records backlog.

Is that true?

A. Yes.

Q. And you're aware -- well, let me show you another document.

(Deposition Exhibit 69 marked.)

THE COURT REPORTER: 69.

Q. (By Ms. Greisen) I've put in front of you exhibit -- what I've marked as Exhibit 69.

Do you recognize this as a memo from then-Interim Chief Dan Oates with respect to his investigation into the records issue?

A. That's what it looks like.

Q. And you're aware, aren't you, that Chief Oates opened his own internal investigation and determined that the records backlog issues are -- were, quote, systemic in nature and not attributable to the actions or negligence of any specific individual?

You said at that press conference that the first time you had had serious discussions about -- with Chief Wilson about the reasons you were terminating her was about one month before the press conference.

Do you remember that?

A. Yes.

Q. And that at the time that you had your first meeting with Chief Wilson that we just talked about, you had not made a decision at that time to terminate Chief Wilson, right?

A. Right.

Q. Okay. So the -- about a month before the press conference would have been early March, right?

Would you agree that was probably the meeting you had with her that was on March 9 with --

A. That sounds right.

Q. -- Chief Wilson --

Sorry, I just --

A. That sounds right.

Q. -- talked over you.

I just did it again. I will -- I will --

A. All right now.

Q. That's okay.

That would be the meeting that you had with Chief Wilson on March 9; would you agree?

A. Probably so.

Q. Okay. So that meeting, were you aware that meeting was recorded?

A. No.

Q. I'm sorry?

A. No.

Q. Okay. So in this meeting, would you agree that you said -- that you told Chief Wilson that: The APA was on a campaign to get rid of you and council members are all ears for that.

Do you remember saying something to that effect?

A. I could have, yes.

Q. And that you told Chief Wilson during that March 9 meeting that you had talked to Jurinsky, Zvonek, and Sundberg and that you knew from your first conversations with them, you understood where they stood.

Do you remember telling Chief Wilson that?

A. I -- I could have. I don't remember.

Q. Would that be consistent with -- an accurate assessment?

A. Again, I could have said that. I don't remember saying it, but it may have -- it may have come up in the -- in the conversation.

Q. Okay. Well, you understood by that

conversation that Jurinsky, Zvonek, and Sundberg, their position was that they wanted Chief Wilson fired, right?

A. Yes.

Q. And you expressed in that discussion with Chief Wilson your concern that with the council members and AP saying that stuff, that they would say it, quote, loud enough and say it long enough.

Do you remember saying words to that effect to Chief Wilson?

A. I don't remember saying that, but again, I could have said that.

Q. Was that consistent with the sentiment that you shared with her at that meeting?

MS. ORTIZ: Objection. Form.

A. I -- I don't remember -- I don't remember saying that or I don't remember that being that much of a topic in that conversation.

Q. (By Ms. Greisen) Well, do you remember sharing with -- do you know what I mean by saying it loud enough and long enough, that --

A. Yes --

Q. -- that's kind of --

A. -- I understand that.

Q. Okay. Saying that if somebody is loud enough, says something loud enough and long enough, that

people start to believe it's true, something to that effect?

A. Yes.

Q. Okay. Do you remember sharing with Chief Wilson during that meeting the sentiment that you were concerned that it was going to be said loud enough and long enough, or something to that effect?

A. Yes.

Q. And the next meeting that you had with Chief Wilson, would you agree -- I'm pulling up the date -- that it was on March 21?

A. That's --

Q. Do you recall that?

A. I recall having a second meeting with her later in the month.

Q. Okay. And that's the meeting -- have you listened to the recording of that meeting?

A. I didn't know it was recorded.

Q. Okay. Do you recall saying to her at that meeting that, quote, We have a lot of noise and we have a campaign against you?

MS. ORTIZ: I'm calling somebody in for you, Paula, just in case you're wondering what's happening.

MS. GREISEN: I thought you were just

Q. (By Ms. Greisen) All right. Well, I'll have help with the recording and come back. In fact, maybe it's -- I'll ask you these questions, and you can listen to anything that you think wasn't consistent with what you said.

Do you agree that at that conference, you told Vanessa that you needed to talk with her about an exit strategy?

