EXHIBIT 21
Batchelor 3/13/25

CIVIL SERVICE COMMISSION, CITY OF AURORA, COLORADO

# FINDINGS, CONCLUSIONS AND ORDER

IN THE MATTER OF DISCIPLINARY PROCEEDINGS AGAINST:

OFFICER DOUGLAS WILKINSON, A MEMBER OF THE AURORA CIVIL SERVICE, AURORA POLICE DEPARTMENT,

Petitioner.

This matter involves Officer Douglas Wilkinson's appeal of his termination by former Aurora Police Chief Vanessa Wilson based on an email sent by Officer Wilkinson regarding a Consent Decree entered into between the City of Aurora and the Colorado Attorney General. Chief Wilson concluded the email violated City of Aurora Employee Manual Policy 1.2 Anti-Harassment Policy and Aurora Police Department Directive 10.9 Discrimination, Harassment and Sexual Harassment Complaint Procedure. Officer Wilkinson appealed, relying primarily on his assertion that his email was protected speech and therefore could not be used as the basis for imposing discipline.

Petitioner's appeal was heard by the Aurora Civil Service Commission in the Aurora City Council Chambers on June 28 and 29, 2022. Chair Harold Johnson, Commissioner Barbara Shannon-Bannister, Commissioner Barbara Cleland, Commissioner Desmond McNeal, and Commissioner Matthew Snider were present with counsel, Scotty P. Krob. Chief Wilson was represented by Assistant City Attorneys Peter Ruben Morales and Isabelle Evans. Petitioner Wilkinson was present and represented by Michael T. Lowe, of Bruno, Colin & Lowe, P.C.

## 1. PROCEDURAL HISTORY

On February 3, 2022, Chief Williams issued her Disciplinary Order terminating Petitioner Wilkinson. On February 15, 2022, Petitioner, through his counsel, filed a Petition for Appeal with the Civil Service Commission.

## 2. DIRECTIVES INVOLVED

Chief Wilson sustained Petitioner Wilkinson for violating two directives which provide, in relevant part, as follows:

CITY OF AURORA EMPLOYEE MANUAL POLICY

1.2 ANTI-HARASSMENT POLICY

> The City of Aurora prohibits harassment on the basis of any characteristic protected by law… For the purposes of this policy, harassment is verbal or physical conduct that denigrates or shows hostility toward an individual because of a legally protected characteristic and has the purpose or effect of creating an intimidating, hostile or offensive work environment or unreasonably interfering with individual's work performance, or otherwise adversely affects an individual's employment opportunities.
>
> Harassing conduct includes, but is not limited to epithets, slurs, or negative stereotyping; threatening, intimidating, or hostile acts; or denigrating jokes and display or circulation of written or graphic material that denigrates or shows hostility toward an individual or group (including through email).
>
> AURORA POLICE DEPARTMENT DIRECTIVE
>
> 10.9 DISCRIMINATION, HARASSMENT AND SEXUAL HARASSMENT COMPLAINT PROCEDURE
>
> The Aurora Police Department adheres to the City of Aurora Equal Employment Opportunity Policy except the portion on Reporting and Investigation of Harassment, which is covered by this Directive.

## 3. FINDINGS AND CONCLUSIONS

Based on the facts stipulated to by the parties in advance of the hearing, as well as the evidence presented during the hearing, the Commission finds and concludes as follows with regard to the directive violations asserted against Petitioner.

On September 21, 2021, the Colorado Attorney General issued a report finding, among other things, that the Aurora Police Department had a pattern and practice of racially biased policing. The report indicated this pattern and practice was the result of the culture within the Department and that because of the City's hiring practices Aurora police officers do not reflect the diversity of the City. Based on its report, the Colorado Attorney General initiated litigation against the City of Aurora. To resolve that litigation, the City of Aurora and the Colorado Attorney General entered into a Stipulated Consent Decree and Judgment pursuant to Section 23-31-113, Colorado Revised Statutes ("the Consent Decree").