A. Yes.

Q. Okay. And do you agree at that meeting on March -- again, we're still talking about March 21 -- that you told her you had been talking with -- hearing things from officers?

Do you recall saying words to that effect?

A. Yes.

Q. Okay. And so it's fair to say that as of March 21, 2022, you had decided to terminate Chief Wilson, right?

A. Yes.

Q. So I would like you to tell me, between March 9, the first meeting we talked about, and March 21, 2022, the names of all the people you talked to concerning Vanessa Wilson.

A. I think -- on March 21, when I referred to talking to officers, that was referring to officers that

I had talked to during the months of January and February. I may have talked to some in March also.

But in terms of the decision to terminate her, after talking with her on March 9 and asking her to -- after talking about the situation of -- of council members, those three council members wanting her fired, and talking to officers who -- who kind of laid a -- out their sense of the status or the state of the department and her -- her leadership shortcomings, her isolating herself from officers, her -- her continually shrinking the officers that she trusted within the department, I told her that I felt like we needed to come up with a plan to where she could continue to move forward in the department.

And I said I'd like her to think about that, and "Let's talk again in a week, and we can schedule that meeting."

And I believe that March 9 was a Wednesday. And on Friday, Dan Brotzman, the city attorney --

MS. ORTIZ: Okay. Don't say -- I'm going to stop you. Don't say anything Dan Brotzman told you.

MS. GREISEN: Well, it's not anything Dan Brotzman told you. If he's giving you legal advice, that's privileged. But not everything Dan Brotzman said

is -- is information you can't share.
So --
MS. ORTIZ: But --
MS. GREISEN: -- if there are facts that were shared, I believe you can.
A. He --
MS. ORTIZ: I mean, I would say I think she's correct.
But I would like to discuss with him what Dan Brotzman said so I can determine before, if that's all right with you.
MS. GREISEN: I think this -- I think Mr. Twombly knows what legal advice is.
Q. (By Ms. Greisen) So are you about --
A. Dan --
Q. -- to share facts?
A. Dan Brotzman told me that he had been contacted by you and that Vanessa had retained an attorney.
Q. Okay.
A. And -- that, and then the fact that sometime between March 9 and March 21, there was media coverage of the fact that I had talked with Vanessa and she had an attorney and that -- that this was becoming a media deal and not a discussion between myself and the

police chief.

Q. So the fact that Vanessa had gotten an attorney during that time is what made you -- what you made the decision -- why you made the decision to --

A. That --

Q. -- terminate her?

A. That was part of it.

Q. Anything else?

A. Well, the fact, too, that, you know, I had said, "Let's meet again in a week," and there was -- she was unresponsive to meeting again in the week. It was my impression she wasn't interested in pursuing that, that she was interested in pursuing something from a legal standpoint.

Q. So did she tell you during the March 9 meeting that she wasn't interested in meeting again in a week?

A. No, she didn't, but I -- I -- we were unable to set up another meeting, and it was basically her unavailability.

Q. When did you ask her to set up another meeting?

A. I told her on March 9 that we needed to set another meeting next week and have further discussion on this and that I wanted to hear her ideas about what

Q. Okay. But --
A. I don't remember.
Q. -- you were aware she was on a vacation in Mexico, I don't know the exact dates, but the week before March 21, so it would have been around the middle of March, right?
Right?
A. Right.
Q. Okay. Did you try to have a meeting with her while she was on vacation?
A. I wanted to have a follow-up meeting with her, and it didn't happen. I was available and willing and wanting to meet with her, but it didn't happen because Vanessa was not available.
Q. So because she was unable to meet with you when she was in Mexico, that's why you decided that she was unwilling to meet with you; is that correct?
MS. ORTIZ: Objection. Form.
A. She -- she was -- she was available before she went to Mexico and after she got back from Mexico. And we didn't meet.
Q. (By Ms. Greisen) Okay.
A. We didn't meet until the 21st.
Q. So did you personally call Vanessa and ask her to meet with you and she refused?