The Consent Decree was intended to ensure that the City addressed the issues identified in the Attorney General's September 2021 report. A portion of the Consent Decree addressed the goal of improving the hiring of police officers to ensure a qualified public safety workforce that better reflects the City's diversity. The final version of the Consent Decree was released to the public on November 16, 2021 and was subsequently entered as an order of the District Court, Arapahoe County, Colorado.

At the time the Consent Decree was released to the public, Petitioner Wilkinson was the president of the Aurora Police Association ("the APA"). The APA is a labor organization that represents between 260 and 270 of the Aurora police officers, though it is not currently the designated local bargaining unit. The same day the Consent Decree was publicly released (November 16, 2022), Petitioner Wilkinson, as the president of the APA, using



Wilson 000777

Response to MSJ Ex. 24

his personal email address, sent an email to all APA members who had provided him with their email addresses, expressing his thoughts about the Consent Decree. It is this email that resulted in Petitioner Wilkinson's termination and that was the focus of the appeal hearing.

Petitioner Wilkinson's email stated, in part:

> [T]he elephant in the room for some of you is the "diversity" issue in hiring and promotions. "Diversity" isn't defined or justified by them. I suppose that the city could do political polling to make sure that the average politics of the department reflects the political "diversity" of "the community". Or, to match the "diversity" of "the community", we could make sure to hire 10% illegal aliens, 50% weed smokers, 10% crackheads, and a few child molesters and murderers to round it out. You know, so we can make the department to look like the "community".
>
> But I'm pretty sure that's not the "diversity" they are talking about. I'm pretty sure they are simply talking about the only currency leftists deal in: identity politics. We'd prefer that they focus on intelligence, personal ethics, and courage, which should be our only criteria for hiring and promotion. We should only be interested in merit. But that will never do. They're addicted to race and sex politics.
>
> The decree indicates that they want to replace as many of the department's white males as possible with as many women and minorities as possible. It's as simple as that.
>
> We already hire every minority that passes the minimum requirements. We can't make people apply, and people of different race and sex groups apply for police jobs at different rates. It's a cultural thing that we can't control and that won't quickly change.
>
> So, yes, the State's plan, fully embraced by the city, is literally systematically sexist and racist. The irony is impossibly thick. The "diversity" hiring and promotion plan won't work and isn't your problem so if I were you I'd forget about it. The department will be deploying new doctrine for only charging, arresting, or fight certain percentages of various race groups in order to avoid disparate impacts.
>
> Doug

One or more of the recipients of the email disclosed it to the media, who provided it to the public. On November 22, 2021, after a local news station aired a story disclosing and criticizing Petitioner Wilkinson's initial email, he sent a follow up email, responding to the news story and to comments he had received. Petitioner Wilkinson acknowledged his initial email had evoked negative responses from several recipients but attributed that to a failure by the recipients to accurately read what he wrote, rather than any flaw in his email. Petitioner Wilkinson adamantly defended his initial email stating, in part: "A campaign as vicious as the one proposed against us must be resisted, even if all we can do is call it out





Response to MSJ Ex. 24

for what it is." He also sought to defend his percentage characterization of the Aurora community in his initial email by asserting he was just trying to assist officers in performing their duties because the part of the Consent Decree that requires the City to reduce racial disparities "most likely means that if you are arresting people at a rate higher than the population percentage of the particular group you will be sanctioned."

Based on Petitioner Wilkinson's email, the City received two EEO Complaints from Aurora police officers alleging race, color and gender discrimination. A third written complaint asserting similar concerns was provided by another officer. All of the complaining officers were minorities or women or both. Pursuant to the rules governing EEO complaints, the names of the complaining officers were not disclosed to the Commission.

Because the matter involved EEO complaints in addition to alleged APD directive violations, the investigation was handled by Aurora Human Resources, rather than through the APD. Human Resources retained an independent investigator, Ms. Langhoff. Ms. Langhoff reviewed the written complaints and interviewed the complaining officers. Ms. Langhoff provided a report to Human Resources and Chief Wilson summarizing her investigation and setting forth her conclusions.