A. I don't -- I don't recall what the interaction was.
Q. Okay. So apparently Dan Brotzman told you that Vanessa had hired counsel at some point after your March 9 meeting, right?
A. Yes.
Q. And she told you -- he told you that she had hired counsel because she was concerned she was getting terminated because of the type of things Jurinsky and the union were saying, right?
A. No, that's not correct.
Q. What were --
A. Dan --
Q. -- you told?
A. -- Brotzman --
MS. ORTIZ: Okay. Hold -- I'm going to ask you not to --
Q. (By Ms. Greisen) Well, you can't just selectively tell me parts of what Dan Brotzman said, so I have a right to ask --
MS. ORTIZ: Well, and --
Q. (By Ms. Greisen) -- what he told you.
MS. ORTIZ: I objected initially, and you agreed that some things are --
MS. GREISEN: Yeah. This --

MS. WILSON: Sorry.
Q. (By Ms. Greisen) Did you have an understanding as to why Chief Wilson had gotten counsel?
A. Had gotten what?
Q. Counsel, an attorney.
A. My understanding was, is that she was concerned about her job.
Q. Do you know why she was concerned about her job?
MS. ORTIZ: Objection. Foundation.
A. Well, she was concerned about her job because of external things that were going on. I didn't think she should have been concerned about her job in talking to me.
Q. (By Ms. Greisen) Okay. And that's what I'm asking about: She was concerned about her job, about external things going on.
What was your understanding about why she was concerned about her job?
A. What I just said: External things that those three council members were saying.
Q. Those three council members --
A. But those three council members don't have the power to fire her.
Q. I just want to ask you the questions about

what your understanding was about why she was concerned.
It was because of what the council -- those council people were saying and what the union leadership was saying, right?
A. Right.
Q. Okay. So we started this line of questioning about -- between March 9 and March 21.
Can you identify any person that you talked to between March 9 and March 21 concerning Vanessa Wilson?
A. No.
Q. Did you -- do you recall asking anyone to give you names of people to talk to between March 9 and March 21?
A. No.
Q. And did you tell anyone during that period of time that you were trying to set up a meeting with Chief Wilson and she was refusing to meet with you?
A. I don't -- I don't recall telling anyone in particular. I might have, but I don't recall.
Q. Did you reach out to Jason Batchelor and say, "Look, I'm really trying to talk to Vanessa and she's refusing to talk to me," or anything to that effect?
A. I don't recall.

Q. Had you ever had Chief Wilson refuse to talk to you before when you asked to talk to her about something?

A. No.

Q. Did you meet with Jurinsky after your March 9 meeting with Vanessa Wilson?

A. I didn't meet with her.

Q. Did you have a call with her?

A. I -- I don't recall whether I did or not.

Q. Did you have a text with her?

A. I don't recall.

Q. Did you talk with Zvonek or Sundberg after your March 9 meeting with Chief Wilson?

A. I don't believe so.

Q. Did you tell Chief Wilson that you were ordering her to have a meeting with you?

A. No.

Q. Did you have authority to do that?

A. Yes.

(Deposition Exhibit 70 was marked.)

THE COURT REPORTER: 70.

Q. (By Ms. Greisen) I'm putting in front of you what's been marked as Exhibit 70.

Do you recognize this document as an email between yourself and Jad Lanigan on March 11, 2022?

A. Yes.

Q. And for the record, can you say who Jad Lanigan is?

A. He's an Aurora officer. I'm not sure what his role was at the time.

Q. And Jad Lanigan is one of the officers you spoke to about Chief Wilson, right?

A. Yes.

Q. Did you meet with Chad -- or Jad Lanigan in your office?

A. I -- I don't think so. I think I probably talked to him on the phone.

Q. Fair to say that Council Person Jurinsky gave you Jad Lanigan's name as somebody to talk to?

A. It could have been, but I don't recall.

Q. Do you recall that Jad Lanigan was one of the officers that was letting Council Person Jurinsky into those police briefings? Do you recall that?