Ms. Langhoff reported the officers felt throughout their law enforcement careers they had to overcome an unspoken assumption by many that they are "less than" their white male counterparts. By "less than", they indicated they are frequently viewed as less qualified, less competent, less intelligent, and less deserving of promotion or highly desirable assignments. They indicated they have been subjected to ignorant comments, challenges to their competency, and to suggestions that they were in the positions they held due to their race and/or gender rather than their abilities. They all noted that while their race, color and/or gender have been an issue for them throughout their law enforcement careers, and in fact throughout their lives, they generally ignore ignorant comments and accept that while many people have racist attitudes, so long as they are not overtly expressed or acted upon, they have a live and let live philosophy. However, all the officers indicated that Petitioner Wilkinson's commentary to a large number of their colleagues crossed a line they simply could not ignore. The officers indicated Petitioner Wilkinson's comments were not only personally offensive, insulting and disrespectful, they perpetuate unfounded negative stereotypes and reflect contempt for and hostility toward the majority of the City's citizens along with disdain for officers who are not part of the white male majority.

The officers told Ms. Langhoff that although Petitioner Wilkinson characterized the plan under the Consent Decree as "sexist and racist", they felt his email was racist and sexist, particularly so in its suggestion that efforts to diversify the make-up of the APD would diminish the quality of officers on the force. The officers took personal offense at the implication that people who are not part of the white male majority are somehow not as valuable as those officers and seeking to develop a police force that more closely mirrors the community it serves would be detrimental to the department.

The officers were outraged at the notion that efforts to hire more minorities and women will require the department to lessen its focus on people with intelligence, personal ethics and courage. They were offended by Petitioner Wilkinson's suggestion that the only way

to hire minorities is to lower standards. Some of the complaining officers wondered how many of the recipients of Petitioner Wilkinson's email share his view and questioned whether APD was the place for them, particularly since there was no outcry by others about what they perceived to be patently racist and bigoted comments.

Ms. Langhoff discussed each of the most offensive portions of Petitioner Wilkinson's email with the complaining officers. Regarding Petitioner Wilkinson's statement about the percentage make-up of the community, the officers found his comment to reflect hostility toward a large number of individuals who are members of a protected class based on race and color. They deemed the comment denigrating and disparaging. Such a comment reflects negative stereotyping and undermines the APD and their individual desires, and related efforts to improve relations with the community and eliminate racial bias in policing.

Regarding Petitioner Wilkinson's comment that minorities gained their positions in the Department through the racist practice of invitation only promotional practice sessions, the officers indicated the statements were false and insulting, and imply that the officers cheated to get to where they were. The Commission finds this statement by Petitioner Wilkinson particularly egregious.

Regarding Petitioner Wilkinson's comment that the APD already hires every minority that passes the minimum requirements, the officers all felt the implication from this statement was that they merely met the minimum standards and were hired based on their protected status rather than on their competencies and capabilities to perform the work. All deemed the comment to be highly offensive.

Regarding Petitioner Wilkinson's statements that APD standards had already been lowered, the officers felt this comment suggested that was done to benefit minority applicants when, in fact, the same standards were applied to all applicants.

Based on the written complaints of the officers, her interviews of the officers, her interview of Petitioner Wilkinson, and her further investigation of the matter, Ms. Langhoff issued a written report concluding that Petitioner Wilkinson's email denigrated the officers and showed hostility toward them and other members of their protected class (minorities), caused the complaining officers and other members of the APD to be offended, insulted, hurt, diminished and denigrated based solely upon their minority status, and caused the officers to feel disrespected and uncomfortable in their workplace and to question whether they should remain with the APD, an agency to which they had collectively devoted decades of service.

Relying on Ms. Langhoff's investigation and recommendations from Acting IAB Commander Rossi and Chief Parker who reviewed Ms. Langhoff's investigation report, Chief Wilson sent Petitioner Wilkinson a memo informing him of her belief that there was sufficient evidence to support sustained violations of the City's Employee Manual Section 1.2 Anti-Harassment Policy and APD Directive 10.9 Discrimination, Harassment & Sexual Harassment.