A. I -- I don't really know.

Q. And Jad Lanigan said negative things about Chief Wilson and her leadership to you, right?

A. Probably, yes.

Q. Okay. So it looks like on March 11, you reached out to Jad Lanigan to ask him to remind you who you should talk to.

That would be concerning Chief Wilson, right?
A. Right.
Q. And so he responded and gave you the names of Tim Glenn and Doug Pearson and their phone numbers, right?
A. Yes.
Q. And I'm going to assume it's fair to say that Mr. Glenn and Mr. Pearson had negative things to say about Chief Wilson and her leadership; is that fair to assume?
A. I think so. I mean, I don't recall speaking with them, but I'm assuming what you're saying is true.
Q. They were friends with Jad Lanigan, aren't they?
A. I don't know if they're friends. Those are names he gave me.
Q. Okay. And so it looks like most likely -- well, let me ask you:
Did you then -- is it your memory you reached out to Mr. Glenn and Mr. Pearson?
A. Yes. I think I did.
Q. Okay. Those are both officers at APD, is that right -- or at -- they used to be, at least at one

point, right?
A. Yes.
Q. Okay. Did you ever meet with Councilwoman Jurinsky and any other officer together?
A. There was a phone call where she wanted me to hear, I guess, the story of an officer who I think had resigned, left the department, and I think went to work for Arapahoe County. And she was in detectives and had been, I think, moved either out of the detective group or was given a different role in the detective group. And she wanted me to hear firsthand about this -- this person's experience.
And so I listened, and I followed up later with -- and, of course, she blamed Vanessa for her reassignment. And I talked with whoever her supervisor was -- I don't recall who that was -- and I asked why this person was reassigned. And he talked about the detective group being kind of inbred and that they needed some fresh perspectives within the group.
I said, "What was Vanessa's role in this?" And he said, "She had no role. This was something we decided to do."
And I was glad to hear that, but at the same time, I was discouraged to hear that because it made me think that, are we at a point where anything bad that

MS. GREISEN: It was a long one, just wasn't a good one.

Q. (By Ms. Greisen) So in any event, when did you have that meeting or when did you have that call that Jurinsky set up?

A. It -- probably in February, is what I'm guessing.

Q. It was before the March 9 meeting with -- with Vanessa --

A. I'd be --

Q. -- Chief Wilson?

A. -- pretty sure about that.

Q. Okay. So anyone -- does it sound right that Jurinsky put you in touch with Jad Lanigan? I'm sorry, I may have asked you that.

Do you recall that?

A. I don't recall that, no.

Q. Do you recall them being aligned with each other?

A. Yes.

Q. Okay. And do you -- other than this officer that you listened on the phone with, is there anyone else that Jurinsky arranged for you to talk to?

A. She may have suggested a few names that I most probably would have followed up on.

have even been after March 21. And again, that would have been a -- a Jurinsky recommendation.

Q. So the -- if I'm understanding your testimony correctly, the reason you made the decision between March 9 and March 21, is it your testimony that's because she got a lawyer and refused to meet with you; is that correct?

A. It's my -- what -- my reason was because I felt like Vanessa didn't want to work with me.

Q. And just for the record, did you ever ask that -- Chief Wilson, whether or not she no longer desired to work with you?

A. Well, I don't know what was in the March 21 recording, but I tried to work with her in -- in March -- at March 29, in that meeting, I tried to indicate to her that I wanted to work on a solution to --

Q. Did she indicate --

A. -- to this issue.

Q. Did she indicate to you at the March 9 meeting that she didn't want to work with you?

A. No, she didn't.

Q. Okay. Did you ever ask Vanessa at any point, "Hey, do you not want to work with me on this? Do you not want to keep your job," or anything to that effect?

Q. Where -- where did all the stuff from your desk go after you left?

A. Well, a lot of it went in the trash.

Q. Who -- is that a decision you made about what to put in the trash?

A. Yeah. Yeah, I'd say so.

Q. And so did you, during this time, ever ask Chief Wilson to give you a list of people to talk to?

A. No.

Q. And you've told me that -- every one -- every name that you can remember on that list at this point?

A. Yes.

Q. And you did -- I think in -- we already went through this because in the March 9 conversation, you said you had talked -- in addition to talking with Jurinsky, you had talked with Zvonek and Sundberg about Chief Wilson, too, right?