Chief Wilson held a pre-disciplinary hearing with Petitioner Wilkinson on January 31, 2022 and a final disciplinary hearing on February 3, 2022. The same day, Chief Wilson

entered her disciplinary order, adopting the findings of Ms. Langhoff's report, sustaining violations of City of Aurora Employee Manual Policy 1.2 Anti-Harassment Policy and Aurora Police Department Directive 10.9 Discrimination, Harassment and Sexual Harassment Complaint Procedure, and terminating Petitioner Wilkinson effective immediately.

In response to the allegations against him, Petitioner Wilkinson's explanation to Ms. Langhoff during the investigation, to Chief Wilson during the pre-disciplinary hearing, and to the Commission during the appeal hearing was essentially the same throughout. He testified that the majority of the responses he received to his email were supportive and that those who had negative responses failed to carefully read what he wrote or simply misunderstood or misinterpreted what he said.

According to Petitioner Wilkinson, when his email is carefully read he does not believe his comments were offensive. His statements about the makeup of Aurora's citizenry was a "metaphorical" estimate of the type of misconduct amongst those he has interacted with during his time on patrol. His comment was meant to point out that in reality, the Consent Decree is not intended to get the police force to mirror the make-up of its citizens, but rather is premised on "race and sex politics" which he says the "leftist Chief, City Manager, and Attorney General" are addicted to. According to Petitioner Wilkinson, "the goal of the leftist regime is to reduce the number of white officers even if to do so, it must focus on hiring criteria other than intelligence, personal ethics and courage." The Commission finds Petitioner Wilkinson's explanation of what he was trying to say disingenuous.

According to Petitioner Wilkinson, he did not believe his email was divisive. Petitioner Wilkinson expressed little recognition or concern about the fact that some people might have been offended by his email, noting that his role is to do what he thinks is best for the majority of the APA membership. Petitioner Wilkinson further argued there was no evidence that anyone resigned from the APD as a result of his email nor that his email interfered with any specific officer's performance of their official duties. Petitioner Wilkinson's primary explanation and defense of his email, discussed in greater detail below, is that it was protected speech for which he cannot be investigated or disciplined.

As they relate to this case, Aurora Personnel Policy 1.2 regarding anti-harassment, and APD Directive 10.9 which requires adherence to the City's anti-harassment policy, are violated when an officer:

> ... denigrates or shows hostility toward a protected class, which includes minorities and women and has the... effect of creating an intimidating, hostile or offensive work environment or adversely affects an individual's employment opportunities...Harassing conduct includes, but is not limited to ...negative stereotyping... hostile acts...and circulation of written material that denigrates or shows hostility toward an individual or group."

Petitioner Wilkinson's characterization of the Aurora community as consisting of 10% illegal aliens, 50% weed smokers, 10% crackheads and some child molesters and murders, denigrated the Aurora community as a whole, which includes a large number of minorities and women.

Wilkinson's statements regarding reliance on race and sex rather than intelligence, personal ethics and courage in APD hiring are a clear insinuation that minority and women officers were hired on the basis of their race and sex, rather than their ability, qualifications and integrity. Those statements are negative stereotypes that denigrated all minority and female officers in the Department.

His statement that the City wants to "replace as many of the department's white males as possible with as many women and minorities as possible" is hostile to minorities and women and, frankly, to all groups other than white males.

His statement that "[w]e already hire every minority that passes the minimum requirements" is hostile and denigrates minority officers by indicating that the standards were lowered to enable them to pass the entrance exams, when in fact, the same standards were applied to all applicants.

The overall adverse impact of Petitioner Wilkinson's email, was hostile and offensive, stereotyping minorities and women, and creating an intimidating, hostile and offensive work environment and adversely impacting employment opportunities. This is perhaps most clearly evidenced in the words of the officers who objected to Petitioner Wilkinson's message, describing how the email caused them to feel and what impact it had on them as officers in the APD:

> Doug has taken away every ounce of respect and dignity that I have fought for.... It does not matter how hard I work whatever I get is given to me based solely on my race and gender and I am inherently not qualified to be doing this job.
>
> My entire life I've been told or made to feel that I've gotten something because of my skin color or sex...Based on Doug's statement I'm in [my current] position because I'm a black female and I stole it from a white male....How many of my fellow coworkers read this email from their union president and agreed? How many read it and now are questioning every position of a minority officer or now think they were turned down for a position because they are a white male?