A. I'm not sure what -- are you saying that I just talked with them at some point in time?

Q. You talked with them about the fact that they wanted you to terminate Chief Wilson?

A. I didn't talk -- I don't believe I talked with Sundberg and Zvonek about them wanting to terminate Chief Wilson.

Q. So when you told Chief Wilson that you knew where they stood --

A. Right.

Q. -- what were you referring to?

A. I think knowing -- well, I'm sure Danielle told me that Sundberg and Zvonek were on board, that their feelings were the same. You know --

Q. You knew there was an alliance between the three of them?

A. Yes.

Q. Okay.

A. Thank you.

Q. That's fine.

So, I mean, that's generally what -- you may -- may or may not recall a specific conversation, but you understood Zvonek and Sundberg stood with Jurinsky in wanting you to terminate Chief Wilson; is that fair?

A. Yes.

Q. Okay. So we talked about this earlier, and we talked about the fact that Mr. Batchelor said that you and he discussed Jurinsky's conduct and that decision had been made that you would take it up with Mayor Coffman, right?

A. Yes.

Q. So tell me about your decision with Mayor

Can you unpack that for me? What do you mean it wasn't good for you that Jurinsky was doing that kind of stuff?

A. Well, from the standpoint that I already knew that there was rumors that, you know, if I wasn't going to fire Chief Wilson, I would be fired. And it wasn't good for me from the standpoint that if there was going to be some kind of personnel action with Chief Wilson, it was important that it be the city manager that makes the decision and that it's not the city manager bowing to outside, you know, threats or forces.

Q. So did you talk with Jurinsky about -- about that?

A. I -- I'm pretty sure that I did. I think that was part of the discussion about publicly calling for her termination.

Q. And what did she say in response?

A. Well, she didn't say much. I -- I think she said -- I think she said, "I understand," or, "Okay."

Q. Anything else that you can recall?

A. I think -- I think that was primarily it.

Q. Was anybody else present during this conversation?

A. No. This was a phone conversation.

Q. And did you -- did you call Jurinsky?

A. Yes.

Q. So at the time you had that meeting with Jurinsky, so this would -- this was after the Tubbs show, right?

A. A day or two after.

Q. Okay. And at that point in time, you had already heard the rumors that if you didn't fire Chief Wilson, you would be fired, right?

A. Yes.

Q. And did she say anything at all in response to the rumors that you were hearing that you would be fired if you didn't fire Chief Wilson? Did she say anything at all in response to that?

A. I don't think I said any -- I don't think I said that to her. I think I -- like I said, I think I -- all I said was that it -- about it's not helping Chief Wilson, me, or the City.

Q. So did you ask her like, "Look, I'm hearing these rumors that I'm going to be fired if I don't fire her. Is that true?" Did you ask her anything like that?

A. No, I didn't.

Q. Why not?

A. I guess I just didn't see the point of it. I -- I -- I don't think I really cared, to tell you the

not aware of that otherwise.

Q. You didn't have the joy of attending those council meetings?

A. I -- I didn't, you're right.

Q. Okay. Well, it's pretty fair to say, if you look at the comments that are going on, that the insinuation is she's not going to shut up about wanting Chief Wilson out until it happens.

Would you agree that's generally a fair statement? In fact, it may --

A. Well --

Q. -- have been something she actually said. I may be paraphrasing her. But do you remember words to that effect?

A. I -- I do. I don't know when she said that. I guess I'm, in my mind, trying to think in terms of post March 21, between March 21 and April 6, but at any time during the beginning of 2022 --

Q. That was the --

A. -- that could very well have come out of her mouth.

Q. That was the sentiment she was expressing during --

A. Right.

Q. -- from -- from the inception of being

elected; would you agree?
A. I wouldn't say the -- well, I wouldn't say the inception of being elected. Maybe soon after being sworn in.
Q. Okay. That's fine.
Let's talk about the censure.
As we talked about and I -- and I know you read Jason Batchelor's testimony, he testified that you told him City Council Member Marcano had indicated his intent to bring charges against Jurinsky related to her conduct involving Chief Wilson.
Is that --
A. Yes.
Q. -- true? Okay.
Okay. And Jason Batchelor testified that you and he discussed that Jurinsky's comments violated the city charter; is that also true?
A. Probably. I mean, yeah.
Q. Exhibit --
A. We --
Q. -- 27, can you pull up Exhibit 27.
Do you -- Exhibit 27, do you -- have you seen that document before? It's the document -- we've already talked about it -- indicating that Juan Marcano was bringing a charge against Jurinsky that she had

violated the city charter by attempting to direct or request the removal of the -- of the Police Chief Wilson.