The evidence is overwhelming that Petitioner Wilkinson violated the directives by sending an email that denigrated and showed hostility toward women and minorities, included negative stereotyping, had the effect of creating an intimidating, hostile and offensive work environment, and adversely affected employment opportunities for women and black officers within the APD. Accordingly, the Commission finds and concludes that Petitioner Wilkinson's conduct violated the directives.

Petitioner Wilkinson's primary defense was that even if his conduct violated the directives, his email is protected speech under the First Amendment and therefore cannot be used as the basis for imposing discipline.

The importance and centricity of the First Amendment's protection of free speech, and its underpinning of free thought, to fundamental freedoms enjoyed by all Americans cannot be overstated. "If there is any principle of the Constitution that more imperatively calls for

attachment than any other it is the principle of free thought – not free thought for those who agree with us but freedom for the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 654-655 (1929) (Justice Holmes dissent). The Supreme Court has consistently recognized "that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth." *Boy Scouts of America v. Dale*, 530 U.S. 640, 661 (2000) (quoting *Whitney v. California*, 274 U.S. 357, 375 (Barndeis concurring)).

In the area of public employment, the Supreme Court has held that public employees cannot be compelled to relinquish their First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation "of those for whom they work." *Pickering v. Bd. of Educ*, 391 U.S. 563, 568 (1968). When a public employee's speech "touches on matters of public concern, the First Amendment prohibits the government from taking an adverse employment action against the employee for such expression without sufficient justification." *Rankin v. McPherson*, 483 U.S. 378, 387, (1987).

The central issue before the Commission in this appeal is whether Petitioner Wilkinson's email was speech protected by the First Amendment and, if so, did the Chief have sufficient justification to discipline him despite that protection. Resolution of this issue requires the Commission to consider the five factors of the *Garcetti/Pickering* test set forth by the United States Supreme Court and articulated as recently as 2009 by the Tenth Circuit in *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). In the context of Chief Wilson's termination of Petitioner Wilkinson, the five *Garcetti/Pickering* factors are:

1. Whether Petitioner Wilkinson's email was made pursuant to his official duties.

2. Whether the email was about a matter of public concern.

3. Whether the APD's interest, as employer, in promoting the efficiency of providing police services are sufficient to outweigh Petitioner Wilkinson's free speech interests.

4. Whether Petitioner Wilkinson's email was a motivating factor in Chief Wilson's decision to terminate him.

5. Whether Chief Wilson would have reached the same decision to terminate in the absence of Petitioner Wilkinson's email.

The City did not dispute and apparently concedes that Petitioner Wilkinson has satisfactorily addressed the first, second, fourth and fifth elements of the *Garcetti/Pickering* test. Petitioner Wilkinson sent the email from his private email during his off-duty time in his capacity of president of a labor organization and not as part of his official duties as an Aurora police officer. The subject of the email, the Consent Decree, was and is a matter of public concern. The email was Chief Wilson's motivating reason for terminating Petitioner Wilkinson. But for the email, Chief Wilson would not have terminated him.

The sole *Garcetti/Pickering* factor disputed by the City is the third one – whether the Department's interest in efficiently providing police services and protection to its citizens outweighs Petitioner Wilkinson's interest in commenting about the Consent Decree.

As argued by the Chief, the "only public employer interest that outweighs the employee's free speech interest is avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships." *Duda v. Elder* 7 F.4th 899, 912 (10th Cir. 2021)(emphasis in original). This interest "is particularly acute in the context of law enforcement, where there is a heightened interest in maintaining discipline and harmony among employees." *Id.* (quoting *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995)).

Factors for the Commission to consider in determining whether Petitioner Wilkinson's email sufficiently disrupted the operations of the Aurora Police Department to cause it to lose the First Amendment protection it would otherwise enjoy, include: (1) whether it impaired discipline by superiors or harmony among co-workers, (2) whether it had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, (3) whether it impeded Petitioner Wilkinson's performance of his duties, and (4) whether it interfered with the operation of the Department. *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1207 (10th Cir. 2007).