You recall that?

A. I don't recall that I -- that I saw this. I -- I knew about it. I didn't -- I don't know if I actually had this in my possession.

Q. Okay. Well, generally, you understood that Council Member Marcano brought a charge that Jurinsky had violated city charter by calling for the termination of Chief Wilson.

Is that --

A. Yes.

Q. -- a fair --

A. Yes.

Q. And the section -- now -- now that you've closed it up, the section that he's saying that -- and you may not need to look at it -- but the section that he was charging Jurinsky with was Section 3-10, the section that we talked about earlier today as to what power city council does not have --

A. Yes.

Q. -- right? Okay.

And Exhibit 27, that came down -- Council Member Marcano brought the charges down, it was sometime mid February of 2022.

Does that sound right?
A. It -- yes, I suppose so.
Q. Okay. And you're aware that council -- or that the City of Aurora then hired lawyers to investigate that allegation.
Were --
A. Yes.
Q. -- you aware of that? Okay.
Then at -- were you -- that was Burns Figa.
Do you recall that?
A. That was during what?
Q. The name of the law firm, Burns Figa.
A. I don't --
Q. Do you recall them?
A. -- remember.
Q. So after that investigation started, you're aware that Councilperson Jurinsky then also hired a lawyer, are you aware of that, to stop the investigation?
A. Yes, I think so.
Q. Okay. And there was a March 14 meeting of city council.
And at the March 14 meeting -- I'm not going to go into any privileged information -- but you're

paraphrase, and then I'll ask you the question.

The Court of Appeals decision talked about a March 28 regular public meeting by city council. And at that meeting, the city council publicly approved to stop the censure -- it's Agenda Item 19(f) -- that was based on a March 14 executive session in which, at the March 14 executive session, city council directed and instructed special legal counsel to end the investigation.

So I'll go back and ask the question --

A. Okay.

Q. -- now.

You would agree that on the March -- during an executive session on March 14, city council was -- or directed and instructed its legal counsel to stop the censure investigation with respect to Ms. Jurinsky, right?

MS. ORTIZ: Objection. Foundation.

A. Right.

Q. (By Ms. Greisen) Okay. And then on March 28, you attended -- well, let me back up.

You were at that executive session on March 14, right?

A. Yes.

Q. And you then attended the March 28 city

A. Right.
Q. -- don't have memory of it? Okay.
But it is your testimony that between the 9th and the 21st, that you asked Chief Wilson to meet with you and she refused; is that right?
A. I don't know. What I asked on the 9th was that we meet again next week, which would have been sometime between the 14th and the 18th, and -- and we didn't meet. So . . .
Q. Okay. And your office is in the same complex that Chief Wilson's office was, right? It was, like, in the adjacent building, right?
A. Right.
Q. Okay. Did you ever walk over and just try to talk to her?
A. No, I didn't.
Q. And is it your memory that you ever tried to call her to ask her, like, "We need to set up a follow-up," or anything --
A. I don't --
Q. -- like that?
A. -- recall that.
Q. Okay. So do you have any recollection of making any attempt from the 9th through the 20th, I guess, of specifically trying to meet with Chief Wilson?

A. I don't recall that.

What I do know is that I asked her on the 9th to come back and talk again the next week. And I guess I would think that, you know, if she's concerned about her job and her boss has asked her to come back the next week and talk with them, that she would be darn sure to do that.

Q. And it's specifically your testimony that during the March 9 meeting, you said, "We need to have a meeting next week"?

A. That's my recollection.

Q. Okay.

MS. GREISEN: The -- we did not put this on the record. I wanted to go ahead and mark this.

(Deposition Exhibit 72 was marked.)

THE COURT REPORTER: 72.

Q. (By Ms. Greisen) Do you recognize this as the stipulation that the City of Aurora entered into with Council Member Jurinsky?

A. I -- I don't know that I ever saw this.

Q. Does it appear to reflect the stipulation that you understood?

A. Well, I'd have to read it.

(A pause occurred in the proceedings.)