The Commission recognizes and affirms that free speech is a fundamental right entitled to strong protection. However, that protection is not absolute and must give way where it jeopardizes the safety of others. For example, a person falsely yelling "fire" in a crowded theater is universally recognized as speech that is not protected by the First Amendment. Here, Petitioner Wilkinson's email which might have been otherwise protected by the First Amendment, lost that protection due to its disruption on the Aurora Police Department and the ability of its officers to protect the safety and well-being of the community, as well as themselves.

Effective law enforcement necessitates close working relationships among officers and requires confidence that other officers will work together and provide support in often intense and dangerous situations. Officer Wilkinson's email undercut those requirements of police work by causing officers to wonder about the support they will receive from other officers due to the color of their skin or their sex. In her report Ms. Langhoff noted the officers were concerned about retaliation caused by the email and "that retaliation in the form of a delayed response to a request for back-up could have life or death consequences."

If Petitioner Wilkinson had been allowed to remain a member of the Department, his email would almost certainly have impeded the future performance of his duties when they involved working with minorities and women. Petitioner Wilkinson could be wondering what the other officers were thinking and vice versa, all at a time when their sole focus should have been on providing safe and effective police services to the citizens of Aurora and protection to fellow officers. Those concerns would likely have been exacerbated if the police were responding to a call involving an individual that fell into any of the categories Petitioner Wilkinson demeaned and denigrated when characterizing the Aurora community. Petitioner Wilkinson's email separated members of the Aurora Police

Department according to race and sex at a time when its officers needed to be unified in working toward the common goal of achieving diversity.

His email "interfered with the operation" of the Aurora Police Department at every level. At the Departmental level, the Department had to respond to questions from the media and the public about Petitioner Wilkinson's racist and sexist comments at a time when the Aurora Police Department was already under heightened scrutiny for its lack of diversity and its past racial transgressions. Petitioner Wilkinson's email and its dissemination by the media was counterproductive to the efforts of the Department to recruit women and minorities to join the Aurora police force.

The email interfered at the level of relationships between and among officers by creating division between groups of officers, and uncertainty in the close working relationships and harmony required in order for officers to effectively and safely perform their law enforcement duties. Officers had to worry about whether they had been or would be promoted based on their race and sex or their abilities and character. Minority and women officers became concerned that other officers would think they had obtained any position they might hold unfairly. Officers even expressed concerns about whether officers with differing views would "have their back."

And at the level of individual officers, Petitioner Wilkinson's email interfered with officers by causing them to question their own abilities Perhaps most poignantly, Petitioner's interference at the individual officer level is evidenced by the statement of the black female officer who questioned why she would even want to remain with the Department if, in fact, the backwards view of Petitioner are shared by others in the APD.

Speech that undermines the ability of the police to work together securely and competently threatens their ability to safely and effectively protect the community they serve and, in turn, jeopardizes the safety of the public.

Based on the evidence and arguments presented, the Commission finds that proper police services are a critical aspect of a safe and secure society. Petitioner Wilkinson's email significantly and substantially interfered with the APD's operations and the relationships and environment essential to allow it to provide police services. It also interfered with the good order and discipline needed within the Department as a para-military organization, and the harmony needed among officers that allows them to work cohesively in critical situations.

The Department's interest in efficiently providing police services and protection to its citizens outweighed Petitioner Wilkinson's interest in commenting about the Consent Decree. Therefore, Petitioner Wilkinson's email was not entitled to the protections of the First Amendment.[1]

---

[1]Though not discussed during the appeal hearing, in his pleadings Petitioner Wilkinson seeks the protection of what is often referred to as "the Union privilege" (See *United States v. C.I.O.*, 335 U.S. 106 (1948) and Colorado's off-duty conduct statute (Section 24-34-402.4, Colorado Revised Statutes)), in addition to the First Amendment. For the same reasons that his email is not protected by the First Amendment, it is also not protected under Union privilege or the Colorado statute.