A. Yes.

while he was on a phone call using the N-word?
A. I don't --
Q. Were you aware of that?
A. -- recall that.
Q. Do you know much about Officer Pearson or what used to be -- who used to be an officer at the APD?
A. No.
Q. Now, fair to say that when it became clear that the investigation of Danielle Jurinsky, the censure investigation of Danielle Jurinsky was stopped, would you agree that at that point, there really weren't any guardrails around what Jurinsky could say or do?
MS. ORTIZ: Objection. Form.
A. I -- I don't believe I ever thought of it that way, but I suppose if there would be any guardrails, that would say there aren't.
Q. (By Ms. Greisen) The voting to stop the censure means that there were no guardrails around her; is that fair?
A. Yes.
Q. Okay. Before you -- when we were -- I think you already said this, but when you were at Broken Arrow -- in Broken Arrow, you said they didn't renew your contract for city manager, right?
A. Yes.

A. July.
Q. -- before.
In July? Okay.
So did you give Danielle Jurinsky copies of any material in Chief Wilson's personnel file?
A. No.
MS. GREISEN: That's why you can never trust a lawyer when she says, "Just one more issue."
(Deposition Exhibit 73 was marked.)
THE COURT REPORTER: 73.
Q. (By Ms. Greisen) Putting in front of you what's been marked as Exhibit 73.
Do you recognize that as an email, with an attachment, that you sent to Danielle Jurinsky on April 18 of 2022?
A. Yes, I do.
Q. And it's an email in which you sent Danielle Jurinsky a copy of the official record terminating Chief Wilson; is that correct?
A. Yes.
Q. Why did you send Jurinsky the final termination personnel order on Jurinsky?
A. I don't -- I don't recall why.
Q. Did you talk to Jurinsky about Chief Wilson receiving her LEOSA badge and card?

A. I -- I think she asked about it.
Q. When was that?
A. Probably within a couple of weeks of termination. She was aware that, of course, Doug Wilkinson didn't get his LEOSA card or badge.
Q. So how -- did she tell you that, that Doug Wilkinson didn't get one, and therefore --
A. I --
Q. -- Vanessa should not have her LEOSA card and badge either?
A. I -- I think that was the implication: that she shouldn't get that either.
Q. So she was telling you that Chief Wilson should be treated the same as Doug Wilkinson --
A. I --
Q. -- was treated?
A. I think what she said to me was, "Hey, he didn't get his LEOSA card and badge."
And I said, "Yeah, so?"
She said, "Well, I just want you to know that."
Q. And she was telling you that she didn't think Chief Wilson --
A. That being --
Q. -- should get her --

A. -- again, the implication --

Q. Just a minute, let me -- let me finish and --

A. Okay.

Q. -- just for the record. I know it gets late in the day and people start talking over -- it's not that late, but . . .

She was making it clear that she thought because Doug Wilkinson did not get his LEOSA card and badge, she did not think Chief Wilson should get those either, correct?

A. I believe that was her message.

Q. That was the message that she was giving you with respect to: Hey, I don't want you to give Chief Wilson her -- her card and badge, right?

A. I think that's what she expected me to take away from that.

Q. Okay. And -- and it was after that that you made the decision that Chief Wilson would not get her LEOSA card and badge, correct?

A. Well, it was after that that I asked Jason Batchelor about, "What have we done in the past?" And then his response was that terminated employees don't retain those. And I said, "Okay, well, she shouldn't either."

Q. Would you agree that there is a vast difference in the reasons for termination between Chief Wilson and Doug Wilkinson?

A. There's certainly a huge difference in what -- the reasons for termination.

Q. Doug Wilkinson was fired for cause, right?

A. Right, right.

Q. And Chief Wilson wasn't fired for cause, correct?

A. Right.

Q. Okay.

MS. GREISEN: Okay. I don't have anything further. Thank you.

MS. ORTIZ: You sure?

MS. GREISEN: No. Give me a minute, I'll come up with another question, but we'll go off the record for now.

(WHEREUPON, the within proceedings were concluded at 2:38 p.m. on the 22nd day of August, 2025.)

* * * * *