Accordingly, the Commission concludes the allegation that Petitioner Wilkerson violated City of Aurora Employee Manual Policy 1.2 Anti-Harassment Policy and Aurora Police Department Directive 10.9 Discrimination, Harassment and Sexual Harassment Complaint Procedure, is SUSTAINED. One Commissioner concluded that although Petitioner Wilkinson's email violated the directives, given the importance of the First Amendment, Petitioner Wilkinson's statements did not sufficiently interfere with the operations of the Department to cause it to lose its protection under the First Amendment, and therefore would not have sustained the violations.

## 4. DISCIPLINE

Whether a member of the Aurora Police Department committed violations as asserted by a Police Chief is determined solely by the Commission as the trier of fact in disciplinary appeals. Once the Commission has determined whether the violations have been established, the Commission must then decide, after giving due consideration to the Chief's need for administrative control over the Aurora Police Department, whether the Chief's discipline should be affirmed, reversed or modified.

Petitioner Wilkinson has a substantial disciplinary history, including four written reprimands, a ten-hour suspension and as recently as May of 2021, a 30-hour suspension involving an intemperate statement to a member of the public. However, it is primarily Petitioner Wilkinson's misconduct in this particular incident that leads the Commission to its conclusion regarding the propriety of his termination.

Throughout the investigation and the appeal hearing, Petitioner Wilkinson evidenced no remorse either for the content of his email nor for its adverse impact on the Aurora Police Department and its officers. When he sent his follow up email, Petitioner Wilkinson had the opportunity to acknowledge that his initial communication was poorly worded and to apologize for the problems it caused. Instead he blamed his readers for their inability to comprehend what he said and reiterated his racist and sexist views.

It is clear Officer Wilkinson has no intention of changing his ways regarding the efforts of the Department and the City to improve diversity within its police force and to comply with the Court edicts contained in the Consent Decree. If he is allowed to remain on the force he is likely to do all he can to interfere with and impede those efforts. These considerations indicate that he can no longer be a positive, contributing member to the Department.

During the hearing there was some discussion of a 2018 decision by a previous Commission in what was referred to as the DeShazer matter, and whether the Commission had acted appropriately in imposing discipline against an officer for making racial slurs. Specifically, Officer DeShazer referred to a group of black residents of a neighborhood as "Alabama porch monkeys." At the outset this Commission wants to be clear that DeShazer was not decided by the current Commission, does not reflect the views of the current Commission, and is not binding on it.

In addition, it is important to recognize what the previous Commission did and did not say in DeShazer, as reflected by the express language of the Commission's written decision.

The DeShazer Commission did not, in any manner, condone Officer DeShazer's misconduct. The DeShazer Commission stated:

> The Commission finds Petitioner's statement to be absolutely inappropriate and unacceptable, and should not have been made regardless of the circumstances or tension Petitioner faced...The Commission concludes that Petitioner's statement was absolutely reprehensible and should never have been uttered by an Aurora police officer...

The DeShazer Commission imposed the most severe discipline that had ever been imposed against an Aurora officer for using offensive language – demotion plus a year suspension without pay. The Commission refrained from terminating Officer DeShazer solely because such discipline would have been inconsistent with the discipline imposed by previous chiefs for egregious statements. Those previous incidents included an officer's use of the "N" word and the chief imposing only a 160-hour suspension, and another incident where the officer made a racially derogatory remark to a black suspect and the chief imposed only a written reprimand. The discipline imposed by the Commission in DeShazer was a substantial increase in the severity of discipline imposed for egregious and racially offensive statements.

Regardless of whether the DeShazer decision was appropriate when it was made, the challenges, racial tension, and need for diversity within the APD the City currently faces are even greater. Under current circumstances where the City and the Department are seeking cohesiveness and working diligently to achieve diversity, the Commission intends to send a clear message that racist and sexist statements that divide the police force and community have no place in Aurora. In light of the nature of Petitioner Wilkinson's statements in his email, the negative impact of those statements on the Department, and his lack of remorse and inability to understand or acknowledge the negative effects of his statements, the Commission concludes that termination is appropriate.

**5. ORDER**

Based on the foregoing findings and conclusions, the Commission hereby sustains the violations and approves Chief Wilson's termination of Petitioner Wilkinson.

ENTERED THIS 12th DAY OF JULY, 2022.

AURORA CIVIL SERVICE COMMISSION

[signature]

Harold Johnson, Chair